# EXHIBIT E:

# AFFIDAVIT OF ADRIAN HARDINGHAM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 7221**

BOSSE SHIPPING LTD

<u>Plaintiff</u>

-against-

GREAT WHITE FLEET LTD

<u>Defendant</u>

### AFFIDAVIT OF
### ADRIAN CHARLES HARDINGHAM

I, ADRIAN CHARLES HARDINGHAM, of 22- 23 Great Tower Street, London EC3R 5HE, state on oath:

1. I am the Senior Partner of Holmes Hardingham, Solicitors, practising at 22 – 23 Great Tower Street, London EC3R 5HE.

2. I have been requested on behalf of Great White Fleet Ltd to comment on the Verified Complaint dated 13th August 2007 of Bosse Shipping Ltd.

3. The contents of this Affidavit are true to the best of my knowledge, information and belief. The sources of my information and the grounds for my belief are communications, information and documentation provided on behalf of Great White Fleet Ltd.

1

4. I qualified as a Solicitor in 1978 and since then have practised in maritime and commercial law in the City of London. In 1980 I was made a Partner of Ingledew Brown Bennison & Garrett. Holmes Hardingham was established as a firm in 1989 and I have been a Partner of it since then.

5. I understand that this action has been brought by Bosse Shipping Ltd to obtain security in respect of claims made by it against Great White Fleet Ltd in aid of London arbitration proceedings.

6. The Charterparty dated 1st April 2005 between Bosse Shipping Ltd as Owners and Great White Fleet Ltd as Charterers provides for the application of English law and London arbitration. Each of the parties has nominated a London arbitrator. Robert Gaisford has accepted appointment as Great White Fleet Ltd's arbitrator.

7. I note that paragraph 7 of Bosse Shipping Ltd's Verified Complaint in this action places reliance on Clause 77 of the Charterparty. This clause provides as follows:

   "**77.Syria**
   Charterers can trade Syria if required on basis that Charterers will provide an LOI in respect of present or future Customs fines in respect of this Charter".

   The allegation in paragraph 7 of the Complaint is that Great White Fleet Ltd have in breach of charter failed and refused to provide the LOI or to pay the Customs fine. This fine is referred to in paragraph 6 of the Complaint where it is stated that the amount was US$420,000 and that it was imposed against the vessel *in rem* as a result of a previous call of the vessel to Syria in April 2001 when the vessel sailed under a different name and was under different ownership.

8. I note that Clause 77 of the Charterparty refers to "present or future Customs fines in respect of this Charter". As is clear from paragraph 6 of the Complaint of

2

Bosse Shipping Ltd. the fine of US$420,000 which was levied was a past Customs fine which did not arise under this Charter. I can therefore see no basis on which Bosse Shipping Ltd's claim against Great White Fleet Ltd for US$153,600 (representing the amount of the Customs fine not recovered by Bosse Shipping Ltd from the vessel's former owners) can succeed. Any LOI (Letter of Indemnity) provided by the Charterers under Clause 77 of the Charter would not be required to cover a fine levied prior to the existence of the charter. An LOI would only have to be in respect of Customs fines levied in respect of the trading of The "BOSSE" to Syria pursuant to this charter and the LOI would be expected to cover such a fine whether already levied when the LOI comes into existence or to be levied subsequently.

9. The next head of claim referred to in Bosse Shipping Ltd's Complaint is for US$94,709.27 in respect of amounts alleged to have been improperly deducted from hire.

10. Clause 11 of Part II of the Charterparty is entitled "Suspension of Hire etc", but Clause 41 of the Riders to the Charterparty is of more direct relevance. Clause 41 provides as follows:

> "41. **Seizure, Detention, Arrest**
> Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents.

> The Owners shall indemnify consequences the Charterers may suffer or incur by reason of her seizure or detention or arrest or delay, even if such reason frustrates this Charter Party."

11. This Clause is of no assistance to Bosse Shipping Ltd. There was no "personal act or omission or default" of Great White Fleet Ltd or their agents. The arrest of the vessel was occasioned by some event which occurred in April 2001 when the vessel, with a different name and under different ownership, called at Syria. Clause 77, which relates only to the issue of a Letter of Indemnity, is of no relevance in this respect.

12. It follows that all time lost by reason of the vessel being arrested by the Syrian Government during the currency of this charterparty is to be treated as off-hire in accordance with Clause 41. The wording of Clause 41 is clear in this respect and it seems unnecessary to refer to any authorities. I will however for the sake of completeness mention the recent decision of the English Court of Appeal in Hyundai Merchant Marine Co Ltd -v- Furnace Withy (Australia) Pty (The "DORIC PRIDE") [2006] 2 Lloyd's Rep. 175 of which for ease of reference I attach a copy as part of the Exhibit "ACH 1" to this Affidavit.

13. In the "DORIC PRIDE", there was a trip time charter for a voyage from the US Gulf to South Korea. The Charterparty contained Clause 85 which provided:

> "Capture, Seizure Arrest
> Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this charter-party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for owners account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission

4

> or default of the charterers or their agents or by reason of cargo carried or calling port of trading under this charter."

14. The vessel was detained on her way to call at New Orleans, for the purposes of loading a cargo. The detention was on the orders of the Captain of the port pursuant to US legislation which had been put in place for security purposes. Under this the vessel had been identified as a "High Interest Vessel". It was held that the vessel was off-hire pursuant to Clause 85.

15. Owners placed no reliance on the words "any personal act of omission or default of the Charterers or their agents" within Clause 85. Rather, they relied on the words "by reason of cargo carried or calling port of trading under this charter". The latter wording does not appear in Clause 41 of the Charterparty with which we are concerned. However it is instructive to note the approach taken by Lord Justice Rix who gave the leading Judgment in the Court of Appeal.

16. In paragraph 35 of his Judgment, Lord Justice Rix summarised the question as being: on which side of the line of either owners' responsibility or charterers' responsibility do the facts of this case fall? His conclusion appears in para. 45 of his Judgment as follows:

> "45. Ultimately, it seems to me that the fact that the vessel is a first time caller at the United States is a matter which goes to the status of the vessel. It is something like a vessel about to transit the Suez or Panama Canal needing to have its documents in order (see clause 56). A charterer is not obliged to know, in this case the charterers did not know, but the essential point is, he is not obliged to know what the US status of a vessel that he charters is. However, owners know what their vessel's status is, or are required to know it."

5

17. In our case, the question of the exposure of the vessel to an arrest by the Syrian authorities as a result of a Customs fine incurred when the vessel was in previous ownership clearly falls on the side of owners' responsibility. It was they who had purchased the vessel and were in a position to check that they were buying the vessel free of encumbrances and that they would be indemnified by the previous owners for any encumbrances which might remain. It is unclear why a full indemnity has not been recovered by Bosse Shipping Ltd from the former owners, as occurred in The "BARENBELS" [1985] 1 Lloyd's Rep. 528, a decision of the English Court of Appeal.

18. The claims of Bosse Shipping Ltd against Great White Fleet Ltd for the balance of the Customs fine and for amounts said to have been deducted improperly from hire have no basis in fact or law.

19. Bosse Shipping Ltd's Complaint also refers to a claim for US$750,295.71 which is the sum claimed by Chiquita.

20. The assertion is made in paragraph 16 of the Complaint that, pursuant to English law, breach by Great White Fleet Ltd of Clauses 9 and 77 of the Charterparty has directly led to Bosse Shipping Ltd incurring potential liability to Chiquita. All other questions apart, it seems to me that there is here a lack of logic. Any breach by Great White Fleet Ltd of an obligation to indemnify Bosse Shipping Ltd cannot have led to Bosse Shipping Ltd incurring a potential liability to Chiquita. The potential liability must come first, followed by any obligation which there may be of Great White Fleet Ltd to provide an indemnity.

21. The second sentence of paragraph 16 of the Complaint is worded as being a corollary of the first sentence and must therefore also fail as a matter of logic. The second sentence of the paragraph contends that Bosse Shipping Ltd's claim for the damages asserted by Chiquita is presently ripe.

22. Clauses 9 and 77 of the Charterparty do not under English law provide any basis for Bosse Shipping Ltd to claim an indemnity from Great White Fleet Ltd in respect of the US$750,295.71. I have referred above to Clause 77. It is on its wording inapplicable to the facts of this case. As for Clause 9 and as was made clear by Mr. Justice Donaldson in The "WHITE ROSE" [1969] 2 Lloyd's Rep 52:

> "A loss may well arise in the course of compliance with the time charterers' orders but this fact does not, without more, establish that it was caused by and is in law a consequence of such compliance and, in the absence of proof of such causation, there is no right to indemnity".

23. In the present case, Chiquita's claim against Bosse Shipping Ltd derives from the latter's failure to take proper steps to ensure that the vessel was when purchased free from encumbrances. This is not a matter for which Great White Fleet Ltd has any obligation to provide Bosse Shipping Ltd with an indemnity.

24. In my view, therefore, Bosse Shipping Ltd's claims against Great White Fleet Ltd have no basis in fact or law and will fail before the English arbitrators applying English law. It follows that Bosse Shipping Ltd's claims for interest and costs will also fail, and indeed Great White Fleet Ltd will be awarded costs against Bosse Shipping Ltd.

25. However, for the sake of completeness I will comment on the figures put forward for interest and costs in the Complaint. The figure mentioned for interest is US$107,329.88 which is stated to have been calculated at the rate of 8% per annum compounded quarterly. I attach (as part of Exhibit "ACH 1") an interest rate table obtained by my firm from the London Maritime Arbitrators Association under whose rules this arbitration would be conducted. In May 2005 when the vessel was arrested at Tartous the rate quoted in the table was 3.26%. Adding 2.5% in accordance with the suggestion appended as a note to the table gives 5.76%. Whilst the rates have increased since then, they have at no time produced

7

a figure of 8%. In my view arbitrators would be likely to award interest at a rate between 5% and 6% p.a. I would not expect the interest to be compounded.

26. The figure put forward on behalf of Bosse Shipping Ltd, in the Complaint, for estimated recoverable lawyers' fees, costs and the costs of the arbitration is US$380,000. This currently equates to amount GBP 189,375. In English proceedings for security for a claim, it would be a requirement that a breakdown be provided showing the derivation of the figure claimed for costs. No such breakdown appears in the Complaint. This would incline an English tribunal against Bosse Shipping Ltd on the issue of the reasonableness of the figure put forward. In any event, the figure is in my view inflated. An appropriate figure would be GBP 100,000 equating to US$ 200,000.

SWORN this 5th day of September 2007
at 51 Eastcheap in the City of London

Before me,

*[signature]* OWEN MCHUGH

*[signature]*

Clyde&Co
51 Eastcheap
London
EC3M 1JP

A Solicitor empowered to administer Oaths

8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BOSSE SHIPPING LTD

Plaintiff

-against-

GREAT WHITE FLEET LTD

Defendant                                    07 CIV 7221

# AFFIDAVIT OF
# ADRIAN CHARLES HARDINGHAM

Holmes Hardingham
22-23 Great Tower Street
London   EC3R 5HE

Tel: +44 (0) 20 7280 3200
Fax: +44 (0) 20 7280 3201
Email: Adrian.Hardingham@hhlaw.co.uk

9

UNITED STATES DISTRICT COURT  
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 7221**

BOSSE SHIPPING LTD

<u>Plaintiff</u>

-against-

GREAT WHITE FLEET LTD

<u>Defendant</u>

### EXHIBIT "ACH 1"

This is the Exhibit marked "ACH 1" referred to in the Affidavit of Adrian Charles Hardingham sworn before me this 5th day of September 2007

..................... (OWEN MCHUGH) .....

Solicitor empowered to administer Oaths

Clyde&Co  
51 Eastcheap  
London  
EC3M 1JP

1

Vol 2

[CA

on the
eal on

[2006] Vol 2　　　　LLOYD'S LAW REPORTS　　　　175

CA]　　　　　　　　The "Doric Pride"　　　　　　　　PART 3

## COURT OF APPEAL

25 January 2006

### HYUNDAI MERCHANT MARINE CO LTD
v
### FURNACE WITHY (AUSTRALIA) PTY

### THE "DORIC PRIDE"

[2006] EWCA Civ 599

Before Lord Justice BROOKE, Lord Justice RIX, and Sir PAUL KENNEDY

**Charter-party (time) — Off-hire — Vessel chartered for trip from US Gulf to South Korea — Charterers directed vessel to load at New Orleans — Vessel ordered by US Coast Guard to await security clearance before entering Mississippi river — Whether vessel "detained" within meaning of off-hire clause — Whether delay caused by USCG — Whether delay "occasioned by calling port of trading under this charter".**

The vessel *Doric Pride* was hired by the claimant charterers from the defendant disponent owners under a charter-party dated 30 January 2004 on the NYPE form as amended for one time charter trip from the US Gulf to South Korea.

On 2 February 2004 the charterers instructed the master to proceed to New Orleans to load a cargo of soya beans for carriage to South Korea. On 17 February 2004 the master gave his ETA at the south west pass to New Orleans as 1430 on 20 February. On 19 February 2004, while the vessel was still outside US territorial waters, the master was notified by telex from the United States Coast Guard (USCG) that the vessel had been targeted as a "High Interest Vessel", and as such was prohibited from entering the lower Mississippi and was directed to a waiting position until inspected by a USCG boarding team.

"High Interest Vessel" was a designation under security procedures introduced in the United States following the September 11 attack on the World Trade Center. The USCG used the term High Interest Vessel to describe a commercial vessel intending to enter a US port that might pose a high relative risk to that port. In any specific instance the decision to board and inspect a vessel was a matter for the captain of the port. In February 2004 the policy at US Gulf ports, particularly at New Orleans, was to board and inspect vessels that were first time callers to the United States, which *Doric Pride* was.

On 20 February 2004 at 0920 the vessel arrived at the location designated by the USCG for her to await inspection. At that stage it was anticipated that the inspection would take place the following day. However, as a result of a collision between two vessels at about 0500 on 21 February, the south west pass was closed from about 0600 on that day, and the river was not reopened until 1300 on 25 February 2004. Shortly after the collision on the morning of 21 February the vessel was directed by the USCG to move from her original waiting location to await inspection at the south west pass anchorage.

Had the vessel not been awaiting inspection, she would have been able to proceed upriver to her loading berth, but the effect of the collision would have been to delay her passage down river from that berth. Moreover, as a result of the collision the available resources of the USCG were engaged in a search and rescue operation, so that inspection of *Doric Pride* was delayed until 26 February when it was successfully completed at 1245. The vessel was thereupon cleared to proceed up river to her loading berth.

A dispute arose in relation to the meaning of clause 85 of the charter-party, which provided:

　Capture, Seizure Arrest

　Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this charter-party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for owners account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the charterers or their agents or by reason of cargo carried or calling port of trading under this charter.

The charterers contended that the vessel had been detained within the meaning of clause 85 while awaiting inspection by the USCG, and was therefore off-hire between 0920 on 20 February 2004 until 1245 on 26 February. The owners contended that the "calling port of trading" proviso applied because the detention was caused by the charterers' order to proceed to and load cargo at New Orleans.

At first instance Mr Peter Crane QC, sitting as a Deputy Judge of the High Court, held that the vessel was off-hire between 0920 on 20 February 2004 and 1245 on 26 February 2004 in accordance with the main part of clause 85. He found that the vessel had been detained because she was a first time caller to the United States. He held that the "calling port of trading" proviso did not apply because the owners had assented to the risk of a security detention by contracting expressly for carriage from the United States.

The owners appealed.

—————*Held*, by CA (BROOKE and RIX LJJ and Sir PAUL KENNEDY), that the appeal would be dismissed.

(1) Clause 85 reflected the basic distinction in a time charter-party between matters which were the responsibility of the owners, and matters which were the responsibility of the charterers. The main part of the clause was intended to apply to matters which lay on the owners' side of responsibility, essentially the vessel and crew, whereas the proviso was intended to apply to matters relating to the charterers' employment of the vessel and crew for their trading purposes, which lay on the other side of the line (*see* para 33).

(2) In determining on which side of the line the facts of the present case fell, it was necessary to ask why the US legislation had the effect of detaining the vessel, and in particular, whether it was because of something for which the owners were responsible, or something

for which charterers were responsible (*see* paras 43 and 44).

(3) The judge had been correct to conclude that, in the circumstances of the present case, the vessel's detention on the approach to a port of calling was a matter for which the owners, and not the charterers, were responsible. The fact that the vessel was a first time caller at the United States was a matter which went to the status of the vessel (*see* paras 45, 46 and 49).

---

The following cases were referred to in the judgment:

*Itex Itagrani Exports SA v Care Shipping Corporation and Others (The Cebu) (No 2)* [1990] 2 Lloyd's Rep 316;
*Ocean Tramp Tankers Corporation v V/O Sovfracht* (CA) [1963] 2 Lloyd's Rep 381;
*Royal Greek Government v Minister of Transport* (1949) 83 Ll L Rep 228;
*St Vincent Shipping Co Ltd v Bock Godeffroy & Co (The Helen Miller)* [1980] 2 Lloyd's Rep 95;
*Transatlantic Petroleum Carriers v Cook Industries Inc (The Mary Lou)* [1981] 2 Lloyd's Rep 272;
*Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)* (HL) [2001] 1 Lloyd's Rep 147; [2001] 1 AC 638.

---

This was an appeal by Furness Withy (Australia) Pty, disponent owners of the vessel *Doric Pride*, against the decision of Mr Michael Crane QC, sitting as a Deputy Judge of the High Court ([2005] 2 Lloyd's Rep 470) granting a declaration in favour of the charterers Hyundai Merchant Marine Co Ltd that the vessel was off hire between 0920 on 20 February 2004 and 1245 on 26 February 2004.

Nigel Cooper, instructed by Bentleys Stokes & Lowless, for the disponent owners; Philip Edey, instructed by Holman Fenwick & Willan, for the charterers.

The further facts are stated in the judgment of Rix LJ.

Wednesday, 25 January 2006

---

**JUDGMENT**

**Lord Justice RIX:**

1. This is what nowadays is a very rare bird, namely a case in the courts about off-hire, under a time charter; the sort of dispute which tends to go to arbitration and not to figure in the courts at all. The issue arises in the following way. The appellants, Furnace Withy (Australia) Pty, are the disponent owners of the vessel, *Doric Pride*, under a trip time charter for a voyage from the US Gulf to South Korea. The respondents are their charterers, Hyundai Merchant Marine Co Ltd. I will refer to the parties as owners and charterers, respectively. Above the sub-time charter with which we are concerned there are two time charters, each of them for 35 to 37 months on typical broad trading limit terms between, first of all, head owners and first charterers, and then between those first charterers as disponent owners and the owners who are before the court in this case. The issue arises out of a special off-hire clause concerned with capture, seizure or arrest; clause 85 of the time charter. It reads:

> Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this charterparty, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the charterers or their agents or by reason of cargo carried or calling port of trading under this charter.

2. In reciting that clause I have amended two occasions where the word "of" appears for the word "or", as everyone accepts. The issue is whether the detention of the vessel on her way to call at New Orleans, for the purposes of loading a cargo, the detention being on the orders of the captain of the port, pursuant to US legislation designed for security purposes following the 9/11 disaster and under which the vessel had been identified as a "High Interest Vessel" or HIV, should fall within the first half of the clause and therefore lead to the vessel being off-hire or within the proviso towards the end of the clause and therefore should lead to the vessel remaining on hire. The judge held the vessel to be off-hire within the main part of the clause. The owners appeal.

3. The background facts I can take almost verbatim from the judgment below, which is that of Mr Michael Crane QC, sitting as a Deputy High Court Judge, and for which I am grateful. The charterparty in question is dated 30 January 2004. It is on the NYPE form with various amendments and additional clauses. Pursuant to that charter on 2 February 2004 the charterers instructed the master to proceed to New Orleans to load a cargo of 45,000 metric tonnes plus or minus 10 per cent soya beans, for carriage to ports in South Korea. The vessel was delivered to the charterers, pursuant to the terms of the charter, on dropping last outward

[2006] Vol 2    LLOYD'S LAW REPORTS    177

CA]    The "Doric Pride"    [RIX LJ

sea pilot at Hartlepool, and that was on 4 February 2004.

4. On the same day the vessel's agents in New Orleans asked the vessel's managing agent whether this was her first trip to the United States indicating that if it was, they anticipated that the vessel would be designated a "High Interest Vessel", with the result that she would be prevented from entering port until such time as the US Coastguard had conducted a security boarding. In fact because the vessel was a comparatively new one, having been built during 2001, this was her first trip to any United States port. There was however uncontroverted evidence at the trial that the charterers did not know that at the time of the charter.

5. "High Interest Vessel" is a designation under security procedures introduced in the United States following the 9/11 attack. The Marine Transportation Safety Act 2002 was enacted to protect the ports and waterways in the United States from terrorism. Under that Act the United States Coastguard ("USCG") was required to develop a risk-based system for evaluating the potential for security violations in US waters.

6. In December 2003 the USCG published a circular entitled "Coastguard ports date control targeting and boarding policy for vessel security and safety". Under this circular the term "High Interest Vessel" was used to describe "a commercial vessel intending to enter a US port that may pose a high relative risk to that port". Various matrices were established to assist in assessing the level of risk imposed by a given vessel, but in any specific instance the decision to board and inspect was a matter for the captain of the port or his staff. The reason for any individual decision and the intelligence upon which it was based always remained classified. However, on the evidence before the judge below, he was satisfied that (see para 33 of his judgment):

> The vessel was probably stopped because she was a first time caller to the United States and in so far as there was a USCG policy of inspecting first time callers, the policy was general to Gulf ports rather than specific to New Orleans. If this is right the vessel would probably have been stopped at any Gulf port on her first visit to the United States, albeit inspection might be regarded as even more likely if New Orleans is the nominated port.

7. On 17 February 2004 the master of the vessel gave his ETA at the south-west passage to New Orleans and on 19 February he was notified by telex from the USCG that the vessel had been targeted as a High Interest Vessel, was therefore prohibited from entering the lower Mississippi river and was directed to a given position in the south-west pass, north-west approach, safety fairway until found satisfactory by a coastguard boarding team.

8. On 20 February 2004 at 0920 the vessel arrived at the designated location to await her inspection. At that stage it appears to have been anticipated that the inspection would take place during the following day. We have been informed by counsel that as a routine matter the inspection itself typically lasts only 45 minutes and that may have been the position in this case itself.

9. What unfortunately happened however was that while the vessel was at anchor awaiting the coastguard boarding team, there was a serious collision between two vessels at about 0500 on 21 February, which led to the closure of the south-west pass from shortly after that time. The pass was not re-opened until 1300 on 25 February 2004 and it was another consequence of the collision that the available resources of the USCG were engaged in search and rescue operations and connected matters with the result that the inspection of the vessel was delayed until 26 February. It was successfully completed that day at 1245; and the vessel was cleared to proceed up river to her loading berth.

10. The effect of this delay was that the vessel was detained at anchorage between 0920 on 20 February 2004 and 1245 on 26 February 2004, during which time, if the vessel was on hire, a sum of US$257,732.77 would have been payable. The issue at trial and on this appeal is whether the vessel was off-hire during that period or whether that amount of hire which has been in escrow since the dispute arose was payable.

11. It is common ground that if the off-hire part of clause 85 operates it is a period off-hire clause and not a net loss of time clause, and therefore the simple question on appeal is whether for the period which I have stated the vessel was on-hire or off-hire.

12. I recited the relevant clause at the beginning of this judgment, but I need to refer to some other clauses in the charter before considering the submissions of the parties and the judge's solution. The agreed trip under the charter was expressed in these terms at lines 14 and 15:

> ... one time charter trip via safe anchorage(s), safe berth(s), safe port(s) always afloat, always institute Warranty Limits from US Gulf to South Korea with bulk grain, duration of about 65–75 days without guarantee ... within below mentioned trading limits.

13. I should also refer to the following clauses. Clause 1 is the standard NYPE clause stating the owners' essential obligations under the time charter, namely what they were to provide and pay for. It concludes by referring to the owners' obligation to:

... maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment with inspection certificates necessary to comply with current requirements at port of call for and during the service.

14. Clause 2 is again the standard NYPE clause, albeit slightly amended in this case, expressing what, whilst on hire, the charterers were obliged to provide and pay for, including such things as port charges. At lines 42 to 43 of this clause is the sentence:

Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this Charter to be for Charterers account.

15. Clause 8 is the typical NYPE clause, again very slightly amended, under which the vessel was under the orders and directions of the charterers as regards employment and agency, but charterers were to load, stow, trim, discharge and tally the cargo at their expense under the supervision of the captain. Clause 15 is the standard NYPE off-hire clause, which I need not set out.

16. Clause 26 states:

Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, acts of pilots and tugboats and all other matters, same as when trading for their own account.

17. The remaining clauses are additional clauses to the NYPE form. Clause 52 relates to fines which might be imposed on the vessel, owners, master, officers or crew, or on charterers originating from master, officers or crew contravening local port or customs regulations particularly as regards to smuggling. The clause stated that such fines were:

... to be for Owners' account and Charterers are not to be responsible for any consequences resulting from such offence.

18. Clause 55 is an additional off-hire clause as follows:

In the event of loss of time due to boycott of the vessel by labour, because of vessel's flag or nationality of Owners, Master, Officers or Crew, or the terms and conditions under which the Master, Officers or Crew are employed, payment of hire shall cease for the period of such inefficiency and Owners to pay all directly related expenses occasioned thereby.

19. Clause 56 is a particular clause designed to deal with Suez and Panama Canal problems. It reads:

Throughout the period of this Charter, vessel to have on board a Current valid Suez Canal and Panama Canal Certificate, and vessel and her fittings/equipment to comply with all applicable requirements/regulations of the Canal Authorities. Any delays and extra expenses incurred in transit of Canal through vessel's lack of proper Certificate/fittings to be for Owners' account. Vessel does not have Suez Canal searchlight.

20. Finally and immediately before clause 85, which is the particular focus of this appeal (see para 1 above), there is clause 84, which is headed "Quarantine":

Normal quarantine time and expenses for the vessel's entering port shall be for Charterers' account, but any time of detention and expenses for the quarantine due to pestilence, illness etc of Master, officers and crew shall be for Owners' account. Any detention and/or expense due to ports called or cargoes carried to be for Charterers' account.

21. In his submissions on behalf of the owners, Mr Nigel Cooper submits that the situation in this case falls simply and plainly within the words of the proviso to clause 85. He submits that this is a case of an express exception to the off-hire otherwise provided under the clause by reason of detention by any authority or by any legal process: because this was a simple case of a detention, albeit by the US Coastguard authority and by legal process, by reason of "calling port of trading under this charter", namely the vessel's imminent call at New Orleans.

22. He therefore submits that in coming to the opposite conclusion, that these facts fell within the first part of the clause, so as to make the vessel off-hire, the judge had erred in two fundamental respects. First, he had erred in considering this time charter to be "essentially a voyage charter transaction", see para 25 of the judgment below.

23. Secondly, Mr Cooper submits that the judge erred fundamentally in contrasting, for the purposes of clause 85, this trip time charter with the classic three-year time charters above it in chain.

24. Thus, at paras 26 to 28 of his judgment, by reference to well-known jurisprudence concerned with employment and indemnity clauses such as the implied indemnity clause to be found in clause 8 of the NYPE form, the judge drew a distinction between a time charter under which charterers have a broad, or at any rate broader, discretion to nominate ports to which a vessel is to trade, and on the other hand, as here, a trip time charter under which the ports of call of loading and discharge are much more closely circumscribed, either by being expressly named within the charter or as in this case by being closely limited by reference to a trading range such as the US Gulf.

25. The judge went on to develop this distinction by reference to the facts of this case, pointing out that since on his findings the probability was that

the vessel would have been detained as an HIV first time calling vessel at any port in the US Gulf, and perhaps indeed at any US port at all, nothing rested on the particular nomination of New Orleans as the loading port. Thus he concluded, at para 34, having set out his finding in the previous paragraph which I have already recited about the probability that the vessel would have been stopped at any US Gulf port as a first time caller, that:

> All this falls far short of demonstrating the necessary causal link between the nomination of New Orleans, as distinct from some other Gulf port, and detention by the USCG. In my judgment the evidence leads to the conclusion that the risk of boarding and inspection by the USCG under laws enacted after the World Trade Center attack was a risk general to any vessel calling at any US Gulf port, particularly if she was calling at a US port for the first time. This risk did not flow from an act or omission of Charterers or from their nomination of a particular loading port. It was a risk inherent in the voyage agreed in the single trip time charter.

26. Therefore the judge left open the possibility that, whereas he was finding the vessel to have been off-hire under this trip sub-charter, it may have been on hire under the latter part of clause 85 under the three-year time charters further up the line.

27. This suggestion of the judge led to Mr Cooper's submission that this would be a surprising and unfortunate result under a chain of charters which, for relevant purposes, in particular for the purposes of clause 85, were and were intended to be back-to-back. As it is we have been informed that all the parties in chain had agreed to be bound by the decision of the courts in the issue joined between these owners and charterers. Nevertheless the submission made by Mr Cooper is a general one, irrespective of that particular agreement.

28. Thus, for the purposes of supporting these two main criticisms of the judge's reasoning, Mr Cooper has directed our attention to cases in which trip time charters had been unsuccessfully argued for various purposes to be essentially voyage rather than time charters, and to be construed in accordance with that way of looking at the matter: see *Ocean Tramp Tankers Corporation v V/O Sovfracht* [1963] 2 Lloyd's Rep 381 at 388, *Itex Itagrani Exports SA v Care Shipping Corporation* [1990] 2 Lloyd's Rep 316 at 320 and *Whistler International Ltd v Kawasaki Kisen Kaisha Ltd (The Hill Harmony)* [2001] 1 Lloyd's Rep 147 at 156 col 1; [2001] 1 AC 638 at 652. In those cases there are classic expositions to be found of the essential difference between any time charter, whether for a long period or for a trip, on the one hand and voyage charters on the other. The essential point is, for present purposes, that under a voyage charter the risk of delay on an approach voyage is the owner's risk, the charterer is only at risk once the vessel becomes an arrived ship and goes on demurrage, whereas under a time charter the risk of delay is fundamentally on the charterer, who remains liable to pay hire in all circumstances unless the charterer can bring himself within the plain words of an off-hire provision.

29. In my judgment these citations are apposite and the judge was in error in describing the time charter in question as "essentially a voyage charter transaction"; and to the extent that he may have been influenced by that in the construction of clause 85, it seems to me that Mr Cooper's criticism is well made. The question remains, however, whether that makes a crucial difference to the decision which would be made on the facts which have been found in relation to clause 85.

30. In relation to his second main criticism, Mr Cooper referred us to the well-known judgment of Devlin J in *Royal Greek Government v Minister of Transport* (1949) 83 Ll L Rep 228 at 234, where Devlin J described in classic terms the function of an implied indemnity provision, but ended by allowing the possibility that express provision may lead to a different result. In effect Mr Cooper was saying that the clause 85 proviso was an express provision which took this case out of the area of debate about whether implied indemnities about trading operated under charters where the trade was agreed.

31. Mr Cooper went on to cite examples of the effectiveness of an express safe port warranty, even in cases of charters to nominated ports, such as *The Helen Miller* [1980] 2 Lloyd's Rep 95 at 101 and *The Mary Lou* [1981] 2 Lloyd's Rep 272. Those citations are, in my judgment, again apposite. It is of course standard law that express warranties and provisions must be given their true effect, such as they are, and that there is only room for the implication of an indemnity clause to the extent that the express provisions do not allocate risks in other inconsistent ways. Even so, however, the question remains as to the choice between finding that the facts of this case come within the first half of clause 85 or its proviso.

32. For these purposes one has to stand back for a moment in my judgment and ask the question, "What is the distinction which clause 85 is seeking to make between the primary part of the clause and the proviso with which it ends?" It will be recalled therefore that the essence of clause 85 is that, by contrast to the normal rule for the incidence of hire under a time charter, to which I have already referred, *prima facie* time during which a vessel suffers capture, seizure, detention or arrest by an

authority or by legal process shall be time at the risk of the owners and not the charterers, unless perchance such capture, seizure, detention or arrest falls within the proviso, which brings the risk back to the charterers. What is that proviso concerned with? It is concerned essentially with two things. One is "any personal act of omission or default of the Charterers or their agents", and the other is "by reason of cargo carried or calling port of trading under this charter".

33. We are not here concerned with personal act, omission or default of the charterers or their agents, but it is submitted by Mr Cooper that this is a case of detention by reason of calling port of trading. It seems to me that when one looks at clause 85 in the context of the other clauses under this charter to which I have referred in this judgment, one sees that there is within the express wording of the particular clauses a basic distinction which the draftsman seeks to make, and which is entirely familiar to owners and charterers, between those matters which lie upon the owners' side of responsibility, essentially the vessel and crew, which the owners have to provide to the charterers, and those matters relating to the charterers' employment of the vessel and crew for their trading purposes, which lie upon the other side of the line. Thus one has come across reference to "cargoes carried or ports visited while vessel is employed under this Charter" in clause 2 and "ports called or cargoes carried" in clause 84 as well. Those are the closest analogous expressions to the words which fall to be construed in clause 85, but the point I seek to make is a more general point than that: in its various forms of wording the charter seeks to draw the line, which can often be a difficult line to draw in just a few words, between matters which are the owners' responsibility and matters which are the charterers' responsibility. It is possible to see this line being drawn in clauses 1, 2, 8, 15, 26, 52, 55, 56, 84 and 85.

34. Thus with reference to cargo carried or calling port of trading under clause 85, as in the case of the similar expressions in clauses 2 and 84, there is acknowledgement of the charterers' responsibility for the trading or employment of the vessel.

35. The question which then arises, to my mind, is this: on which side of the line of either owners' responsibility or charterers' responsibility do the facts of this case fall? One argument is that they fall on the side of owners' responsibility, because the problem lay in the vessel's status as a first time caller. The counter argument is that they fall on the side of charterers' responsibility because the problem lay in the trading of the vessel by the charterers to New Orleans. The judge, however, considered that the facts should be considered to fall on the owners' side of the line because the causative impact of the US legislation did not differentiate between any particular US port and that therefore the problem did not arise out of the nomination of New Orleans in particular, but was, as he said, inherent in the very charter agreement that the voyage to be performed, or the trip to be performed, was to be to the US Gulf.

36. Now it seems to me that there is potentially cogency in Mr Cooper's submission that the judge introduced into the proviso to clause 85 the concept of nomination or orders in addition to the express words of the clause itself. Mr Cooper's point is that all you have to ask is whether the problem arose out of a cargo carried or a port of trading at which the vessel was to call, and that the problem in this case did arise out of the vessel's call at New Orleans and it made no difference for these purposes that New Orleans represented the same risk in terms of the security legislation as any other US Gulf port. It was nevertheless a risk associated with the vessel's imminent call at that port.

37. He therefore submitted that when one is looking at the question of causation and the question of any distinction between owners' and charterers' responsibility, for the purposes of the application of this clause, one should not stop, as he put it, at the fact that the vessel was a first time caller, but should look behind that to see that the real problem lay more generally in the legislative measures for port safety which the US government had enacted.

38. Looking at the matter in that way, he submitted, one could see that the problem here arose out of the employment of the vessel to a port of trading and not from the status of the vessel or any other matter for which owners were responsible or which lies on the owners' or vessel's side of the line. In this context he accepted the broad distinction which I have sought to make in this judgment, but said that if one looked beyond the fact that the vessel was a first time caller to the measures of port safety, one would come to the conclusion that the cause of the problem in this case was a matter which fell within the proviso and not the main part of the clause.

39. This is ultimately, it seems to me, when one has taken full account of the criticisms which Mr Cooper has made of the judge's reasoning, the essential point in the case. For these purposes, Mr Cooper accepts that a distinction has to be made between areas of owners' and charterers' responsibility respectively. Thus he accepts that if a vessel's detention at or in the course of imminent calling at a port arose out of a problem of stowaways or arose out of a problem relating to the maintenance of a vessel which fell foul of environmental legislation



or conventions, then that would be an example of matters that fell on the owners' side of the line within the primary and opening part of the clause; but in this case he submits the legislation in question did not relate to the vessel but to the port.

40. It seems to me that in seeking to allow for the possibility of the distinction working on those examples in that way, Mr Cooper was not only accepting, as he did, the broad distinction I have drawn for the purposes of clause 85, but was also implicitly accepting that one does have to look beyond the mere existence of the legislative measures by which an authority at a port of calling may act and ask why it was that the authorities were acting and invoking their legal powers.

41. Thus he accepted that if a vessel was detained under the US security legislation by USCG because of some earlier pre-charter activity of the vessel which had, through security intelligence, brought her to the notice of the coastguards and rendered her a High Interest Vessel, a matter quite different for instance from the mere fact that she was a first time caller, then it may be — although it would be, I think he would wish to say, a matter for a factual investigation in any particular case — that such a problem of detention would lie on the off-hire side of the clause as an owners' or vessel's responsibility. It seems to me that that acknowledgment by Mr Cooper was an inevitable one.

42. The question ultimately is a question of cause. It is a question that Devlin J, dealing with the problems of causation which can arise under the employment and indemnity clauses, had addressed in the *Royal Greek Government* case at page 236, in these words:

> I think that the explanation of most, though not all, of these apparently conflicting *dicta*, is that each must be judged in relation to the problem in the case in which it was used. Questions of causation can give rise to problems both of law and of fact. Once the problem has been formulated it will be seen whether its solution requires the application of some legal principle or arises out of some point of construction or is to be obtained by resolving a matter of fact or inference from fact.

43. That was, it may now be seen, an early expression of a thought about causation which has been much addressed in recent years in cases in the House of Lords, in particular by Lord Hoffmann, who in effect has said that when you have a problem of causation you ought to begin by asking: Why do you want to know the answer to this question? For what purpose are you asking a question of causation? The insight is that you cannot answer questions of causation without knowing, as it were, what the point of the question is. In the context of clause 85, you are looking for an essential distinction made in the wording of that clause and reflecting an essential distinction made throughout the time charter as a whole, familiar to all owners and charterers, between matters of responsibility for owners and matters of responsibility for charterers. The question still remains: "On what side of the line, on the facts of this case, do these facts fall?"

44. It seems to me that simply to point to the fact that the problem arises out of legislation with reference to a port of calling which raises a risk associated with a vessel calling at United States ports, is to leave the problem still addressed at a level of too great generality. What one needs to know is why that legislation had the effect of detaining the vessel in this particular case. Was it because of something for which the owners were responsible, such as, for example, information coming to the attention of the authorities that there was some kind of security danger or contraband involved with the vessel because it arose out of the activities of their crew, or was it something for which charterers were responsible?

45. Ultimately, it seems to me that the fact that the vessel is a first time caller at the United States is a matter which goes to the status of the vessel. It is something like a vessel about to transit the Suez or Panama Canal needing to have its documents in order (see clause 56). A charterer is not obliged to know, in this case the charterers did not know, but the essential point is, he is not obliged to know what the US status of a vessel that he charters is. However, owners know what their vessel's status is, or are required to know it.

46. Of course, the US status of the vessel may be a matter which it is comparatively easy for a charterer to find out. I accept that he could find out about it and that specific provision could be put into a charter to deal with it. Nevertheless, if one asks, in the absence of express provision, whether it is a matter which is concerned with the charterers' trading or employment on the one hand, or with the status of the vessel and with matters of the owners' responsibility on the other hand, it seems to me that it lies in the latter quarter.

47. In this context Mr Cooper has cited an arbitration award, of unknown arbitrators, referred to in the *Lloyd's Maritime Law Newsletter* on 17 March 2004, LMLN 635. That was a case where, as a result of the US legislation with which we are here concerned, a vessel was not detained so as to cause loss of time, but her presence at the port involved the additional expense of paying for five security guards to keep an eye on the vessel's crew. The question arose as to whether that expense fell

within the express provision relating to the charterers' responsibilities in clause 2 of the NYPE form relating to port charges, or whether it fell more loosely within the owners' responsibility for the crew. The express provisions relating to the crew in clause 1, cited in the note, did not seem to fit very happily with these charges and it was the tribunal's opinion that they fitted more happily with the express provision for port charges in clause 2 as charges which were usually incurred, at any rate for this particular ship, at that port in question.

48. It seems to me that the tribunal there did not consider the issues with which we are concerned in this case. It did not consider the question of whether that expense arose out of an essential exercise of the charterers' responsibility for the trading of the vessel on the one hand, or for matters of owners' responsibility on the other. It was rather a particular question of whether the expense in question was within the expression "port charges".

49. We have got a more general question to decide, whether detention at or on the approach to a port of calling lies on the owners' or charterers' responsibility side of the line. For the reasons that I have sought to give, it seems to me that the judge's essential conclusion, that it lay on the owners' side of the line, was the right answer. I accept that the actual analysis by which he got to that answer is not precisely that which I would apply myself in this case, but his decision did reflect his essential choice in the prevailing circumstances. In this connection, it is possible to view the judge's reasoning, that the vessel would be likely to receive the same treatment whichever port in the US Gulf she was sent to by the charterers, as a reflection of the underlying fact that the real problem lay in the vessel's status and not in the charterers' trading.

50. It seems to me that it may well be, therefore, that the same conclusion would be reached whether one considers this problem under this trip time charter or under the head charter, or its immediate sub-charter. It is true that under the head charter an additional factor which does not arise in our case is that the charterers have a broad choice as to where they will employ the vessel and had not agreed with the owners that the trip will be to a US port. It is possible that in those circumstances, that being an additional factor for a tribunal to take into account, another tribunal might consider that the answer to the essential question of which side of the line this particular problem fell under would be different from that which I adopt in this case.

51. Speaking for myself, however, and purely as a matter of opinion — it is not a matter I have to decide — I am rather sceptical of that. I would still be inclined to say that the essential problem is a problem relating to the status of the vessel. Be that as it may, the answer that has to be given is an answer to how this essential distinction under clause 85 operates on the facts of this case and the findings of the judge with relation to this charter. I accept that, speaking generally, one would expect the application of back-to-back provisions to operate in the same way, but it is not necessarily so. A clear example of that latter possibility has been mentioned in court; for instance, some problem which arose out of cargoes carried under a head charter at a time before the trip time charter even got into operation. That would plainly not be a problem arising out of cargoes carried "under this charter." It is one example of how a matter can lie upon the owners' side of the line under a sub-charter, depending upon a number of considerations, while it lies on the charterers' side under a longer head charter.

52. Therefore, albeit by a slightly different route, I would uphold the judge and dismiss this appeal, with the effect that the vessel, in my judgment, was off-hire under the first part of clause 85, in the sum of US$257,732.77.

**Sir PAUL KENNEDY:**

53. I agree.

**Lord Justice BROOKE:**

54. I also agree. The appeal is dismissed.

Table 3

| | U.S. LIBOR 3-monthly Rates, averaged monthly | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MONTHLY AVERAGE RATES (%) | | | | | | | | | | |
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| JANUARY | 5.00 | 6.03 | 5.69 | 1.82 | 1.36 | 1.12 | 2.67 | 4.60 | 5.36 | | |
| FEBRUARY | 4.99 | 6.10 | 5.34 | 1.90 | 1.34 | 1.12 | 2.82 | 4.75 | 5.36 | | |
| MARCH | 5.00 | 6.19 | 4.96 | 1.98 | 1.28 | 1.11 | 3.02 | 4.92 | 5.35 | | |
| APRIL | 4.99 | 6.31 | 4.61 | 1.96 | 1.30 | 1.15 | 3.15 | 5.07 | 5.35 | | |
| MAY | 5.02 | 6.75 | 4.10 | 1.90 | 1.28 | 1.25 | 3.26 | 5.18 | 5.36 | | |
| JUNE | 5.17 | 6.79 | 3.83 | 1.87 | 1.12 | 1.41 | 3.42 | 5.38 | | | |
| JULY | 5.31 | 6.73 | 3.75 | 1.84 | 1.10 | 1.62 | 3.60 | 5.50 | | | |
| AUGUST | 5.45 | 6.69 | 3.56 | 1.77 | 1.13 | 1.72 | 3.79 | 5.42 | | | |
| SEPTEMBER | 5.56 | 6.67 | 3.03 | 1.80 | 1.14 | 1.90 | 3.91 | 5.38 | | | |
| OCTOBER | | 6.18 | 6.77 | 2.40 | 1.78 | 1.16 | 2.08 | 4.16 | 5.37 | | |
| NOVEMBER | | 6.10 | 6.75 | 2.10 | 1.45 | 1.17 | 2.30 | 4.34 | 5.37 | | |
| DECEMBER | | 6.12 | 6.54 | 1.92 | 1.40 | 1.17 | 2.45 | 4.48 | 5.36 | | |

For US Dollar amounts, where the claimant's business operates *outside* the USA, it is suggested that members should normally award 2.5% over the rates set out in Table 3.