07 CIV 7221 (PKL)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOSSE SHIPPING LIMITED

<u>Plaintiff</u>

AGAINST

GREAT WHITE FLEET LIMITED

<u>Defendant</u>

---

**DECLARATION OF MICHAEL JOHN SMITH**

---

MICHAEL JOHN SMITH, pursuant to Title 28 § 1746 of the United States Code, hereby declares and says the following under penalty of perjury:

1. I am a partner of Mills & Co, Solicitors practicing at Milburn House, Dean Street, Newcastle upon Tyne, England. I have been requested by Bosse Shipping Limited ("Bosse") to comment on the affidavit of Mr Hardingham sworn by him on 5th September 2007.

2. Insofar as the contents of this Declaration are within my own knowledge, they are true. Insofar as the contents of this Declaration are not within my own knowledge, they are true to the best of my information and belief. The sources of my information and the grounds for my belief are communications, information and documentation provided by Bosse. There is now produced and shown to me an exhibit marked "MJS 1" consisting of a bundle of documents to which I shall refer in this Declaration.

3. I qualified as a solicitor in 1988 and have since then practised maritime law. I have been a partner in Mills & Co since 1996.

4. On 14th August 2007 Bosse commenced arbitration against Great White Fleet Limited ("GWF") in respect of three separate claims, namely:

(a) US$ 153,600 being the balance of the customs fine paid to the Syrian authorities which has not been recovered from other parties (together with interest from May 2005 to April 2006);

(b) US$ 94,209 for wrongful deductions from hire made by Great White Fleet Limited ("GWF") during the period the vessel was under arrest at Tartous, Syria; and

    (c)    US$ 750,295.11 in respect of the cargo claim made by Chiquita which is the subject of a separate action in the United States District Court for the Southern District of New York captioned Chiquita International Limited and Great White Fleet Limited against M/V BOSSE, BOSSE SHIPPING LTD., and HOLY HOUSE SHIPPING AB, Docket No. 07 cv 6786 (PKL).

I shall deal with each of these in turn.

### Customs fine

5. The claim in respect to the customs fine is founded upon clause 77 of the Charterparty which provides "*Charterers [GWF] can trade Syria if required on basis that Charterers will provide an LOI [Letter of Indemnity] in respect of present or future Customs fines in respect of this Charter.*" My view is that Mr Hardingham's construction of clause 77 at paragraphs 7 – 8 of his Affidavit where he suggests that GWF was not responsible for fines existing as of the date of charter is overly restrictive and in fact wrong. The only logical construction of the clause is that the word "present" refers to customs fines presently outstanding when the Charterparty was entered into. If Mr Hardingham's construction were to be adopted, the word "present" in the clause would be meaningless. If the clause does not apply to fines levied prior to the existence of the charter, then the only fines to which the clause could apply would by definition have to be "future".

6. My view of the purpose of the clause is that it was to permit GWF to direct the vessel to Syria where there is a significant risk of customs fines being levied against a vessel. In exchange for this permission GWF agreed to indemnify Bosse in respect of the risk of customs' fines. Since the risk of the vessel being detained and Bosse being compelled to pay a fine could equally arise just as much in relation to a previous or current call of the vessel at Syria, and through no fault of Bosse, one would expect that the indemnity given for the permission to direct the vessel to Syria would cover all fines and not just those arising on that particular call.

### Deductions from hire

7. In seeking to justify GWF's deductions from hire Mr Hardingham refers to clause 41 of the Charterparty. On the basis that the vessel was arrested he claims GWF was entitled to place the vessel off hire by reason of clause 41. However, all loss or damage flowing from the arrest of the vessel at Tartous was a contingency in respect of which GWF, by virtue of clause 77, had expressly agreed to indemnify Bosse. Accordingly, whether or not the vessel was strictly speaking off hire or not pursuant to clause 41 is irrelevant. The unpaid hire during the period of arrest, or an equivalent sum, is payable by GWF to Bosse by reason of clause 77.

8. Alternatively, if GWF argue in the arbitration that because no LOI was ever given GWF cannot be held to have breached its obligation to indemnify Bosse, the failure of GWF to provide an LOI was a breach of clause 77 of the Charterparty. Had GWF complied with its obligation under the Charterparty, then the sum which it improperly deducted from hire would have been payable to Bosse by way of indemnity. Clearly, however, the failure to provide such an indemnity has caused a loss to Bosse (namely the amount of the deductions) so that Bosse are entitled to recover the same by way of damages.

9. That off hire deductions can be recovered by owners pursuant to an indemnity or as damages for a breach by charterers is clearly established under English law. (See paragraphs 25.81 to 25.90 - especially paragraphs 25.88 to 25.90 of Wilford attached at pages 1 to 3 of Exhibit "MJS1").

10. In light of the above, Mr Hardingham's analysis of The "Doric Pride" and his claims at paragraph 17 of his Affidavit are irrelevant. Given, however, that Mr Hardingham at various other points in his Affidavit relies upon his view that Bosse acted imprudently in not checking at the time they purchased the vessel, or subsequently prior to the call at Syria, whether there were existing unpaid customs fines which might result in the vessel being arrested if she called at Syria, I do consider it appropriate to comment now on paragraph 17. In this respect I cannot see how in any way Bosse can be held responsible for the arrest of the vessel in Syria or for the fact that a full recovery was not made from the sellers of the vessel. I say this for the following reasons:

(a) When purchasing a vessel, I believe that most buyers will not carry out checks in individual jurisdictions to find out if there are claims against the vessel. Even where a buyer does carry out some checks, he is not in a position to check every port in the world to find out if the vessel might be subject to arrest there. (See paragraphs 12-01 to 12-19 (especially 12-9(5)) of Strong & Herring - Sale of Ships at page 4 to 7 of "MJS1"). Tartous is not a port at which such checks are normally carried out when ships are purchased. For instance the North of England P&I Club offers a search facility to its members before they purchase a vessel (see page 8 to 11 (especially page 9) of "MJS1") but the countries in which a search for evidence of proceedings will be carried out are limited to England, Hong Kong, Singapore, Australia, New Zealand, Canada and South Africa. It would simply be unreasonable and not practicable to check every conceivable port at which a vessel might call prior to a ship purchase.

(b) Even if Bosse had checked at Tartous, it is extremely unlikely that they would have found out that the vessel would be arrested when she next called there. The vessel arrived at Tartous on 29 April 2005 and it was only on 30 April that notice was given for the first time that an arrest order had been made. It is not clear when the order was made but

      from the limited information Bosse now have it seems that it must have been after the purchase of the vessel.

(c)     Even if an arrest order had been made before the vessel's call at Tartous there is no evidence that this information would have been provided to Bosse by the Syrian court.

(d)     The reason that a full indemnity was not recovered from the vessel's former owners was that the seller was insolvent. This is not an unusual position. Whilst a purchaser of a vessel might theoretically be protected by the terms of the sale contract, in practice he will usually not be able to make a recovery from the seller because the seller no longer has any assets. (See paragraph 22-06 of Strong & Herring at pages 12 and 13 of "MJS1"). That Bosse made any recovery at all from her former owners was, I think, remarkable.

(e)     In any event, even if Bosse had made no claim whatsoever against the seller of the vessel this would still not give GWF any defence. A claimant is not generally obliged to make a claim against one party liable for its loss for the benefit of another. (See paragraphs 7-075 and 7-076 of McGregor on Damages at pages 14 and 15 of "MJS1").

11.     In sum, Bosse has a good arguable case under English law that GWF is liable to Bosse for the full amount of the customs fine which Bosse paid as a result of the call made at Syria at GWF's direction which Bosse has not recovered from the vessel's former owners.

### Chiquita's claim

12.     Mr Hardingham appears to have misunderstood the basis of Bosse's claim against GWF in respect of the potential liability to Chiquita. Bosse do not allege that GWF's failure to indemnify Bosse under clause 9 and 77 has caused Bosse to incur a liability to Chiquita.

13.     Rather, Bosse's claim is that under clause 77 GWF was obliged to provide an LOI to Bosse which would indemnify Bosse in respect of customs fines. The scope of the indemnity would have included all claims made by reason of the imposition of the fines and this would clearly include the present claim made by Chiquita as Chiquita is contending that its losses flowed directly from the delay to the vessel which delay was the result of the customs fine. Thus it is not alleged that the failure to provide an LOI caused Bosse to incur a potential liability to Chiquita but rather that GWF are contractually obliged to indemnify Bosse in respect of that potential liability.

14.     Alternatively if GWF claim that by reason of the fact that they did not provide an LOI they are not obliged to indemnify Bosse, then Bosse would be entitled to claim the loss suffered by reason of GWF's failure to provide an LOI in breach of clause 77 (ie. the inability to recover the potential liability to Chiquita under an LOI) as damages for breach of

        contract. Under either scenario Bosse has a good arguable case under English law permitting it to recover from GWF any sums which Bosse is adjudged to owe to Chiquita.

15. In reply to Mr Hardingham's discussion of clause 9 of the Charterparty at paragraphs 22 - 23 of his Affidavit I note the following. Bosse rely on two aspects of clause 9. The first is the provision "*The Charterers to indemnify the Owners against all consequences or liabilities arising from … complying with such orders*". As clause 9 shows "*such orders*" refers to "*the orders of the Charterers as regards employment, agency or other arrangements*".

16. GWF ordered the vessel to proceed to Syria. If they had not done so, then the vessel would not have been arrested. As the extracts from Wilford - Time Charters at pages 16 to 25 of "MJS1" show, a charterer can only avoid liability for the consequences of his order if:

(a) the loss is one arising from ordinary expenses and navigational risk; or

(b) there is a break in the chain of causation between the order and the consequences.

17. It appears that Mr Hardingham is of the view (see paragraphs 22 and 23 of his Affidavit) that there was a break in the chain of causation. He appears to claim that the alleged failure by Bosse to take precautions on the purchase of the vessel was the true cause of the vessel's arrest. For the reasons set out at paragraph 10 above, it is my opinion that Bosse could not realistically have been expected to have found out that the vessel would be arrested at Tartous. Moreover, Bosse's alleged failures pre-date considerably the order to proceed to Syria and so in any event cannot be said to have interrupted the chain of causation between GWF's order to proceed to Syria and the arrest of the vessel there.

18. The other basis on which Bosse relies on clause 9 is that the clause provides that "*The Charterers to indemnify the Owners against all consequences of liabilities arising from the Master, Officers or Agents signing Bills of Lading …*".

19. As the discussions in Wilford (pages 25 to 29 of "MJS1") show, if the issuance of a bill of lading leads to a greater liability being imposed on an owner than the owner has undertaken under the charterparty, clause 9 will require the charterer to indemnify the owner in respect of that liability.

20. Obviously whether or not Chiquita's claim against Bosse succeeds is a matter for the US courts. It is clear, however, that as a matter of English law under the Charterparty, Bosse would not be liable for that claim for the following reasons:

(a) It is not clear from Chiquita's claim what the exact basis of the claim against Bosse is. I cannot see, however, how the delay at Syria can be said to have been caused by any unseaworthiness of the vessel or any failure by Bosse to care for the cargo. There does not, therefore, appear to be any basis on which it could be argued that Bosse could be liable to GWF.

(b) Even if there were, however, a prima facie cause of action on the part of Chiquita against Bosse, the terms of the Charterparty would protect Bosse from liability in this case. The US COGSA is incorporated into the Charterparty by clause 45. When US COGSA is incorporated into a contract governed by English law then it will usually be interpreted in accordance with English law. (See paragraph 34.1 of Wilford at page 30 of "MJS1"). Section 4(2)(g) of US COGSA provides that a carrier (and thus Bosse) will not be "*responsible for loss or damage arising or resulting from ... Arrest or restraint of princes, rulers or people or seizure under legal process*". Accordingly, as can be seen from paragraph 85.304 of Cooke - Voyage Charters (page 31 of "MJS1"), Bosse cannot be liable or responsible for loss arising from the arrest of the vessel in Syria.

(c) Pursuant to clause 13 of the Charterparty it is provided "*The Owners not to be responsible in any other case nor for damage or delay whatsoever or howsoever caused unless caused by the neglect or default of their servants*". This means that Bosse will not be liable unless they have been negligent. No allegation of negligence has been made against Bosse except, it seems, that they should have known that the vessel would have been arrested at Tartous. As I set out above, I do not believe that that can in any way be said to be negligence on the part of Bosse.

21. At paragraph 21 of his Affidavit, Mr Hardingham refers to the issue of whether the claims by Bosse are sufficiently ripe to justify the attachment. As I understand it, the concept of whether a claim is ripe or not is one of US law. As a matter of English law, however, the claims made by Bosse in respect of Chiquita's claim are currently existing causes of action and not prospective claims.

22. As a matter of English law, a claim for a breach of contract will arise when the breach occurs. It is not necessary that the loss be then capable of being ascertained. (See page 114 of Oughton, Lowry & Merkin - Limitation of Actions at page 32 of "MJS1").

23. As to the indemnity claims under clause 9, it has been held in the case of <u>Bosma v Larsen</u> [1966] 1 Lloyd's Rep. 22 (see pages 33 to 40 of "MJS1") that the cause of action under clause 9 of the Baltime Form (i.e. the clause in the current Charterparty) arises when the incident occurs rather than when the amount of the liability is ascertained. Some doubts have been expressed (eg. in Wilford) about the <u>Bosma v Larsen</u> decision in the light of decisions in other cases relating to other

forms of indemnities. As pointed out, however, in Bosma v Larsen and the other cases, when the cause of action in an indemnity claim will arise will depend upon the construction of the particular indemnity clause. Bosma v Larsen, therefore, remains good authority for the construction of clause 9. Accordingly, under English law Bosse has a well-founded currently actionable claim against GWF for indemnity as to any sums which Bosse is adjudged to owe to Chiquita.

**Interest and costs**

24. I do not consider that the figure for interest put forward in Bosse's Complaint is excessive. Indeed, I believe that it was probably less than the tribunal would award. Attached at page 41 of "MJS1" is a calculation of Bosse's claim on which the Complaint was based. Although the Complaint states that interest of 8% is claimed on a compound basis, this is in fact not so. Interest (as can be seen for the calculation) has been calculated only on a simple basis.

25. I consider that a rate of 8% compound would in fact be a reasonable rate. It is my experience that London arbitration tribunals more often than not award interest on a compound basis. As can be seen from the table attached to Mr Hardingham's affidavit, the interest rates since May 2006 would justify a rate of 8%. If US Dollar rates continue to rise, then the rate recoverable from now to a London arbitration award would be more than 8%. Awards from London Tribunals are already at or close to 8% compound. In an arbitration in which I was concerned, an award was made in February 2007 at a rate of 7% to be compounded at quarterly rests.

26. With regard to costs, it is always extremely difficult to predict in advance the amount of costs that will be incurred in a London arbitration. In a case, however, where the claim (with interest) is over US$1 million, costs of up to US$380,000 could very easily be incurred without even taking into account the fees of the arbitrators. In a recent arbitration in which I was involved, costs of approximately £200,000 were incurred in taking the matter to and through a five day hearing.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Newcastle upon Tyne, England
12 September 2007

_____
MICHAEL JOHN SMITH