of the clause. I am bound to say that I find it hard to visualise the accumulation of marine growth during the contract service as a 'defect' in the hull. But even if it were, the defect arose as a natural consequence of the way in which the charterers chose to employ the ship. I do not consider that the loss of time thus caused should be deducted from the amount of time for which hire is payable."

*The Rijn* [1981] 2 Lloyd's Rep. 267.

(But for a case where a ship was delivered with her bottom fouled, see *The Ioanna* [1985] 2 Lloyd's Rep. 164 and paragraph 25.94, below.)

## Incident caused by charterers' breach

**25.81** If an event falling within the wording of the off-hire clause has been caused by some breach of the express or implied terms of the charter by the charterers, the courts may deal with it in one of two ways. They may either declare the ship to be off-hire but allow the owners to claim hire back from the charterers as damages (see paragraph 25.88, below) or they may hold that the ship remains on-hire. Usually it will make little difference which course is followed, but in certain circumstances it may be important.

**25.82** Although it may be argued that the off-hire clause in the New York Produce form makes no mention of fault and should be allowed to operate automatically provided only that the events which occur are within its wording (see paragraph 25.3, above), there is some authority supporting the opposite view that the charterers are not entitled to rely on the clause if the events which cause it to operate result from their breach of contract. It seems to have been assumed by the Court of Appeal in *Board of Trade* v. *Temperley* (1927) 27 Ll.L.Rep. 230 that if the charterers' breach of an express or implied term of the contract had caused the loss of time they could not have relied on the clause (see particularly the judgment of Scrutton, L.J., at page 232), but no breach was established. See also a similar assumption in *Fraser* v. *Bee* (1900) 17 T.L.R. 101. In the case which follows there is clear support for the somewhat narrower proposition that the charterers may not rely on the clause when the loss of time relates to something which under the charter it is their duty to supply, although the decision could have been reached on construction alone.

Delay was caused to the *Megna* by faulty bunker coal, supplied by the charterers, heating dangerously. The off-hire clause provided: "That in the event of loss of time from . . . breakdown of machinery or damage to hull preventing the working of the steamer for more than 24 consecutive hours, the hire shall cease until she be again in an efficient state to resume her service; or if breakdown or damage occurs at sea, not resulting from the cargo, necessitating putting back, hire shall cease until steamer is again in the same position . . . "

It was held that both parts of the clause were limited to breakdown of machinery or damage to hull, and as neither had happened the clause did not operate. Greer, J., also said that the hire should not cease where the loss of time had been caused by "anything for which the charterer is responsible", in this case their bunkers.

*Nourse* v. *Elder Dempster* (1922) 13 Ll.L.Rep. 197.

**25.83** In *Lensen* v. *Anglo-Soviet* (1935) 52 Ll.L.Rep. 141, the Court of Appeal held that a ship remained on-hire under the Baltime form during repairs to her hull caused by a breach by the charterers of their obligation to order her to a safe berth. The leading judgment, of Greer, L.J., is based in part upon the charterers being unable to rely on the off-hire clause while employing the ship outside the limits agreed in the charter and partly on the indemnity clause, but also refers to the right of the owners to recover hire as damages "if technically the vessel was off-hire". Although the decision must be regarded as authoritative so far as concerns delay resulting from orders of the charterers covered by an express or implied indemnity, particularly where the orders are for trading outside the charter limits (including orders to unsafe ports or berths), it probably does not support any wider proposition. The reference by Greer, L.J., to the



**25.83**                                    OFF-HIRE CLAUSE

possibility of the ship being "technically" off-hire introduces a further reason for caution. Nevertheless, the combined effect of the cases cited above may be that the off-hire clause does not operate where the event which would otherwise cause it to operate flows from a breach by the charterers.

### Payment of hire shall cease

**25.84** In *The Lutetian* [1982] 2 Lloyd's Rep. 140 Bingham, J., held that under the New York Produce form the charterers were not obliged to pay an instalment of hire on the due date if the ship was off-hire at that time, as Clause 15 provided that when time was lost from the listed causes "the payment of hire shall cease". He accepted the contention that in such circumstances the charterers' obligation to make payment of the next monthly instalment of hire in advance was suspended until immediately before the ship was again at the service of the charterers. This decision seems difficult to reconcile with the general principle set out at paragraph 25.1, above, and may produce serious uncertainty in practice. It is suggested that it be treated with caution pending consideration by higher courts.

### Bunkers and other obligations during off-hire periods

**25.85** The mere fact that hire is not payable by operation of the off-hire clause does not curtail the other obligations of the charterers during the relevant period. Thus, unless express provision has been made to the contrary, the charterers remain responsible for providing and paying for bunkers while the ship is off-hire: see, for example, *Arild* v. *Hovrani* [1923] 2 K.B. 141. In the New York Produce form express provision is made by Clause 20 to relieve the charterers from payment for bunkers consumed, but this clause does not cover other obligations and if relief in respect of these is required appropriate words must be inserted. There is no such express provision in the Baltime form: see *Arild* v. *Hovrani*, above and *The Bridgestone Maru No. 3* [1985] 2 Lloyd's Rep. 62. It is, therefore, common to amend Clause 4 of the Baltime form by the addition of the words "While on hire" at the very beginning of the clause: see paragraph 12.26, above.

### *NYPE 93*

**25.86** The off-hire clause in the 1993 revision of the New York Produce form provides that bunkers consumed while the ship is off-hire shall be for the owners' account: see Lines 230 and 231. So far as concerns the other items that are to be provided by the charterers, Line 84 makes the charterers' obligation conditional on the ship being on-hire.

### Effect on other remedies of owners and charterers

#### *Claims by charterers*

**25.87** The off-hire clause does not destroy or cut down any right the charterers may have to claim damages from the owners even in respect of matters specifically mentioned in the clause. If the charterers can prove that they have suffered damages in excess of or in addition to the loss of use of the ship as a result of a breach of charter by the owners then they may recover these damages. In *The Democritos* [1975] 1 Lloyd's Rep. 386 Kerr, J., said, at page 401: "since this point appears rarely to have arisen in practice, it is right to repeat that it was common ground that if a period of off-hire results from a breach of the charter on the part of the owners, then the charterers would in law be entitled to damages quite apart from not being liable for hire, or

2

being able to recoup any hire paid in respect of this period, if they can establish that they have thereby suffered additional loss." So if, for example, serious delay were caused by a breakdown of ship's gear due to a breach of the owners' obligations of fittedness or seaworthiness on delivery or of maintenance in an efficient state thereafter, and the delay were to deprive the charterers of a profitable voyage, the charterers would not be restricted to a claim for repayment of hire under the off-hire clause. If the loss of profit exceeded the hire lost, the owners would be entitled, subject to any questions of remoteness, to claim the loss of profit by way of damages, giving credit for any hire recovered under the off-hire clause. (See *The H.R. Macmillan* [1973] 1 Lloyd's Rep. 27 concerning delay caused by breakdowns of the ship's specially fitted gantry cranes; see also *Sea & Land Securities* v. *Dickinson* (1942) 72 Ll.L.Rep. 159, and, by analogy, *Leslie Shipping* v. *Welstead* [1921] 3 K.B. 420, where it was held by Greer, J., that an owner's right to damages was not cut down by the withdrawal clause in the charter.)

### Claims by owners

**25.88** If, despite what is said at paragraphs 25.81 to 25.83, above, the ship goes off-hire as a result of some breach of contract by the charterers, the owners may claim from the charterers the hire they have lost as all or part of their damages for that breach.

The *Dodecanese* was time chartered on the Baltime form for employment "in lawful trades for the conveyance of lawful merchandise". The charterers loaded her with ammunition and other explosives for the British Forces in Egypt, although they knew that this was prohibited by the Egyptian authorities. The ship was blacklisted by the authorities in consequence and when, subsequently, the ship suffered a machinery breakdown, the authorities delayed her repairs so that they took 30 days instead of four days. The charterers put the ship off-hire for the whole 30 days under the off-hire clause, but it was held by Pilcher, J., that the owners were entitled to recover, as damages and for breach of the charterers' obligation to ship only "lawful merchandise", the hire for the 26 days which they had lost under the off-hire clause.
*Leolga* v. *Glynn* [1953] 2 Lloyd's Rep. 47.

**25.89** The owners may also recover hire lost by operation of the off-hire clause if they can show an unbroken chain of causation between the loss of time and their obedience to the orders of the charterers and so benefit from the implied indemnity discussed at paragraphs 19.11 *et seq.*, particularly paragraph 19.16.

**25.90** In *The Berge Sund* [1993] 2 Lloyd's Rep. 453, Staughton, L.J., in the Court of Appeal expressed the view that the reference in the Mobiltime 2 off-hire clause to loss of time "not caused by Charterer's fault" excluded the implication of an indemnity where there was no fault on the part of the charterers; see paragraph 38.63. But in *The Marie H* [1998] 2 Lloyd's Rep. 71, Timothy Walker, J., held that owners were entitled to be indemnified in respect of off-hire caused by the ship loading, at charterers' risk, dangerous cargo, the off-hire clause reading, "Should the vessel put back whilst on voyage by reason of an accident or breakdown for which charterers are not responsible . . . ". See further paragraph 19.16.

### Off-hire deductions and equitable set-off

**25.91** It seems that under both the New York Produce and the Baltime forms, off-hire periods can be deducted from subsequent monthly payments of hire, probably on the basis of a reasonable estimate made by the charterers in good faith if the amount has not yet been agreed or determined by arbitration; see paragraphs 16.23 to 16.43. It also seems that charterers may deduct from hire claims for damages in respect of periods during which the owners have

3

is to
*cean*
te".
lute
who
rus-

may
ept-

doc-

**CHAPTER 12**

**CLAUSE 9—ENCUMBRANCES**

**12–01**    Clause 9 of Saleform '87 provides as follows:

| | |
|---|---:|
| **9. Encumbrances** | 99 |
| The Sellers warrant that the vessel at the time of delivery, is free from all encumbrances and ma- | 100 |
| ritime liens or other debts whatsoever. Should any claims which have been incurred prior to the | 101 |
| time of delivery be made against the vessel, the Sellers hereby undertake to indemnify the Buyers | 102 |
| against all consequences of such claims. | 103 |

## The purpose of Clause 9

**12–02**    The purpose of Clause 9 is to provide Buyers with some protection (albeit limited) in case at the time of delivery there is in existence some encumbrance on the vessel, or maritime lien attaching to the vessel, or there is any other liability which could lead to a claim being made against the vessel after delivery to the Buyers. The reasons why a Buyer needs protection of this kind are threefold.

A.    Ships can be the subject of claims being made against them (*i.e.* claims *in rem* as opposed to claims *in personam* against the owner of the ship) which will follow the ship despite a transfer of ownership to a bona fide arms' length purchaser. Maritime liens (a list of which appear in para 12–09) attach to the vessel upon creation or incurrence and follow her through any number of changes of ownership. Whilst, at least as a matter of English law, maritime liens are of relatively limited scope, other maritime claims (often referred to as "statutory" liens because they arise, now, under the provisions of the Supreme Court Act 1981) survive (as a matter of English law) a change of ownership provided that legal proceedings in respect of such claims are issued (even if not served) before the transfer of ownership has taken place.[1]

B.    Although the contract for the sale of the ship will often be governed by English law[2] the ship, after a change of ownership, may still be susceptible to an arrest in other jurisdictions who will apply their own law when deciding whether a particular claim can be advanced against the ship by way of arrest or attachment. The categories of claims attracting maritime or "statutory" lien status may be wider in other jurisdictions than those claims which allow an arrest, after a change of ownership, under English law.

---

[1] The Monica S [1967] 2 Lloyd's Rep 113.
[2] See Ch.19.

C.    Under English law, Sellers are under no general obligation to disclose circumstances known to them which give rise to a claim *in rem* against the Vessel after delivery. Whilst Buyers can take certain practical steps, before delivery, to ascertain whether claims in rem exist or may exist, such enquiries cannot give complete assurance to Buyers that the ship will not be exposed to claims which could be advanced against the Vessel after they have taken delivery.

Clause 9 contains two separate obligations on the Seller. First, a somewhat limited obligation as at the time of delivery; second a rather wider obligation which continues post-delivery.

### The first limb of Clause 9

12–03    The first sentence of Clause 9 provides:

"The Sellers warrant that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any other debts whatsoever".

Although this first limb describes the Sellers' obligation as a "warranty" it is submitted that the term should be regarded as a matter of English law as an "innominate" or "intermediate" term. If the Sellers' promise is in truth only a "warranty" then the Buyers may claim only damages for any losses which they suffer as a consequence of Sellers' breach of that warranty; they will not be able to refuse to take delivery of the ship even if they are aware of an encumbrance, maritime lien or debt falling within the first sentence of Clause 9. It is submitted that the obligation in the first limb of Clause 9 is not a condition of the contract (a breach of which would entitle the Buyers to refuse to take delivery of the ship on any breach of that provision); if the promise is an "innominate" or "intermediate" term, then whether the Buyers will be able to reject delivery of the ship or terminate the contract will depend upon the nature and consequences of the Sellers' breach.

12–04    No firm guidance on this issue has been given by the English courts before despite the fact that the Clause itself has twice been considered by the Court of Appeal.[3] In *Rank Enterprises v Gerard*, however, Lord Justice Mance at page 408 offers this view:

"The language of cl.8 does not to my mind point clearly either way, although one may ask whether it could really be open to a Seller to furnish a bill of sale with the prescribed warranty, if he knew of an outstanding demand against the ship but believed (rightly) that it would ultimately (although perhaps only after considerable cost and delay) prove possible to defeat the demand as unfounded."

12–05    In that case the words "or claims" had been inserted after "or any other debts in Clause 8 of the Saleform. However, the inference is that Sellers may not be able to tender a Bill of Sale, containing the prescribed warranty, if they know of an outstanding demand against the ship though in a case where Clause 8 (or Clause 9) of Saleform '87 has not been amended by the addition of the words "or claims", the ambit of the

---

[3] The *Barenbels* [1985] 1 Lloyd's Rep 528 and *Rank Enterprises Limited & Ors v Gerard* [2000] 1 Lloyd's Rep 403.

hand ships will not be obliged to establish that any claim, made against the vessel after delivery arising from events taking place before delivery, constitutes an actual liability of the Sellers in order to rely on the indemnity under Clause 9. Whilst this is welcome news for buyers (and is, it is submitted, a business-like result), the deficiencies in Clause 9 remain, namely the limited ambit of the first sentence, the fact that the Sellers do not need to provide security and that often the Buyers will have recourse under the second sentence against a company with no, or no identifiable, assets.

**12.18**   In *Rank Enterprises Ltd & Others v Gerard* the court also had to consider when claims could be said to have been "made" against the vessel. On this issue, the Court of Appeal agreed with the conclusion of Mr Justice Toulson who said:[6]

"A claim against a vessel must involve a demand which carries with it threat of seizure of the vessel. The threat must be real and present but I do not see as a matter of construction or good sense the necessity for there to have been proceedings issued or an order of arrest obtained before there can said to be a claim against the vessel. If, when a vessel is on its way to a particular port, a creditor of the vessel informs the buyer of his intention to have the vessel arrested when it reaches port unless the buyer provides security, I do not see why the buyer's right of indemnity under NSF should not depend on whether he waits for the vessel to be arrested or (plagiarising Mr Justice Robert Goff's words in the *Barenbels*), anticipates the inevitable and furnishes security under pressure of the threat."

Lord Justice Mance went on to say:

"I would however underline and agree expressly with Mr Justice Toulson's further statement that, for a claim to be made against the vessel, there must be a demand which carries with it a real and present threat of seizure of the vessel."

### Steps to protect buyers' position under Clause 9

**12–19**   Given the limitations of Clause 9, prudent Buyers would be well advised to take steps, prior to delivery, to ascertain whether there may exist claims against the Sellers or the ship which fall within Clause 9.

The following various steps can be taken by the Buyers in order to seek to protect themselves against such claims:

1.   The Buyers should as a matter of routine make a search of the vessel register for mortgages, charges or other encumbrances registered against the vessel, both in advance of delivery and on the day of closing. The Sellers will, as standard, have to produce on delivery a certificate stating that the ship is free from registered encumbrances but this will not always be dated on the date of delivery. The search will not, however, reveal hidden maritime liens for which there is no system of registration.

2.   It may be possible for Buyers to purchase maritime lien insurance at a relatively nominal annual premium. Such policies are subject to various requirements (some require for example that a writ search has been carried out at least a

---

[6] [1999] 2 Lloyd's Rep 666 at page 671.

certain number of days before delivery). Further, circumstances surrounding the sale of the vessel which materially increase the risk of claims (for example the fact that the vessel is being sold in a "distressed" sale) will need to be disclosed to underwriters so that, if appropriate, the terms of the policy (and possibly the premium) can be adjusted accordingly. The placing of cover of this type, at least in the London insurance market is, however, becoming increasingly difficult.

3.     In some jurisdictions it is possible to make a search in the register of companies for evidence of the creation of any security interest, for example, an unregistered mortgage or charge over the company's property.

4.     Buyers should undertake a thorough research into the vessel's casualty history by looking at published casualty listings and, if possible, the vessel's log books. Generally a search should be made for a period of at least two years prior to delivery of the ship.

5.     Buyers should undertake a "writ search" in a number of relevant jurisdictions (which can be judged by reference to the vessel's previously trading patterns) to ascertain whether legal proceedings have been issued against the ship which could follow the ship notwithstanding the purchase by the Buyers. Certain P&I Clubs (for example the North of England and the Steamship Mutual) offer their members a writ search facility undertaken by solicitors in jurisdictions such as London, Singapore, Hong Kong and South Africa. It is of course not possible, in practical terms, for writ searches to be undertaken in every conceivable relevant jurisdiction and the searches themselves have their own limitations. Thus, for example, in England and Wales a search at the London Registry will not disclose *in rem* writs issued in District Registries and writs that have been renewed after issue may also not be revealed.

6.     If delivery of the vessel is taking place with the ship still in drydock, or in a repair yard (which is possible if, for example, Buyers' works go beyond the time required by the Sellers in the drydock/repair yard) then Buyers should seek evidence from the Sellers that they have paid the shipyard's invoice. Ship repairers have a possessory lien enforceable against the ship even after delivery.

7.     The Buyers should seek to ascertain, as accurately as possible, the vessel's recent trading history to see whether there could be outstanding unpaid creditors. Some buyers ask for details of previous bunker suppliers in circumstances where the vessel has been operating on a time charter in an attempt to obtain confirmation that the bunker suppliers have been paid.

**Saleform '93**

**12–20**   **8.**   Saleform '93 Clause 9 provides as follows:

| | |
|---|---:|
| The Sellers warrant that the vessel at the time of delivery, is free from all charters, encumbrance, | 208 |
| mortgages and maritime liens or any other debts whatsoever. The Sellers hereby undertake | 209 |
| to indemnify the Buyers against all consequences of claims made against the vessel which have | 210 |
| been incurred prior to the time of delivery. | 211 |

It will be seen that very little amendment has been made to Saleform '87. The only material change (save for some minor tinkering with the second sentence which appears to have left its meaning unaffected) is the addition of the requirement that the vessel at

# FD&D Cover for MOA Risks, "Writ Search Facility" and Maritime Lien Insurance for Second-Hand Ships 2007/2008 Policy Year

**CIRCULATED TO ALL MEMBERS, BROKERS AND DIRECTORS**
**ATTENTION INSURANCE DEPARTMENT              SHP/MS**

**FD & D COVER FOR MOA RISKS, "WRIT SEARCH FACILITY" AND MARITIME LIEN
INSURANCE FOR SECOND-HAND SHIPS 2007/2008 POLICY YEAR**

The purpose of this Circular is once again to draw Members' attention to the "Writ Search
Facility" which the Managers of the Association have arranged on Members' behalf, as well
as to advise Members of the availability of "Maritime Lien Insurance for Second-Hand
Ships" for the 2007/2008 policy year.

The "Writ Search Facility" has been designed to reduce the risk of Members buying
vessels which turn out to be subject to claims in a number of jurisdictions relating to the
vessel's previous ownership. The "Maritime Lien Insurance for Second-Hand Ships" is
intended to provide Members with some further protection against the financial losses
which may flow from claims being made against second-hand vessels purchased by
Members.

Before going on to explain in more detail how these products may benefit Members, it is
perhaps helpful to recap on the types of claims that can be made against vessels relating
to their previous ownership. Broadly speaking such claims fall into two categories:

1. Maritime Liens

2. Statutory Rights of Action in rem

1. MARITIME LIENS

A maritime lien is a claim which entitles the Claimant to arrest the ship in connection with
which the claim arises, which right of arrest survives a sale other than a judicial sale,
despite the fact that the buyer has bought the vessel in good faith and without notice of the
claim. Under English law only a small number of claims have been granted "maritime lien"
status, the most important of which are as follows:

1. Damage done by a vessel
2. Salvage
3. Wages of masters and seamen
4. Masters disbursements

Unfortunately for the buyers of second-hand vessels, there are other jurisdictions which
grant many other claims "maritime lien" status which greatly increases the risk that a vessel
may be subjected to some such claim. For example, in the United States of America, the
Federal Maritime Lien Act provides that any person furnishing "necessaries" in the United
States to a vessel shall have a maritime lien on that vessel. "Necessaries" has been
interpreted by the US Courts very widely to include repair services, supplies (including
bunker supplies), towage, the use of dry-dock facilities, pilotage, stevedoring services and
even P&I insurance premiums!

8

In addition to the categories of claims which, under English law, have been granted "maritime lien" status, the International Convention on Maritime Liens and Mortgages 1993 extends the categories of claims granted "maritime lien" status to include claims in respect of loss of life or personal injury occurring in direct connection with the operation of the vessel as well as claims for port, canal and other waterway dues and pilotage dues amongst others. This Convention has been ratified by a number of countries including China, Denmark, Finland, Germany, Guinea, Morocco, Norway, Paraguay, Sweden and Tunisia and came into force on 28 February 1995 in those countries.

As a matter of English law, the question of whether or not a claim against a vessel has "maritime lien" status will be determined according to the law of the forum. The law of the flag state of the vessel may however be applied in other countries.

## 2. STATUTORY RIGHTS OF ACTION IN REM

Even in England where the category of claims attracting "maritime lien" status is small, all maritime claims listed in the 1952 Arrest Convention may be enforced in rem by arresting the vessel. Such claims cause a particular problem for Members purchasing vessels because providing a writ has been issued prior to a change of ownership, the writ may be served and the vessel arrested perfectly validly even after a change of ownership. The same applies to a number of other jurisdictions such as Australia, Canada, Hong Kong, New Zealand, Singapore and arguably South Africa. The risk of a vessel being arrested pursuant to a writ issued in rem against the vessel prior to a sale can however be significantly diminished by carrying out a search of the Admiralty Registry in London as well as in these other important maritime jurisdictions.

In a recent case involving the Association and one of its Members, the Member purchased a vessel in relation to which a writ had been issued prior to the sale but not served until some time after the sale for a claim of approximately US$250,000. As no "Writ Search" had been carried out at the Registry in Singapore where the writ had been issued, this was not discovered until the vessel was arrested.

## 3. "WRIT SEARCHES" (IN REM CLAIM FORM SEARCHES)

As explained above, in relation to statutory rights of action in rem it is possible in Australia, Canada, England, Hong Kong, New Zealand, Singapore and South Africa to check prior to purchasing a ship whether any writs have been issued which have yet to be served on the ship. In order to assist Members in identifying such claims, the Association has entered into arrangements with the following law firms whereby Members of the Association wanting to purchase FD&D cover for disputes arising under sale and purchase contracts will be entitled to have a search of the Admiralty Registry concerned carried out free of charge:-

Australia and New Zealand - Norton White
Canada - Borden Ladner Gervais
England, Hong Kong and Singapore - Ince and Co
South Africa - Garlicke and Bousfield

The Writ Searches will take place after an application for entry of a vessel in the FD&D Class of the Association has been accepted by the Managers, not more than one week prior to the intended delivery date of the vessel.

Ideally, Members wishing to gain maximum value from this "Writ Search Facility" will give the Association as much notice as possible prior to delivery of the vessel (possibly even

prior to concluding the MOA) in order to enable a proper search of each Registry to be carried out. Should any writs be discovered, Members will then have a proper opportunity to negotiate with the sellers to ensure that these claims are adequately secured by the sellers to the satisfaction of the Claimants. Clearly, had a "Writ Search" been effected in the claim referred to in (2) above, then there can be little doubt but that the Members would not have been faced with the subsequent arrest of the vessel and the financial losses which flowed therefrom. As this "Writ Search" facility is being provided free of charge to Members buying MOA risks FD&D cover, the law firms listed above have kindly agreed to carry out a single search of each Registry, not more than one week prior to the intended delivery of the vessel. Whilst of course there is a risk that a writ may be issued in the Registry after the search has been carried out, Members will appreciate that it is impossible to eliminate all risks. Upon receipt of an application for entry of a vessel in the FD&D Class being accepted by the Members, the Managers of the Association will send Members a brief letter setting out the terms on which the "Writ Search" is being carried out as set out in the draft attached to this Circular.

The Managers of the Association hope that Members will take full advantage of this facility, thereby reducing the risk of suffering unforeseen financial losses as a result of claims being made against vessels purchased by them relating to vessels' prior ownership. Since this facility was introduced in 1999, a number of Members have been assisted in identifying claims which, when brought to the attention of the sellers concerned, were sorted out. As most vessels are owned by single purpose companies whose sole asset is the vessel, once she has been sold and the sale proceeds distributed, it is usually extremely difficult getting the sellers to honour their usual obligation under the MOA to indemnify the buyers in respect of such claims. It is no surprise therefore that some Members view the "Writ Search Facility" as an integral part of their management of uninsured risks when buying second-hand ships.

4. MARITIME LIEN INSURANCE FOR SECOND-HAND SHIPS

Unfortunately, however, there are many jurisdictions other than those referred to in paragraph 3 above which grant various categories of claims "maritime lien" status and where it is not possible to discover the existence of such claims before a vessel has been arrested. In order to assist Members in insuring against the risk of claims being made against a vessel relating to its previous ownership, the Managers of the Association have arranged a Lloyd's Insurance Open Policy to which declarations can be made. Members wanting to purchase FD&D cover for disputes arising under sale and purchase contracts are thereby enabled also to cover the risk of liabilities being incurred by them in relation to claims being made against vessels relating to their previous ownership. Such claims brought against Members' vessels will of course continue to be handled by the Association's FD&D Department in the usual manner. To the extent, however, that financial losses are incurred by Members arising directly from a "maritime lien" type claim being made, such losses will be covered by the Maritime Lien Insurance for Second-Hand Ships up to a limit of US$1.0 million per vessel, subject to a deductible of US$5,000 at a premium for the 2007/2008 policy year of US$7,500 per vessel. Alternatively, Members wishing only to purchase cover up to a limit of US$500,000 any one vessel can pay a reduced premium of US$4,500 per vessel declared. As will be seen from the terms of the policy attached, the cover purchased will continue for 12 months from the date of the declaration.

The Managers of the Association hope that this Maritime Lien Insurance Policy for Second-Hand Ships will continue to provide Members with a useful additional cover to protect them against unforeseen financial losses.

Members wishing to discuss any aspect of this Circular are welcome to contact the

10

Association's Underwriting or FD&D Departments.

Stephen Purvis
Director - North Insurance Management Limited
As Managers on behalf of the North of England P&I Association Limited

## "Mareva" Injunctions (Freezing Orders)

**22–03**   This type of injunction[5] has featured on a number of occasions in reported cases relating to sale and purchase of second-hand ships. Such injunctions have usually been in the nature of what has become known as a *Mareva* injunction which derives from the case of that name in which Lord Denning set out the "new" principle that a creditor may obtain an injunction even before he has established his rights by obtaining judgment. The justification was the need to prevent a Defendant from "snapping his fingers" at a judgment or arbitration award because he had arranged his affairs so as to leave no assets within the reach of the successful Claimant. This development, which was described at the time by Lord Denning as "the greatest piece of judicial law reform in my time", filled a serious deficiency in English law that there was no effective remedy to prevent debtors from evading liability by salting away their assets.[6]

**22–04**   Lord Denning had more to say on the matter in the case of *Third Chandris Shipping Corporation v Unimarine S.A.*:[7]

> "No-one would wish any reputable foreign company to be plagued with a *Mareva* Injunction simply because it has agreed London arbitration. But there are some foreign companies whose structure invites comment. We often see in this court a corporation which is registered in a country whose company law is so loose that nothing is known about it—where it does no work and has no officers and no assets. Nothing can be found out about the membership, or its control, or its assets, or the charges on them. Judgment cannot be enforced against it . . . it is nothing more than a name grasped from the air, as elusive as the Cheshire Cat. In such cases the very fact of incorporation . . . gives some grounds for believing there is a risk that, if a judgment or an award is obtained, it may go unsatisfied . . ." (per Lord Denning at pp. 189 and 669).

**22–05**   Against that background the remedy of injunction began to feature in reported cases involving sale and purchase of second-hand ships the first of which involved a ship called the *Assios*.[8] It is fair to say that these reported cases show some differences of approach reflecting no doubt the different circumstances of each case and the possibly different approaches of the judges hearing those cases and deciding on the application of a discretionary remedy.

### Application to sale and purchase disputes

**22–06**   The background in many of the cases to an attempt to involve courts in granting injunctions to buyers of second-hand ships is the following. It may become apparent to the Buyers during the period prior to delivery (often based on reports by their familiarisation personnel on board the ship) that she may well not be delivered in the condition called for by the contract. There are various reasons why this situation may arise. For example, if the contract is based on Saleform '87 and the wording as to

---

[5]  For convenience the terms "injunction" and "freezing order" are used interchangeably.
[6]  See *Mareva Compania Naviera S.A. v International Bulkcarriers S.A.* (the *Mareva*) [1975] 2 Lloyd's Rep. 509 CA.
[7]  [1979] 2 Lloyd's Rep. 184.
[8]  *Negocios del Mar S.A. v Doric Shipping Corporation S.A.*, (the *Assios*) [1979] 1 Lloyd's Rep. 331 CA.

giving notice to Class in Clause 11 is retained, the Buyers may not be confident that the Sellers will have drawn the attention of Class to all relevant matters. Thus the Sellers may be in a position to present an unqualified certificate of maintenance of class on delivery which, in the Buyers' view, will not represent the true position because appropriate notification to Class has not been made (and as noted in Chapter 14 absent fraud a certificate of class cannot be challenged[9]). Alternatively, the problems with the condition of the vessel may in the view of the Buyers potentially amount to average damage affecting class. If the contract is on "average damage" terms (in the case of Saleform '87 by virtue of an added clause or in the case of Saleform '93 by virtue of Clause 11) the Buyers will be faced with the difficulty that they cannot evaluate the seriousness or otherwise of the suspected defects prior to delivery since they do not have free access to the vessel but may be concerned that such defects could prove very expensive to repair. In such circumstances the Buyers are faced with a considerable difficulty. It is doubtful in many cases, whether, even if the Buyers wished to do so, they would be contractually justified in refusing to take delivery of the vessel. Indeed, such may well not be their wish—they have identified a particular vessel which meets their requirements and they would therefore like to take delivery but are concerned as to their ability to recover any claims for damages against Sellers who may have some or all of the characteristics of Lord Denning's Cheshire Cat. Once the Buyers have paid for and taken delivery of the ship they can of course assess the position fully. But by that time the sale proceeds will have been distributed, either to the Sellers' mortgagees and/or to the Sellers themselves possibly followed by a prompt onward distribution to shadowy or unknown shareholders who cannot be discovered on any share register. It should be said that if the Sellers are a company within what might be regarded loosely as a "group" with a degree of commercial reputation the Buyers' task in recovering a claim for damages might not prove in the event impossible but the Buyers would still face a lengthy uphill struggle with the risk of feeling obliged to compromise a possibly good claim on grounds of doubtful ultimate recoverability. Additionally, the processes of pursuing a recovery by various more or less difficult procedures in possibly more than one jurisdiction may prove unacceptably expensive.

## Injuncting the sale proceeds

22–07   The approach was therefore evolved, starting with the case of the *Assios* (above), of seeking to persuade the Courts to grant the Buyers an injunction which would be available against the proceeds of sale of the vessel as soon as they reached the hands of the Sellers on closing. Such an application would normally be made to a judge in chambers "ex parte" (in other words without the Sellers either being present or in this style of application being notified) in advance of delivery. It was always likely that this rather forceful method of using court procedures would give rise to difficult questions. The first such question (as to full and frank disclosure) arose in the *Assios* (above) in which Mocatta J. granted the requested injunction restraining the Sellers from dealing with any of their assets within the jurisdiction. This injunction was notified to the Sellers and their bank at the end of the completion meeting. On an application to discharge the injunction the same judge held that it should be discharged on the

---

[9]  *Buena Trader* [1978] 2 Lloyd's Rep 325, CA; *Alfred Trigon* [1981] 2 Lloyd's Rep 333.

al in *Savage v*
y balanced on
n in *Geest plc*
success of the
d for from the
uld lead to a
ere the opera-
then a refusal
; such a result
and again in


d pregnancy.
efendants had
. a mother of
ain pregnant,
ture earnings
none of the
onsibility as
lade L.J. said
it right that
cline to have
any medical
y".78 This is
d Slade L.J.
's pregnancy
would have
Emeh claims
he House of
ole develop-
rived it was
n relation to


1974] 1 Lloyd's
1, above.

at "it would be
ich a choice or
hat it might not

blem as one of

bringing up the child, that the decision to have the child rather than undergo an abortion was not a failure to mitigate.[82]

(iv) *A claimant need not take the risk of starting an uncertain litigation*    7–075
*against a third party.* Thus in *Pilkington v Wood*[83] the claimant bought freehold land from a seller who purported to convey the property as beneficial owner, the defendant acting as the claimant's solicitor in the transaction. When the claimant later tried to sell the property he found the title was defective, since the seller was a trustee of the property and had committed a breach of trust in buying it himself. In the claimant's action against the defendant solicitor for negligence, the latter contended that before suing him the claimant ought to have mitigated his damage by suing the seller on an implied covenant of title. This contention was rejected by Harman J. because, even conceding that the defendant had offered an adequate indemnity against costs in an action against the seller and that the seller was solvent and therefore worth suing, it was not clear that the claimant had a good prima facie right of action against the seller. The judge stated that he was of the opinion that "the so-called duty to mitigate does not go so far as to oblige the injured party, even under an indemnity, to embark on a complicated and difficult piece of litigation against a third party".[84]

Cases that take the *Pilkington v Wood*[85] line continue to appear. In *Horsfall*    7–076
*v Haywards*[86] the intended beneficiaries under a negligently drafted will were held not to have failed to mitigate in not issuing rectification proceedings because, in the particular circumstances, there was no prospect that rectification would have resulted in any material recovery of the funds, already distributed, to compensate the claimants for the loss of their interest under the will. In *Pozzolanic Lytag v Bryan Hobson Associates*,[87] since any claim against the third party would be fraught with uncertainty, the claimant was even more clearly not required to embark on what was at best speculative litigation in mitigation. In *Dean v Allin & Watts*[88] there was held to be no failure by the claimant to mitigate where the complex and uncertain litigation involved would have been not in bringing a claim against a third party but in defending a claim brought by a third party.[89] To embark on expensive legal action in the United States was not required of the claimant in mitigation in

---

[82] See *e.g. Allen v Bloomsbury Health Authority* [1993] 1 All E.R. 651 at 653d: "the defendants . . . did not try to contend that [the plaintiff] had acted unreasonably in deciding not to have a termination".

[83] [1953] Ch. 770.

[84] *ibid.* at 777. It was contended alternatively that the claimant should have taken out a policy of insurance against the consequences of the defect in title. This contention failed as well since there was no evidence that such a policy could be obtained: *ibid.* at 777 and 778. The case is also important in relation to remoteness of damage.

[85] [1953] Ch. 770.

[86] [1999] Lloyd's Rep. P.N. 332, CA.

[87] (1999) 63 Con.L.R. 81.

[88] [2000] Lloyd's Rep. P.N. 469.

[89] See *ibid.* at 495–496.

[255]

7–076                    CH.7—MITIGATION OF DAMAGE

*Center Optical (Hong Kong) Ltd v Jardine Transport Services (China) Ltd*[90] and in *British Racing Drivers' Club v Hextall Erskine & Co*[91] the argument that the damages should be reduced because the claimants should have settled litigation against a third party more favourably was rejected.[92]

7–077    However there is now a preparedness, appearing in professional negligence cases, for the courts to see a failure to claim against a third party before suing the professional himself as a failure to mitigate: the classic *Pilkington v Wood*[93] is becoming interpreted as being concerned with the need to embark only on complex, difficult and uncertain litigation. Illustrations are *Western Trust & Savings Ltd v Travers & Co*[94] and *Walker v Medlicott & Son*,[95] both already considered.

7–078    (v) *A claimant need not destroy or sacrifice rights or property of his own.*[96] This point was put with characteristic clarity by Scrutton L.J. in *Elliott Steam Tug Co v Shipping Controller*.[97] The claimants chartered a tug from the owners entitling them to the tug's services until they should give 14 days' notice determining the charterparty. In the course of this contract the tug was requisitioned by the Admiralty, from whom the claimants proceeded to claim statutory compensation under two heads, namely for the amount of hire for which they continued liable under the charterparty, and for loss of profits. The tribunal, allowing compensation for only 30 days under each head, said that the claimants should have minimised their loss by determining the charter-party and gave them the 30 days in which to have done so. Unfortunately there was no appeal to the Court of Appeal on the first head, but Scrutton L.J. stated his disagreement with the tribunal on it. "At common law", he said:

> "the owner of a ship while under a duty to act reasonably to reduce damages is under no obligation to destroy his own property to reduce the damages payable by the wrongdoer. The leasehold tenant of a house would not be bound to stop paying rent to his superior landlord during the period during which a wrongdoer prevented him using the house, because by so doing he would reduce the damages the wrongdoer had to pay if by so doing he lost the tenancy of the house after the wrong of the tortfeasor was repaired, or finished in its effects. It is common practice at common law to recover, (1) net profits lost; (2) standing charges which

[90] [2001] 2 Lloyd's Rep. 678 (Hong Kong); see at 689, para.63.
[91] [1996] P.N.L.R. 523.
[92] See *ibid.* at 542–543.
[93] [1953] Ch. 770.
[94] [1997] P.N.L.R. 295. CA, at 7–069, above.
[95] [1999] 1 W.L.R. 727, CA, at 7–070, above.
[96] This does not mean that the claimant may not be obliged to spend money: see n.68, above. Within this category may perhaps be placed *Gregory v Shepherds* [2000] Lloyd's Rep. P.N. 724, CA, where the Court of Appeal, disagreeing with the judge below, held that the claimants, unable for nine years to sell their holiday apartment abroad because of a defect in title which the defendant solicitor had overlooked, had not failed to mitigate by not renting out the apartment during the period of delay in sale.
[97] [1922] 1 K.B. 127, CA.

[256]

**19.16**                         EMPLOYMENT CLAUSE

override an express term of the charter. The judge, distinguishing *The Berge Sund*, above, as concerning "a different clause in a different contract", rejected this argument on the basis (a) that an overlap between the implied indemnity and an express term did not necessarily involve inconsistency and (b) that the off-hire to be refunded under the award was only that caused by a cause for which the charterers were responsible, namely, the loading of the explosives.

*Deutsche Ost-Afrika-Linie v. Legent Maritime (The Marie H)* [1998] 2 Lloyd's Rep. 71.

**19.17** See also the comments on this issue by Steyn, J., at first instance in *The Berge Sund* [1992] 1 Lloyd's Rep. 460, at page 467 (reversed on other grounds [1993] 2 Lloyd's Rep. 453). As to the charterers' safe port obligations see chapter 10.

### Express indemnity

**19.18** Under some time charters, as in the case of *Strathlorne Steamship* v. *Andrew Weir* above, and in the case of the Baltime charter (Lines 123 to 127), an express right is given to the owners to be indemnified by the charterers against consequences or liabilities arising out of the master complying with the charterers' orders: see paragraph 21.11, and, for an example of a recovery under an express indemnity clause, see *Portsmouth Steamship* v. *Liverpool & Glasgow Salvage Association* (1929) 34 Ll.L.Rep. 459, the facts of which are summarized at paragraph 19.28.

### Indemnity arising from the signing of bills of lading

**19.19** If the master is required by the charterers to sign or permit to be signed bills of lading which impose on the owners greater liability than that which they have assumed under the charter, the owners will usually be entitled to be indemnified by the charterers in respect of their additional liability: see paragraphs 21.4 to 21.13. But the right to indemnity may be lost if the master signs bills that he had a duty to refuse to sign: see paragraphs 21.22 *et seq.*

### Indemnity not dependent on charterers' fault

**19.20** The indemnity in favour of the owners against the consequences of complying with the charterers' orders operates quite independently of any fault on the part of the charterers. In *The Athanasia Comninos* [1990] 1 Lloyd's Rep. 277, see paragraph 19.27, below, Mustill, J., rejecting an argument by charterers that Article IV, rule 3 of the Hague Rules protected them from liability under the implied indemnity in the New York Produce form, said: "they would need to use much clearer language than this to introduce the idea of fault into the shipowner's implied indemnity, where it has never been before."

### Employment

**19.21** "Employment" in this context relates to the economic utilization of the ship. In the words of Lord Bingham in *The Hill Harmony* [2001] 1 Lloyd's Rep. 147, at page 150: "Clause 8 of the present charter-party, providing that the master (although appointed by the owners) shall be under the orders and directions of the charterers, gives the charterer his key right under the contract: to decide where the vessel shall go and what she shall carry, how (in short) she shall be used, always subject to the terms of the charter-party." But matters of "employment" have to be distinguished from matters of "navigation", which remain the responsibility of the master.

**19.22** An order by the charterers that the ship is to proceed to or remain at a certain port is an order regarding employment. Thus in *Temple Steamship* v. *V/O Sovfracht* (1945) 79 Ll.L.Rep. 1, see paragraph 4.47, above, the obedience of the master to the wrongful orders of

320

the charterers to delay at Murmansk and thereafter proceed to Garston did not amount to a waiver and did not prejudice the claim of his owners against the charterers under that charter (an amended Baltime form), since the master was under the orders of the charterers as to employment. See also *Larrinaga Steamship* v. *The Crown* (1944) 78 Ll.L.Rep. 167, above, and *The Eugenia* [1963] 2 Lloyd's Rep. 381. Hence the charterers may be obliged to indemnify the owners in respect of cargo claims for which they must almost inevitably have to pay simply by discharging cargo at a particular port as ordered by the charterers: see *The Island Archon* [1994] 2 Lloyd's Rep. 227 (C.A.) and paragraph 19.13, above.

**19.23** But a distinction is drawn between such orders and how they are to be executed in terms of navigation.

The *Ramon de Larrinaga* was on requisition to the Crown on the terms of the T.99A time charter, including a clause virtually identical to the employment and indemnity clause of the Baltime form. In October 1939 she was ordered to proceed on a voyage from Newport to St. Nazaire and then to Cardiff for a joint survey prior to redelivery. After discharge at St. Nazaire she was ordered by the naval sea transport officer there to proceed at once to Quiberon Bay and join a convoy for Cardiff. The master protested that, with the weather deteriorating and darkness coming on, he should wait until morning before sailing. But he was overruled. The ship thereupon set out but subsequently grounded and was damaged.

One basis on which the owners claimed indemnity from the Crown was that the damage to the ship had been caused by the master's compliance with charterers' orders. This argument was rejected by the House of Lords because, although the orders to St. Nazaire and then to Cardiff were orders by the charterers as regards employment, the orders of the naval sea transport officer as to when the ship should sail for Cardiff were not, and, in any event, the damage was not caused by the charterers' orders, although it occurred while they were being carried out.

Lord Wright said, at page 173: "These sailing orders [of the naval sea transport officer] which the Judge found were given were, in my opinion, merely dealing with matters of navigation in regard to carrying out the orders [of the charterers] to proceed to Cardiff. It was the duty of the master to exercise his judgment in such matters of navigation." Lord Porter said, at page 176: " . . . an order to sail from port A to port B is in common parlance an order as to employment, but an order that the ship shall sail at a particular time is not . . . "

*Larrinaga Steamship* v. *The Crown* (1944) 78 Ll.L.Rep. 167.

(See also *Weir* v. *Union Steamship Company* [1900] A.C. 525 and *Stag Line* v. *Ellerman & Papayanni Lines* (1949) 82 Ll.L.Rep. 826.)

**19.24** That matters of navigation and ship management remain always the responsibility of the owners and their servant, the master, is underlined by the words of Lines 170 and 171 in the New York Produce form. So while it was held by Staughton, J., in *The Erechthion* [1987] 2 Lloyd's Rep. 180, below, that the orders of a harbour master to proceed to an anchorage to lighten were orders as to employment, the advice of the pilot as to precisely where the ship should anchor was a matter of navigation.

The *Erechthion*, while under time charter on the New York Produce form, was ordered by the charterers to discharge at Port Harcourt. Since her draught was too deep, she was ordered by the harbour master to proceed to an anchorage in the river to lighten, where she grounded. It was common ground that there was to be implied in the charter an obligation to indemnify the owners against the consequences of complying with the charterers' order to go to Port Harcourt. It was held by Staughton, J., that the charterers' order was to be regarded as an order to go to such discharging place there as the harbour authority should designate. He held that the harbour master's order was an order as to employment and remitted to the arbitrators the question whether the grounding was proximately caused by this order, rather than by the advice of the pilot as to where within the anchorage the ship should anchor, which was a matter of navigation only.

*The Erechthion* [1987] 2 Lloyd's Rep. 180.

(See also *The Isabelle* [1982] 2 Lloyd's Rep. 81 and *The Mediolanum* [1984] 1 Lloyd's Rep. 136, paragraphs 10.86 and 10.87, above, where these cases are discussed.)

**19.25** Orders from the charterers as to the general route by which the ship is to carry out a voyage are orders regarding employment. Absent any specific charter term to the contrary, the

**19.25**                                          EMPLOYMENT CLAUSE

master is obliged to obey such orders, subject only to considerations of seamanship and safety.

The *Hill Harmony*, a bulk carrier of 15,622 gross tons, was sub-chartered on an amended New York Produce form incorporating the Hague-Visby Rules. In January and again in April 1994, the master ignored orders from the sub-charterers (based on the advice of a weather routing service) to use the great circle route for a voyage from Vancouver to Japan and sailed instead by the more southerly and longer rhumb line route, considerably extending the time taken for each voyage. The sub-charterers deducted from hire in respect of the extra time used and bunkers consumed, claiming that the disponent owners were in breach of Clause 8, in that the master had failed to prosecute the voyages with the utmost despatch and had not obeyed their orders as regards employment.

From written evidence in the arbitration it appeared that the master had followed the more southerly route because in October 1993, under a previous charter, the ship had been damaged in heavy weather on the great circle route. However, there was evidence that many other ships had followed the great circle route in early 1994 without any particular difficulty, and the majority arbitrators concluded that this master had shown no good reason for not doing likewise.

Clarke, J., and the Court of Appeal concentrated on whether there had been a breach of the second of the master's obligations under Clause 8, namely, to follow sub-charterers' orders as regards employment. They held that there had been no such breach, as these routing orders related to navigation as opposed to employment and therefore fell outside the Clause.

The House of Lords reversed their decisions and restored that of the majority arbitrators. They held that the first obligation on the master under Clause 8, namely to prosecute his voyages with the utmost despatch, required him to perform voyages ordered by the sub-charterers by the shortest and quickest route, even in the absence of express orders as to such route, unless either there was some navigational reason for not doing so or he used another "usual" route. In this case no sufficient navigational objection had been raised to the great circle route, nor was there either evidence or a finding by the arbitrators that the rhumb line route was a "usual" route for these voyages.

Although this was sufficient to decide the case, they went on to hold that the disponent owners were also in breach of the obligation to obey the sub-charterers' orders as regards employment. Contrary to the view taken by the courts below, the orders to use the great circle route were orders regarding "employment" rather than "navigation". In the words of Lord Hobhouse: " 'Employment' embraces the economic aspect—the exploitation of the earning potential of the vessel. 'Navigation' embraces matters of seamanship."

The disponent owners could not use as a defence to these breaches Article IV, rule 2(a) of the Hague-Visby Rules, "act, neglect or default of the master . . . in the navigation or management of the ship". The master had not erred in his navigation, but had simply chosen to disregard his two contractual obligations under Clause 8.

Lord Bingham said, at page 153: "The responsibility for making good, so far as practicable, whatever course is chosen of course remains with the master and crew, as does that for navigating the vessel safely into and out of port, and responding to maritime problems encountered in the open sea. But subject to safety considerations and the specific terms of the charter, the charterers may not only order a vessel to sail from A to B but may also direct the route to be followed between the two."

*The Hill Harmony* [1998] 2 Lloyd's Rep. 367, [1999] 2 Lloyd's Rep. 209 (C.A.) and [2001] 1 Lloyd's Rep. 147 (H.L.).

**19.26** In the above case, Lord Hobhouse, at page 159 of the House of Lords report, defined the difference between "employment" and "navigation" as follows: " 'Employment' embraces the economic aspect—the exploitation of the earning potential of the vessel. 'Navigation' embraces matters of seamanship." But exactly where in practice the line between them is to be drawn in respect of routing orders given by (or on behalf of) charterers is capable of further clarification. For this purpose the facts of *The Hill Harmony* were too extreme. The charterers' orders were on a large scale and the master's reasons for disobeying them were unconvincing. A more precise distinction may emerge when there comes before the courts a case in which the charterers give more detailed orders and the master makes out a better case for departing from them for reasons of safety and seamanship. Lord Bingham expressed the balance to be struck as follows, at page 152: "The charterer's right to use the vessel must be given full and fair effect;

but it cannot encroach on matters falling within the specialized professional maritime expertise of the master, particularly where the safety or security of the vessel, her crew and her cargo are involved. He is the person, on the vessel, immediately responsible."

**19.27** Similarly, an order to load a particular cargo has been held to be an order regarding employment. If the order to load that cargo causes loss to the owners, then the right to indemnity from the charterers arises.

The *Ann Stathatos* was time chartered on a wartime version of the Baltime form which included, as in Clause 9 of the present form, the statement that the master was to be "under the orders of the charterer as regards employment" and an express indemnity against the consequences of his obeying such orders. The charterers ordered the ship to load a cargo of coal, which gave off methane gas. Repairs to water tanks in the 'tween decks were being undertaken, pending sailing of the ship's convoy, when a series of explosions damaged the ship. The arbitrators found that the direct cause of the explosions was a combination of the explosive atmosphere and a spark produced by the repairs. The owners claimed that the charterers should indemnify them for the damage to the ship.

Devlin, J., held that an order to load a particular cargo was an order as to the employment of the ship and so was within the scope of the indemnity provision, but, on the facts found by the arbitrators, the loading was not the direct cause of the loss and so no right to an indemnity arose.

*Royal Greek Government* v. *Minister of Transport* (1949) 83 Ll.L.Rep. 228.

The *Athanasia Comninos* and the *Georges Chr. Lemos* were chartered to the same charterers on the New York Produce form. Both were ordered by the charterers to load coal in Sydney, Nova Scotia for Birkenhead. Shortly after sailing each ship was damaged by an explosion caused by ignition of a mixture of air and methane gas, which had been emitted from the coal after loading. The owners sought to recover from the charterers in respect of these damages. It was conceded by the charterers that their order to load the coal fell within the scope of the indemnity implied from Clause 8, even if the owners failed (as they did at the trial) to prove that the coal loaded had properties making it unusually dangerous as compared with other coal cargoes. But the charterers claimed that there had been faults by each of the owners and/or their crews which broke the chain of causation between their orders to load the coal and the explosions. Mustill, J., found no such fault with regard to the *Georges Chr. Lemos*, but that the ignition of the gas and air mixture on the *Athanasia Comninos* had been caused by a crew member lighting a match for a cigarette in the forecastle. Accordingly he held the charterers liable to the owners of the former ship, but not to the owners of the latter. (With regard to the former ship, the judge rejected a defence put forward by the charterers on the basis of Article IV, rule 3 of the Hague Rules: as to which see paragraph 9.25, above, and paragraph 34.36, below.)

Mustill, J., said: "It seems to me perfectly possible to have a loss which is caused by the shipment of a cargo having certain properties, even if the properties of the cargo in question are no different from those of other cargoes of the same description. In the present case, if one asks the question (eliminating the possibility of fault on the part of the shipowner) 'Why was there an explosion?', the answer is—'Because there was methane in the hold.' And if one goes on to ask 'Why was there methane in the hold?', the answer is—'Because the Time Charterers called on the vessel to load coal.' This answer is in my opinion sufficient to found an indemnity, without proof that the coal was in any way unusual."

*The Athanasia Comninos* [1990] 1 Lloyd's Rep. 277.

### Causation

**19.28** For the owners to succeed under the indemnity, they must prove an unbroken chain of causation between the instructions of the charterers and the loss suffered: see *Royal Greek Government* v. *Minister of Transport* (*The Ann Stathatos*), and *The Athanasia Comninos*, above. Donaldson, J., said in *The White Rose*, below: "A loss may well arise in the course of compliance with the time charterers' orders, but this fact does not, without more, establish that it was caused by and is in law a consequence of such compliance, and, in the absence of proof of such causation, there is no right to indemnity." See also *The Erechthion* [1987] 2 Lloyd's Rep. 180, *The Berge Sund* [1992] 1 Lloyd's Rep. 460, at page 467, [1993] 2 Lloyd's Rep. 453

(C.A.), at page 462, and *The Island Archon* [1993] 2 Lloyd's Rep. 388 and [1994] 2 Lloyd's Rep. 227 (C.A.). In *The Aquacharm* [1982] 1 Lloyd's Rep. 7 (the facts of which are set out at paragraph 34.21, below), Griffiths, L.J., said: "the owners have failed to show that the transhipment expenses were incurred as a direct consequence of complying with the charterers' orders . . . The burden is on the owners claiming the indemnity to establish that the charterers' orders caused the loss—this they have failed to do and they are not therefore entitled to be indemnified against the expenses of the transhipment." See also under "Ordinary expenses and navigational risks", below; as to the need to show a *direct* consequence, see the caveat of Staughton, L.J., in *The Berge Sund* [1993] 2 Lloyd's Rep. 453 (C.A.), at page 462. For a decision on the application of the doctrine of remoteness of damage to indemnity claims, see *The Eurus* [1998] 1 Lloyd's Rep. 351.

The *White Rose*, on charter on the Baltime form, was ordered to load grain at Duluth. In accordance with their obligations under Clause 4, the charterers appointed as loading stevedores a firm of average competence by local standards. One of their men, having left his station for his own purposes, fell through an unfenced part of a 'tween deck hatch. He sued the owners for damages for his injuries in the Minnesota courts and the owners became obliged to spend money on legal fees and to contribute towards the settlement of his claim. The owners claimed to be indemnified by the charterers under Clause 9. Their claim was rejected by Donaldson, J., because the accident, and thus the owners' loss, had been caused by the lack of fencing (for which the charterers were not responsible) and the negligence of the injured man himself, and not by either their compliance with the charterers' orders to load grain at Duluth or the selection by the charterers of incompetent stevedores.
  *The White Rose* [1969] 2 Lloyd's Rep. 52.

The *Hillcroft* was chartered to lighten the *West Hesseltine*, aground off the Cape Verde Islands. The charter obliged the captain to "follow the instructions of the charterers" who were to "indemnify the owners from any consequences, or liabilities that may arise" therefrom. The charterers ordered the transfer of barrels of palm oil which leaked, despite careful handling, and damaged the *Hillcroft*'s holds. The ship was also damaged by the transfer of large mahogany logs. Roche, J., held that the charterers were liable to indemnify the owners in both these cases, but not for further damage following the escape of oil from her forepeak tank, for although this had also been loaded on the charterers' instructions, the effective cause of its escape was the subsequent breaking of a pipe connected to that tank.
  *Portsmouth Steamship Co. Ltd.* v. *Liverpool & Glasgow Salvage Association* (1929) 34 Ll.L.Rep. 459.
  (See also the judgments of Lord Porter in *Larrinaga Steamship* v. *The Crown* (1944) 78 Ll.L.Rep. 167, at page 176 and of Lord Hobhouse in *The Hill Harmony* [2001] 1 Lloyd's Rep. 147, at page 158.)

**Severable damages**

19.29  It may, however, be possible to segregate the damage caused by obedience to the charterers' orders from damage caused by other factors and allow the owner to recover in respect of the former.

The *Marie H* was fixed on the New York Produce form for a time charter trip from Germany to East Africa. An additional clause allowed explosives to be shipped subject to certain conditions "at Charterer's risk without any liability to owners for loss of or damage to cargo and/or ship howsoever caused".
  General cargo was loaded at Hamburg and Antwerp, including seven containers and a crate of explosives. The ship then encountered a violent storm in the Bay of Biscay and had to put into Lisbon where she was repaired and her cargo was repacked. Precautions made necessary by the presence of explosives among the cargo prolonged the time taken by this work and also increased its costs.
  The sole arbitrator, relying on Clause 8 and the additional explosive cargo clause, held that the owners were entitled to an implied indemnity arising from their obedience to the charterers' orders to load the explosives, covering a refund of deducted off-hire/damages for delay and expenses at Lisbon but only to the extent that the delay and expense had been exacerbated by the presence of the explosives. His approach was approved by Timothy Walker, J., in the Commercial Court.
  *Deutsche Ost-Africa-Linie* v. *Legent Maritime (The Marie H)* [1998] 2 Lloyd's Rep. 71.

### Ordinary expenses and navigational risks

**19.30** Moreover, the owners are not entitled to recover from the charterers under their indemnity the ordinary expenses and losses of trading, despite the fact that in a broad sense these are incurred as a result of their obedience to the orders of the charterers. This was expressed by Lloyd, J., in *The Aquacharm* [1980] 2 Lloyd's Rep. 237 in the following words: "It is of course well settled that owners can recover under an implied indemnity for the direct consequences of complying with the charterers' orders. But it is not every loss arising in the course of the voyage that can be recovered. For example, the owners cannot recover heavy weather damage merely because, had the charterers ordered the vessel on a different voyage, the heavy weather would not have been encountered. The connection is too remote. Similarly, the owners cannot recover the expenses incurred in the course of ordinary navigation, for example, the cost of ballasting, even though in one sense the cost of ballasting is incurred as a consequence of complying with the charterers' orders: see *Weir and Others* v. *Union Steamship Co. Ltd.* [1900] A.C. 525. The same considerations apply in the present case. The costs of transhipment were an ordinary expense incurred in the course of navigation."

**19.31** The above passage, including the extract from the judgment of Lloyd, J., in *The Aquacharm*, was quoted with approval by Evans, L.J., in the Court of Appeal in *The Island Archon* [1994] 2 Lloyd's Rep. 227, at page 235. The Lord Justice, having referred to other authorities, then continued, at page 236: "The authorities show, therefore, that time charterers may be held liable under an express indemnity for the consequences of ordering the chartered vessel to load a particular cargo or to proceed to a named port, even though the order is one which the charterer is entitled to give and the master is bound to obey. But the consequences for which the charterer is liable do not include two categories of loss. First, the loss may be regarded as caused in law by some subsequent or intervening event. An act of negligence may often, but not invariably, break the chain of causation in this sense: *Portsmouth Steamship Co. Ltd.* v. *Liverpool & Glasgow Salvage Association* (1929) 34 Ll.L.Rep. 459 (Mr Justice Roche) and *The White Rose*, at page 59. Secondly, the loss although a consequence "in a broad sense" . . . may have arisen from a risk which the shipowner has agreed to run, hence the exclusion of navigation risks and also the distinction which has been held to exist between time and voyage charter-parties (*per* Mr Justice Devlin, in *The Ann Stathatos* and Mr Justice Mustill in *The Georges Christos Lemos (third party proceedings)* [1991] 2 Lloyd's Rep. 107)."

**19.32** Lord Justice Evans emphasized, however, that a rigid distinction should not be drawn between voyage and time charters in this regard. An indemnity might less readily be implied in the case of a time charter for the period of a specified voyage or "trip", whereas it might be more readily implied in a voyage charter giving the charterers a wide range of options.

**19.33** He then continued, still at page 236: "What risks the shipowner has agreed to bear must depend upon the true construction of the charter-party and therefore upon the situation when the charter-party was entered into. If there had been a finding in the present case that the 'Iraqi system' was notorious at the date of the charter-party in March, 1979 then there might be substance in the charterers' contention that the shipowners had consented to bear the consequences of ordering the vessel to discharge at an Iraqi port, which they could have excluded from the agreed limits if they had sought to do so."

**19.34** Sir Donald Nicholls, V.-C., also emphasized, at page 238, that the implied indemnity covered some only of the consequences of the shipowner's compliance with the charterer's orders; the loss had not only to arise directly from those orders but "also be one which, on a fair reading of the charter-party, the shipowner cannot be taken to have accepted". In *The Darya Tara* [1997] 1 Lloyd's Rep. 42, the facts of which are summarised at paragraph 20.28,

**19.34**                    EMPLOYMENT CLAUSE

Mance, J., followed this reasoning in rejecting a claim by owners to be indemnified against the consequences of their obedience to the order of charterers to load cargo on deck. By obeying they had accepted the associated risks; the loss arose from heavy weather and not from the charterers' orders.

### Agents

**19.35** The provision in Lines 77 and 78 of the New York Produce form gives the charterers the right (and presumably the duty) to appoint the agents to handle the business of the ship in each port.

**19.36** Lord Wright, in *Larrinaga Steamship* v. *The Crown* (1944) 78 Ll.L.Rep. 167, said, at page 172: "The shipowner is entitled in the ordinary course to decide to what firm or person in each port the ship in the course of the charter-party is to be consigned as agent. The selection is here left to the charterers."

**19.37** Reference should also be made to Line 39 of the New York Produce form, which requires the charterers to "provide and pay for... Agencies... ". Comments on the responsibility of the charterers for the choice of suitable agents and the extent of their liability for the agents' acts or omissions appear at paragraphs 12.22 and 12.23, above.

by Mocatta, J., that this constituted a breach of the obligation under Clause 9 to prosecute the voyage with the utmost despatch, but that the owners were protected by Clause 13 (Clause 12 in the 2001 revision).

*The Apollonius* [1978] 1 Lloyd's Rep. 53.

(Views expressed by Mocatta, J., on other aspects of this case were criticised by the House of Lords in *The TFL Prosperity*, above.)

**37.30** The extent of the protection afforded by the exceptions clause against breaches of Clause 9 has not yet been fully explored by the courts. In *Suzuki* v. *Beynon* (1926) 24 Ll.L.Rep. 49 (summarised at paragraph 18.6, above), on a different form of charter, the view was expressed that if an exceptions clause "wiped out" the obligation to prosecute the voyage with the utmost despatch, the exceptions clause should not be given effect. But the weight of opinion in that case was that if there were matters to which the obligation to proceed with utmost despatch might apply, apart from neglect or default of the master, exceptions excluding liability for the master's negligence should be given full effect. *Suzuki* v. *Beynon* was considered by the House of Lords in *The Hill Harmony* [2001] 1 Lloyd's Rep. 147, summarised at paragraph 18.1, above. In the light of the analysis in the latter case, although again of a different charterparty and a different exceptions clause, it is suggested that if the master fails, at the outset, to adopt the shortest and quickest route (*a fortiori* if that is the route ordered by the charterers), but chooses, without good reason, to follow another longer and slower route, the owners will not be protected by the exceptions clause. If, on the other hand, the master adopts the shortest and quickest route, but thereafter, and without good reason, lengthens the voyage by delaying on or departing from that route, the owners should be protected.

**37.31** Where delay is the result of orders by the owners, they will obtain no protection from the exceptions clause: *International Bulk Carriers* v. *Evlogia Shipping* (*The Mihalios Xilas*) [1978] 2 Lloyd's Rep. 186.

## 37.32 Clause 9 continued—Master (employment and indemnity)

| | |
|---|---|
| The Master shall be under the orders | 121 |
| of the Charterers as regards employment, agency, or | 122 |
| other arrangements. The Charterers shall indemnify the | 123 |
| Owners against all consequences or liabilities arising | 124 |
| from the Master, officers or Agents signing Bills of Lading | 125 |
| or other documents or otherwise complying with such | 126 |
| orders, as well as from any irregularity in the Vessel's | 127 |
| papers or for overcarrying goods. The Owners shall not | 128 |
| be responsible for shortage, mixture, marks, nor for | 129 |
| number of pieces or packages, nor for damage to or | 130 |
| claims on cargo caused by bad stowage or otherwise. If | 131 |
| the Charterers have reason to be dissatisfied with the | 132 |
| conduct of the Master or any officer, the Owners, on | 133 |
| receiving particulars of the complaint, promptly to | 134 |
| investigate the matter, and, if necessary and practicable, | 135 |
| to make a change in the appointments. | 136 |

**Employment and indemnity:** see generally chapter 19.

**37.33** It should be noted that the Baltime form, unlike the New York Produce form, contains an express indemnity: see paragraph 19.18.

**37.34**                                    BALTIME

*Agency, or other arrangements*

**37.34** A similar clause to the employment and indemnity clause in the Baltime form was considered by the House of Lords in *Larrinaga Steamship* v. *The Crown* (1944) 78 Ll.L.Rep. 167, summarised at paragraph 19.23, above. In that case Lord Wright said, in regard to these terms: "The shipowner is entitled in the ordinary course to decide to what firm or person in each port the ship in the course of the charter-party is to be consigned as agent. The selection is here left to the charterers. . . . 'Arrangements' is a wider term. It is also used in this charter-party [T.99A, a wartime version of the Baltime form] in Clause 3. There it refers to disbursements which have to be made for services in connection with operating the ship, and I think it has a similar scope in Clause 9." See also paragraphs 12.22 and 12.23, above.

*Consequences or liabilities*

**37.35** It was held in *Royal Greek Government* v. *Minister of Transport (The Ann Stathatos)* (1949) 83 Ll.L.Rep. 228, summarised at paragraph 19.27, that "consequences or liabilities" in Clause 9 were not limited to matters not covered by other provisions of the charter. Devlin, J., said, at page 234: "I see nothing incongruous in the idea that the clause was intended to have, as it were, a life of its own and to be more than a bin for odds and ends left over from other clauses. Dangerous cargoes, trades, ports and places can all be prohibited by express provision; but many cases may arise which are outside the rigid framework of a prohibition clause, but where an owner, if he were free to choose, might prefer not to go to a particular place or take a particular cargo, not necessarily because he foresees any definite danger but because he feels it might lead to trouble. If he is to surrender his freedom of choice and put his master under the orders of the charterer, there is nothing unreasonable in his stipulating for a complete indemnity in return."

**37.36** It was held in *Bosma* v. *Larsen* [1966] 1 Lloyd's Rep. 22 that the indemnity against "all consequences or liabilities" imposes the obligation to indemnify against the incurring of a liability and hence that the owners' cause of action under Clause 9 in respect of a liability for damage to cargo under bills of lading arose when that liability to cargo was created and not when the cargo claim was paid. But the decision was not followed in *County & District Properties* v. *Jenner* [1976] 2 Lloyd's Rep. 728, where it was held that the cause of action in a claim under a building contract did not, on the wording of the indemnity clause in that contract, arise until the underlying liability was ascertained. The court in *Green & Silley Weir* v. *British Railways Board* (1980) 17 B.L.R. 94 also declined to follow *Bosma* v. *Larsen*. Neill, J., in *The Caroline P* [1984] 2 Lloyd's Rep. 466 (see paragraph 21.14, above), having analysed the authorities, did not state whether he agreed with the decision in *Bosma* v. *Larsen* or not, but he observed that McNair, J., had not dealt separately with the words "all consequences" in construing the indemnity provision in Clause 9. *Bosma* v. *Larsen* must now, therefore, be regarded as very doubtful authority.

*Such orders*

**37.37** In *The Ann Stathatos* (1949) 83 Ll.L.Rep. 228 it was held that "such orders" did not relate only to the signing of bills of lading or other documents: see under "Consequences or liabilities", above.

24

*Relationship with Clause 12 of 2001 revision*

**37.38**  The owners may have a defence under the exceptions clause (Clause 12 of the 2001 revision) to a claim by the charterers for damages caused by a failure of the master to comply with their employment orders if the claim can be categorised as a claim for delay during the currency of the charter, or if it is in respect of physical loss or damage to goods on board (see paragraphs 37.30, above and 37.54, below). The question whether such a claim could be regarded as a claim for delay was left open by the Court of Appeal in *The Charalambos N. Pateras* [1972] 1 Lloyd's Rep. 1. See the reference to *The Hill Harmony* [2001] 1 Lloyd's Rep. 147 at paragraph 37.30, above, and generally chapter 18, above.

*Signing bills of lading*

**37.39**  See generally chapter 21. It should be noted that the Baltime form does not expressly require the master to sign bills of lading "as presented". But it was held by Clarke, J., in *The Ines* [1995] 2 Lloyd's Rep. 144, at page 149, that it was implicit in Clause 9 of the Baltime form that the charterers or their agents had authority to sign bills of lading on behalf of the owners. See also paragraph 21.51, above, and the judgment of Clark, J., in *LEP International* v. *Atlanttrafic Express Services* (1987) 10 N.S.W.L.R. 614.

# American Law

### Charterer's right to issue bills of lading

**37.40**  In *The Penta*, SMA 1603 (Arb. at N.Y. 1981), the panel majority ruled that under Clause 9 of the Baltime 1939 form, the charterer did not have the right to issue bills of lading or to order the master to authorize it, as agent, to sign bills of lading. The majority reasoned that a contrary decision could give the charterer the power to circumvent the owner's right to exercise its lien on sub-freights if it were to issue and sign bills of lading without having to advise the master of the identity of the sub-charterer or shipper. According to the panel majority, the express indemnity given to the owner in Clause 9 against all consequences by reason of the signing of bills of lading did not give the charterer the right to issue bills itself. Rather, if the charterer wished to have this right, it was necessary to obtain the express agreement of the owner.

## 37.41  Clause 10—Directions and Logs; Clause 11—Suspension of Hire etc.

| | |
|---|---|
| **10.  Directions and Logs** | 137 |
| The Charterers shall furnish the Master with all | 138 |
| instructions and sailing directions and the Master shall | 139 |
| keep full and correct logs accessible to the Charterers | 140 |
| or their Agents. | 141 |
| | |
| **11.  Suspension of Hire etc.** | 142 |
| (A) In the event of drydocking or other necessary | 143 |
| measures to maintain the efficiency of the Vessel, | 144 |
| deficiency of men or Owners' stores, breakdown of | 145 |
| machinery, damage to hull or other accident, either | 146 |
| hindering or preventing the working of the Vessel and | 147 |
| continuing for more than twenty-four consecutive hours, | 148 |