# CHAPTER 21

# Signing of Bills of Lading

[Clause 8 continued]

"78. . . . the Captain, . . . who is to sign Bills of Lading for
79. cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

### As presented

**21.1** The master of a ship chartered on the New York Produce form must normally sign bills of lading "as presented" to him by the charterers or their agents.

The *Ellen* was chartered to carry coke from Cardiff to Bilbao, the charter providing that the master was to sign bills of lading as presented. There was a threat of increased import duties on shipments of coke arriving after 30 June and the owners were apprehensive that these extra duties might be deducted from the balance of freight which was payable on delivery. The master refused to sign bills of lading in the ordinary form and insisted on inserting the words "vessel not liable for duties on cargo by non arrival before the 1st July". The charterers refused to accept such bills and eventually the ship sailed without bills of lading being signed. In the event, the apprehension about the imposition of increased duties proved unfounded. It was held that the master was in breach in refusing to sign bills of lading in the ordinary form and Bramwell, L.J., said, at page 124: "the captain was bound to sign a bill of lading. That means a bill of lading in the ordinary form, and not a bill of lading different from the ordinary forms, unless there is some special cause for his doing it, and there was none such here." However, since the charterers could not establish any damage resulting from the master's refusal to sign the bills, nominal damages only were awarded.

*Jones* v. *Hough* (1879) 5 Ex.D. 115.

(See also *Hansen* v. *Harrold* [1894] 1 Q.B. 612, *The Anwar Al Sabar* [1980] 2 Lloyd's Rep. 261 and *The Garbis* [1982] 2 Lloyd's Rep. 283.)

**21.2** But there are circumstances in which the master of a ship under time charter may refuse to sign bills of lading. These circumstances, and the consequences of the master signing bills of lading which he might be entitled to refuse to sign, have not yet been comprehensively defined by the courts.

**21.3** *Jones* v. *Hough* and the other authorities cited above were all cases relating to voyage charters. Time charterers have even wider powers to determine the form and contents of the bills of lading they may call on the master to sign. This was made clear by Lord Wilberforce in *The Nanfri* [1979] 1 Lloyd's Rep. 201 (and see paragraphs 21.35 and 30.35), a case in which owners of ships chartered on the Baltime form instructed their masters to refuse to sign bills of lading marked "freight prepaid" and to insist that all bills would be claused so as to incorporate the terms of the time charters. He said, at page 206: "It is important in this connection to have in mind that the present charters are time charters, the nature and purpose of which is to enable the charterers to use the vessels during the period of the charters for trading in whatever manner they think fit. The issue of bills of lading in a particular form may be vital for the charterers' trade, and indeed in relation to this trade, which involves c.i.f. or c. & f. contracts, the issue of freight pre-paid bills of lading is essential if the trade is to be maintained. Furthermore, Clause 9, as is usual in time charters, contains an indemnity clause against all consequences or liabilities



26

arising from the master signing bills of lading. This underlines the power of the charterers, in the course of exploiting the vessel, to decide what bills of lading are appropriate for their trade and to instruct the masters to issue such bills, the owners being protected by the indemnity clause."

**Bills imposing on owners greater liabilities than imposed by charter**

**21.4** It follows that the master of a ship under time charter will generally have no right to object if bills of lading are presented to him for signature which, by their terms, expose the owners to greater liabilities than those assumed by them under the terms of the time charter. But the owners will normally be entitled to recover from the charterers by way of indemnity (express or implied) any extra liability they incur: see *The Island Archon* [1994] 2 Lloyd's Rep. 227 (C.A.) and paragraph 19.13, above.

*Breach of contract*

**21.5** The earlier authorities on inconsistency between charter terms and bill of lading terms concern voyage charters. There is much support in them for the view that it is a breach of the contract for the charterers to require the master to sign a bill imposing on his owners a greater liability than they have agreed to accept under the charter, for example because the bill does not include an exception against a particular peril which is excepted under the charter.

The owners of the *Invermore* entered into a charter under which they were excepted from liability for negligence of the master. The charter further provided that the master was "to sign clean bills of lading for his cargo . . . without prejudice to this charter". The charterers presented and the master signed bills of lading which, although purporting to incorporate the conditions of the charter, did not effectively incorporate the negligence clause. Ship and cargo were lost owing to the negligence of the master and the owners incurred liability to the bill of lading holders which they would not have incurred had the bills been subject to the negligence clause. It was held by the Court of Appeal and the House of Lords that the owners were entitled to recover from the charterers the amount they had been obliged to pay the bill of lading holders.

*Kruger* v. *Moel Tryvan* [1907] 1 K.B. 809 (C.A.) and [1907] A.C. 272 (H.L.).

**21.6** In the Court of Appeal and the House of Lords the reason most relied upon for allowing the owners to recover was that the charterers were in breach in presenting such a bill and the owners were entitled to damages as a result. Similar views are evident in subsequent voyage charter cases, including the House of Lords case of *Elder, Dempster* v. *Dunn* (1909) 15 Com. Cas. 49 (bills with incorrect marks) and the Court of Appeal decision in *Dawson Line* v. *Adler* (1931) 41 Ll.L.Rep. 75 (bill showing less than actual weight of cargo, upon which freight was payable).

*Implied indemnity*

**21.7** The other ground frequently relied on in the above cases, on its own or in the alternative, was that the inconsistency between charter and bill gave rise to an implied right of indemnity. Bingham, J., in *The C. Joyce* [1986] 2 Lloyd's Rep. 285, expressed the view—which was endorsed by the Court of Appeal in *The Nogar Marin* [1988] 1 Lloyd's Rep. 412, at page 420—that crucial to both grounds of decision in the House of Lords cases above "was the finding of disparity between the bills which the charterers were under the charter-party entitled to present and the bills which they did present". Bingham, J., continued: "From this finding the conclusion naturally follows, and it matters little whether the owners claim damages for breach



27

of contract, of which an indemnity will be the measure, or an indemnity arising from the loss they have suffered from complying with the charterers' request to do something which they were not obliged to do under the charter-party."

**21.8** These comments may be appropriate to voyage charter cases, but it is submitted that they are not necessarily appropriate in the case of time charters. It cannot be a breach of contract, under the usual forms of time charter requiring the master to sign bills of lading as presented, for the charterers to present for signature a bill which is more onerous in its terms than the charter. Nor can the presentation of such a bill for signature be said to oblige the owners "to do something which they were not obliged to do under the charter-party". It would be quite contrary to the purpose of normal time charters which is (within the limits of the express terms of the charter) "to enable the charterers to use the vessels during the period of the charters for trading in whatever manner they think fit": *The Nanfri* [1979] 1 Lloyd's Rep. 201, *per* Lord Wilberforce, at page 206. It would furthermore be contrary to good sense. Consider the position under a time charter which does not incorporate the Hague Rules or any national legislation giving effect to them; most bills of lading issued under the charter will differ from it in that they will incorporate the Hague Rules by express reference or because they are compulsorily made subject to the Rules by the domestic legislation of the country of shipment or the country of intended destination. It cannot be correct to look at this in terms of breach or in terms of the presentation of non-contractual or improper bills of lading (see *The Paros* [1987] 2 Lloyd's Rep. 269, at page 273). This view, which was expressed in previous editions of this book, was endorsed by the Court of Appeal in *The Island Archon* [1994] 2 Lloyd's Rep. 227, the facts of which are set out at paragraph 19.13, above. The Court of Appeal held that an indemnity should in such circumstances be implied either as a matter of law or as a matter of business efficacy (see *The Nogar Marin* [1987] 1 Lloyd's Rep. 456, at page 460, *per* Staughton, J.). Evans, L.J., having referred, at page 233, to the passage in Lord Wilberforce's speech in *The Nanfri* quoted above, went on: "The situation therefore may often arise, where, far from the charterers being in breach by reason of presenting for signature a bill of lading containing different terms and conditions of carriage from the charter-party, the master would place the shipowners in breach of contract if he refused to sign, assuming only that the bill is accurate as to the apparent condition of the cargo loaded and is not in terms which can be said to be outside the scope of any which were contemplated by the charter-party. Does the implied right to be indemnified arise in such a case? In my judgment, there is no reason in principle why it should not do so in accordance with the general rule founded on *Sheffield Corporation* v. *Barclay* [1905] A.C. 392."

**21.9** That this was the position under a New York Produce form charter had been accepted by the parties in *The Caroline P* [1984] 2 Lloyd's Rep. 466 (see paragraph 21.14, below), although Neill, J., did not rule out the possibility that the case could have been put on the basis of breach (see page 475 of the report). It was common ground between the parties that since the bills of lading imposed more onerous obligations on the owners than those stipulated in the charter, the owners were entitled to the benefit of an implied indemnity. (Contrast the voyage charter case of *The C. Joyce* [1986] 2 Lloyd's Rep. 285, where it was held that the owners were not entitled to an indemnity under a heavily amended Gencon charter.) However, the issue has yet to be considered by the House of Lords.

**21.10** In *Kruger* v. *Moel Tryvan* [1907] A.C. 272 Lord Loreburn, L.C., explained the implied indemnity in these words: "the shipowners undertook to carry a cargo on the footing that they were not to be liable for the master's negligent navigation, and the charterers have made them so liable by the bills of lading. Hence arises a duty to give adequate indemnity."

*Express indemnity*

**21.11** Where the time charter contains an express indemnity (see the Baltime form, Lines 123 to 127), the effect will, in general, be the same as in the case where an indemnity is implied.

The time charter of the *Port Victor* contained exceptions against the negligence of master and crew. It also provided that the master should "sign bills of lading at any rate of freight the charterers or their agents may choose, without prejudice to the stipulations of this charterparty, and the charterers hereby agree to indemnify the owners from any consequences that may arise from the captain following the charterers' instructions and signing bills of lading". Bills of lading which contained no exception from negligence were presented and signed by the master and in consequence the owners were unable to recover general average contributions from cargo following a collision caused by the negligence of the master. It was held by the Court of Appeal that the owners were entitled to an indemnity from the charterers in respect of the loss suffered through not being able to recover general average contributions.

*Milburn* v. *Jamaica Fruit* [1900] 2 Q.B. 540.
(See also *The Nanfri* [1979] 1 Lloyd's Rep. 201.)

**21.12** It may be in certain circumstances that an implied indemnity is wider in its scope than the express indemnity: see *Strathlorne Steamship* v. *Andrew Weir* (1934) 50 Ll.L.Rep. 185, and paragraphs 21.7 *et seq.*, above. But it might also be narrower in other circumstances: see *The Island Archon* [1994] 2 Lloyd's Rep. 227 (C.A.), at page 230.

*NYPE 93*

**21.13** Clause 30(b) of the 1993 revision of the New York Produce form reads "All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master at their request": see Lines 311 to 314.

**Time when claim for indemnity arises**

**21.14** For limitation purposes, it is important to know when time starts to run on a claim for indemnity. If the claim is under an implied general indemnity, such as an implied indemnity in favour of owners under a time charter, time starts to run only upon the ascertainment of the liability by court judgment or otherwise. If the claim is under an express indemnity, it will depend upon whether the indemnity is to be construed as an indemnity against liability (in which case time will run from the time the liability is incurred) or as a general indemnity.

The *Caroline P* was chartered on the New York Produce form, Clause 8 being amended to make the charterers responsible for discharge as well as loading and stowage. Bills of lading were presented, and signed on behalf of the master, which made the owners responsible for these operations to their endorsees. The owners were held liable in proceedings before the Iraqi courts, at the suit of the endorsees, for loss and damage to cargo caused in these operations. The question arose whether, on a claim by the owners against the charterers for an indemnity, time ran from the discharge of the cargo, when the liability was first incurred, or from the date of the first judgment of the Iraqi court, when the liability was first ascertained. It was common ground between the parties that in the circumstances some indemnity in favour of the owners was to be implied under the charter. It was held by Neill, J., that the indemnity to be implied was against the consequences of the master signing the bills of lading and that such an indemnity, being a general indemnity, did not become enforceable until the liability had been ascertained by the first judgment of the Iraqi court.

*The Caroline P* [1984] 2 Lloyd's Rep. 446.
(For the express indemnity under Clause 9 of the Baltime form, see paragraphs 37.33 to 37.37.)

# CHAPTER 34

# Carriage of Goods by Sea Act

"24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February 1893, and entitled "An Act relating to Navigation of Vessels, etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both-to-Blame Collision Clause

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

### Incorporation of Harter Act and United States Carriage of Goods by Sea Act 1936

**34.1** In a contract governed by English law the United States Acts will be incorporated as terms of the contract, as far as applicable (see *Adamastos Shipping* v. *Anglo-Saxon Petroleum* (*The Saxon Star*) [1958] 1 Lloyd's Rep. 73 and paragraph 34.5, below) and will, save in very exceptional cases, be construed in accordance with English law (see paragraph 29.4 *et seq.*, above, and the discussion in *The Stolt Sydness* [1997] 1 Lloyd's Rep. 273, at page 278, on the effect of incorporating the United States Acts into an English law charter).

### Harter Act

**34.2** The Act of 1893 is known as the Harter Act. Both it and the United States Carriage of Goods by Sea Act are set out in Appendix A.

**34.3** The Harter Act is now mainly superseded by the United States Carriage of Goods by Sea Act 1936. The Harter Act remains effective for the period the carrier has charge of the goods

**85.301** Whilst this exception does not extend to the effects of disputes falling short of war, such as hostilities or warlike operations,[524] the exception of riots and civil commotions in Article IV rule 2(k) of the Hague Rules does extend to such matters. The fact that the war is in being when the contract of carriage is made probably will not prevent the exception from operating.[525]

**"(f) Act of public enemies"**

**85.302** This is a term which had no historical precedent in English law prior to its introduction into the Hague Rules; the more common formulation was "King's [or Queen's] Enemies". The relevant monarchs for the purposes of that form of clause were at least the British Crown and the ruler of the state of the vessel and her owner.[526] It did not include states at peace with the British Crown.

**85.303** The word "public" is clearly more general than that previous formulation and, to a great extent, the acts of "princes, rulers or people" in Article IV rule 2(g) of the Hague Rules embraces the above types of enemy. It is submitted that the term is apt to refer to the enemies of mankind, such as pirates.[527] Seagoing pirates have been held to be a "peril of the seas"[528]; however, land-based pirates might not be and hence perhaps the need for the introduction of the present exception.

**"(g) Arrest or restraint of princes, rulers or people, or seizure under legal process"**

**85.304** The first part of the exception had a history of incorporation into charterparties and bills of lading prior to the Hague Rules. In the Hague Rules, the final words "or seizure under legal process" were added for the first time to the exception and cover any forcible dispossession or taking of either ship or cargo or parts of them in accordance with the ordinary judicial processes.[529] These additional words therefore provide an extension of the general "restraint of princes" exception to the case where the effective restraint is at the suit of a non-governmental person or body utilising ordinary legal processes.[530] The term "seizure" is familiar in the marine insurance context in which it embraces every act of taking forcible possession either by a lawful authority or by overpowering force, includes both belligerent and non-belligerent,[531] but would not extend to theft by government officials.[532] *Finlay* v. *Liverpool and Great Western Steamship Co.*[533] was a case of a seizure of goods under a regular court order obtained upon the suit of a

524. *Cf. Richard de Larrinaga* v. *Liverpool & London War Risks Association* [1921] 2 A.C. 141.

525. See the reasoning in *Reardon Smith Line* v. *Ministry of Agriculture, Fisheries and Food* [1962] 1 Q.B. 42.

526. *Russell* v. *Niemann* (1864) 17 C.B.(N.S.) 163; *Spence* v. *Chadwick* (1847) 10 Q.B. 517.

527. Discussed in relation to War Risks under the Gencon form. The *Travaux Preparatories* (ed. Berlingieri, 1997, CMI) p. 408 show that the draftsmen did not know what it meant; Sir Norman Hill is quoted as saying: "It may mean pirates; I suppose so."

528. *Pickering* v. *Barclay* (1648) Styles 132.

529. *Cf.* r. 10 of the Rules for the Construction of Policy in Sch. 1 to the Marine Insurance Act 1906. For an example of the terms "arrest restraint detainment . . . or by reason of infringement of any customs or trading regulations . . . the operation of ordinary judicial process failure to provide security . . . or any financial cause" in the Institute Mortgagees Interest Hulls Clauses (1986): see *Handelsbanken Svenska* v. *Dandridge (The Aliza Glacial)* [2002] 2 Lloyd's Rep. 421.

530. Customs authorities seizing goods may simply be acting as thieves: *Bayview Motors* v. *Mitsui Marine & Fire Insurance* [2003] 1 Lloyd's Rep. 131.

531. *Kuwait Airways* v. *Kuwait Insurance* [1999] 1 Lloyd's Rep. 803, esp. p. 814, where Lord Hobhouse applied the definition derived from *Cory* v. *Burr* (1893) 8 App. Cas. 393, esp. p. 405.

532. *Bayview Motors* v. *MitsuiMarine & Fire Insurance* [2003] 1 Lloyd's Rep. 131.

533. (1870) 23 L.T. 251.

simple contract, since there may not be a breach of contract from which time begins to run. Moreover, restitutionary claims may also arise out of the commission of a wrong by the defendant, in which case, the contractual limitation period is clearly inapplicable. What should also be noted is that, generally, contractual and tortious claims are for an unliquidated amount, the extent of recovery being based on the loss suffered by the plaintiff. In contrast, a restitutionary claim is based upon the unjustified enrichment of the defendant, and therefore turns on the recovery of a specific amount.

What is necessary is to identify the gist of the plaintiff's cause of action, since this sets the point from which time will run. For these purposes, the gist of a restitutionary claim appears to be the injustice of the defendant being allowed to retain a benefit gained at the expense of the plaintiff.[47] For these purposes, it is arguable that the plaintiff should only become time barred where the lapse of time has the effect of removing the injustice associated with the enrichment of the defendant at his expense. Generally, this will be the case where the lapse of time may be taken as an indication of the plaintiff's waiver of his rights, or where the effect of the passage of time is to prejudice the defendant's ability to satisfactorily establish a defence to the action brought by the plaintiff. Given these considerations, it is suggested that an appropriate policy basis for the setting of an appropriate limitation period for a restitutionary claim is that set out in *Lindsay Petroleum Co* v. *Hurd*[48] in which it was observed by Lord Selborne that it may be practically unjust to give a remedy either because the conduct of the plaintiff amounts to a waiver of his rights or has acted in such a way as to make it unreasonable to grant him a remedy, having regard to the length of the delay and what has been done during the period of delay.[49]

## ACCRUAL OF THE CAUSE OF ACTION

The basic rule of contract law is that a breach of contract is actionable without proof of damage, although a plaintiff who has suffered no damage will receive only nominal damages, but for limitation purposes, his action is nonetheless maintained. Since damage is not a requirement in order for there to be a cause of action, it follows that the date on which time begins to run cannot be the same as that applicable to an action framed in tort, but starts, instead, at the time of the breach of contract.

The origins of the choice of the date of breach date back to the action on assumpsit, for which purposes it has been held that it is immaterial at what stage the promise is made as the relevant six-year limitation period runs from the date on which the promise was broken.[50] Furthermore, it is of no relevance that damage suffered by the plaintiff occurs after the breach of contract since it was said in *Gibbs* v. *Guild*[51] that:

> " 'Action on the case', as used in the statute, was a general term including actions on assumpsit or contract, actions for negligence or for fraud, and for other causes of action; and it was well settled that in actions on assumpsit, the time ran from the breach of contract, for that was the gist of the

47. See McLean, "Limitation of Actions in Restitution" (1989) 48 CLJ 472.
48. (1874) LR 5 PC 221.
49. *Ibid* at 239–40 discussed in detail in Ch 3.
50. *Gould* v. *Johnson* (1702) 2 Salk 422.
51. (1881) 8 QBD 296.

QUEEN'S BENCH DIVISION
(COMMERCIAL COURT)

Oct. 11 and 12, 1965

BOSMA v. LARSEN

Before Mr. Justice MCNAIR

**Limitation of action - Charter-party - "Charterers to indemnify the Owners against all consequences or liabilities [of] signing Bills of Lading"-Damage to cargo- Whether cause of action arose on incurring of liability by shipowners to cargo-owners or on discharging of such liability- Limitation Act, 1939.**

Baltime charter-party was entered into by plaintiff owner of motor vessel *Cornelia B.I* and defendant charterer which provided (*inter alia*):

9. . . . The Master to be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master . . . signing Bills of Lading or other documents or otherwise complying with such orders . . .

Bill of lading was signed by agents of master on charterer's orders in respect of cargo of fish to be carried from Iceland to Italy. Fish arrived damaged on July 17, 1956, and on Mar. 10, 1962, cargo insurers were awarded damages by Italian Court against shipowner. On Dec. 17, 1963, shipowner paid 1,750,000 Italian lire to cargo insurers under compromised settlement. Writ issued by shipowner on Mar. 12, 1965, in a claim to be indemnified by charterer under Clause 9. Charterer admitted liability, but contended that shipowner's claim was statute barred in that cause of action arose more than 6 years before Mar. 12, 1965. Allegation by shipowner that cause of action accrued on Mar. 10, 1962, or Dec. 17, 1963. Contention by charterer that cause of action accrued when goods were discharged damaged in July, 1956.

-*Held*, by MCNAIR, J., that plain meaning of expression to indemnify against "all liabilities" was that it imposed the obligation to indemnify against the incurring of a liability, not the discharge of that liability by payment or determination of that liability by judicial process; that, therefore, shipowner's cause of action under Clause 9 arose at date when facts came into existence which created their liability to cargo-owners or insurers; that that date was before Mar. 12, 1959; and that, therefore, shipowner's claim was statute barred under Limitation Act, 1939.

The following cases were referred to:

Central Electricity Board v. Halifax Corporation, [1963] A.C. 785;
Chandris v. Argo Insurance Company, Ltd., and Others, [1963] 2 Lloyd's Rep. 65;
Collinge v. Heywood, (1839) 9 A. & E. 633;
Hidick v. Orion Shipping and Trading Co., Inc., [1958] A.M.C. 1281;
Letang v. Cooper, [1965] 1 Q.B. 232; [1964] 2 Lloyd's Rep. 339;
Milburn & Co. v. Jamaica Fruit Importing and Trading Company of London, [1900] 2 Q.B. 540;
Richardson, *In re*, [1911] 2 K.B. 705;
Spark v. Heslop, (1859) 1 E. & E. 563.

---

In this case, the plaintiff, Okko Bosma, of Groningen, Holland, the owner of the motor vessel *Cornelia B.1*, claimed £1003 8s. 10d. (1,750,000 Italian lire), alleged to be due under a time-charter between the plaintiff shipowner and the defendant charterer dated Mar. 22, 1955, and being the amount paid by the plaintiff on Dec. 17, 1963, to receivers' insurers in respect of cargo found to be damaged when discharged from the *Cornelia B.1* at Naples in July, 1956. The defendant admitted liability under Clause 9 of the charter-party to indemnify the plaintiff in the sum claimed, but pleaded that the claim was statute-barred under the Limitation Act, 1939.

The following statement of facts was agreed between the parties:

1. The plaintiff was at all material times the owner of the motor vessel *Cornelia B.1* (hereinafter called "the vessel").

2. By a time charter-party in "Baltime" form dated Copenhagen Mar. 22, 1955, the plaintiff chartered the vessel to the defendant for a period of two calendar months from delivery, the vessel to be delivered on about May 5, 1955. The charter-party period was extended by subsequent addenda.

3. By a bill of lading dated Reykjavik June 28, 1956, signed by agents on behalf of the master and as ordered by the defendant during the currency of the time charter-party, the plaintiff acknowledged the shipment of a quantity of Iceland fish as specified thereon (hereinafter called "the goods") for carriage to and delivery at Naples to order of the shippers.

4. The vessel arrived at Naples on July 17, 1956, and there discharged the goods. On discharge 531 bales were found to be damaged and the receivers and their insurers made a claim for 1,873,560 Italian lire against the plaintiff's agent in Naples in respect thereof.

5. Liability for the damage was repudiated and the insurers of the receivers commenced proceedings in the Italian Courts against the plaintiff. The sum claimed was 1,838,484 Italian lire representing the payment made by way of indemnity to the receivers by the insurers. By a judgment dated Naples Mar. 10, 1962, the Italian Court gave judgment in favour of the insurers against the plaintiff for the sum claimed namely 1,838,484 Italian lire together with costs which were assessed in the sum of 314,642 Italian lire and interest from July 8, 1957, until payment.

6. The plaintiff's agents in Naples entered a notice of appeal against the judgment but there was subsequently an agreement in settlement of the claim in Genoa on Dec. 17, 1963. The insurers agreed to accept the sum of 1,750,000 Italian lire in full and final satisfaction of the claim and the plaintiff paid that sum to the insurers on Dec. 17, 1963.

7. For the purposes of the action it was agreed:

(i) that the Plaintiff was liable to the Receivers and their Insurers under the contract contained in and/or evidenced by the bill of lading for the damage sustained by the goods, and

(ii) that the Plaintiff was not liable for the said damage under the terms of the charterparty.

8. The plaintiff claimed to be indemnified by the defendant in the sum of 1,750,000 Italian lire under Clause 9 of the charter-party. The defendant admitted that he was liable to indemnify the plaintiff in that sum under Clause 9 subject to his defence that the claim was statute barred under the Limitation Act, 1939.

9. It was agreed that the rate of exchange appropriate to the action should be taken as 1744 Italian lire = £1.

Mr. J. F. Donaldson, Q.C., and Mr. C. S. Staughton (instructed by Messrs. Holman, Fenwick & Willan) appeared for the plaintiff; Mr. Anthony Evans (instructed by Messrs. William A. Crump & Son) represented the defendant.

Mr. DONALDSON, for the plaintiff, said that the crucial point in the case was whether the cause of action arose before or after Mar. 12, 1959, that being six years before the writ in the action was issued. Counsel submitted that "cause of action" arose as soon as every essential fact existed (whether or not known to, or ascertainable or provable by, the plaintiff). "Every essential fact" Counsel would define as being every fact which it would be necessary for the plaintiff to prove, if traversed, in order to support his right to the judgment of the Court.

COUNSEL said that it was admitted that the plaintiff had suffered a loss by paying the receivers or their insurers £1003 8s. 10d. in settlement of his liability under the bill of lading, but that fact did not exist before Dec. 17, 1963.

Mr. DONALDSON: Under a contract of indemnity, the cause of action only arises at law-and I stress "at law"-on payment by the indemnified.

Mr. EVANS, for the defendant, submitted that a cause of action arose when the requirements of the law as to the factual situation were satisfied. Counsel further submitted that liability existed as from the date of the discharge of the cargo and that it was quite immaterial how long thereafter it might take the owners and bill of lading holders to resolve any disputes which they might have.

Judgment was reserved.

---

Tuesday, Nov. 9, 1965

---

## JUDGMENT

**Mr. Justice McNAIR:** The plaintiff in this action was at all material times the owner of the motor vessel *Cornelia B.I* (hereinafter called "the vessel"). By a time charter-party dated Mar. 22, 1955, in the familiar Baltime form the plaintiff chartered the vessel to the defendant for a period of two calendar months subsequently extended for a further 11 calendar months. By a bill of lading dated at Reykjavik on June 28, 1956, signed by agents on behalf of the master as ordered by the defendant the plaintiff acknowledged the shipment of a quantity of Icelandic fish for carriage and delivery to Naples to the order of the shippers. The vessel arrived at Naples on July 17, 1956, and there discharged the goods. On discharge 531 bales were found to be damaged and the receivers and their insurers made a claim for 1,873,560 Italian lire against the plaintiff's agent in Naples in respect of that damage. Liability was repudiated and the insurers of the receivers commenced proceedings in the Italian Courts to recover 1,838,484 Italian lire, which they had paid to the receivers by way of indemnity under their policy on goods. By a judgment dated Mar. 10, 1962, the Italian Court gave judgment in favour of the insurers against the present plaintiff for that sum together with costs which were assessed at 314,642 Italian lire and interest thereon from July 8, 1957, until payment. Notice of appeal against this judgment was entered by or on behalf of the plaintiff but subsequently, that is to say on Dec. 17, 1963, an agreement by way of compromise was reached and on that date the plaintiff paid to the insurers the sum of 1,750,000 Italian lire which was accepted by the insurers in final and full settlement of their claim.

The charter-party which regulated the contractual relationship between the plaintiff and the defendant contained the familiar indemnity Clause 9 which (so far as material) provides as follows:

> 9. . . . The Master to be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master . . . signing Bills of Lading or other documents or otherwise complying with such orders . . .

The charter-party further provided by Clause 13 (so far as is material) as follows:

> The Owners only to be responsible . . . for loss or damage to goods onboard, if such . . . loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. . . .

By a writ dated Mar. 12, 1965, the plaintiff advanced a claim as indorsed on the writ against the defendant

> . . . for £1,003.8.10d. (the sterling equivalent of Italian lire 1,750,000) [-being the sum paid by the plaintiff under the settlement agreement of Dec. 17, 1963-] as money due under a time charter between

35

the Plaintiff and the Defendant dated 22nd March, 1955, [-being the time charter above referred to-] or as damages for breach [of contract]

The basis of this claim which was advanced under Clause 9 of the charter-party was that the terms of the bills of lading under which the fish was shipped were more onerous to the plaintiff than the terms set out in Clause 13 referred to above which operated as between the plaintiff and the defendant. See *Milburn & Co. v. Jamaica Fruit Importing and Trading Company of London*, [1900] 2 Q.B. 540.

For the purpose of this case it has been agreed between the plaintiff and the defendant that the plaintiff was liable to the receivers and their insurers under the contract contained in or evidenced by the bill of lading for the damage sustained by the goods but the plaintiff was not liable for that said damage under the terms of the charter-party.

In this action the defendant admits that he is liable to indemnify the plaintiff in the sum of 1,750,000 Italian lire under Clause 9 of the charter-party subject only to his defence that the claim in the present action is statute barred under the Limitation Act, 1939. Accordingly the only question which I have to decide is whether or not that defence is well founded.

The Limitation Act, 1939, provides by Sect. 2 (1) as follows:

> The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say:-
>
> (*a*) actions founded on simple contract or on tort . . .

Admittedly the cause of action for an indemnity under Clause 9 of the charter-party is an action founded on simple contract. The writ having been issued on Mar. 12, 1965, the defence succeeds if the cause of action accrued before Mar. 12, 1959. If as the plaintiff contends the cause of action accrued after that date, it fails.

In summary, the plaintiff contends that the cause of action accrued at the earliest when judgment was entered against him on Mar. 10, 1962, or alternatively on Dec. 17, 1963, when he paid under the compromise settlement. The defendant on the other hand contends that the cause of action accrued at the latest when the goods were discharged damaged at Naples in July, 1956, and therefore accrued at a date outside the six-year limitation period.

In *Letang v. Cooper*, [1965] 1 Q.B. 232; [1964] 2 Lloyd's Rep. 339 (a case under the Limitation Act, 1939, Sect. 2, as amended by the Law Reform (Limitation of Actions, &c.) Act, 1954), Lord Justice Diplock says this (*ibid.*, at pp. 242 and 344 of the respective reports):

> A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another . . .

and after referring to the effect of the Judicature Act, 1873, in abolishing forms of action, continues:

> . . . It did not affect causes of action; so it was convenient for lawyers and legislators to continue to use, to describe the various categories of factual situations which entitled one person to obtain from the court a remedy against another, the names of the various "forms of action" by which . . . the remedy appropriate to the particular category of factual situation was obtained. But it is essential to realise that when, since 1873, the name of a form of action is used to identify a cause of action, it is used as a convenient and succinct description of a particular category of factual situation which entitles one person to obtain from the court a remedy against another person. To forget this will indeed encourage the old forms of action to rule us from their graves.

Accordingly, as it seems to me, the material question in this case is: When, on the facts stated above, did a factual situation arise which, subject to the effect of the Limitation Act, 1939, would have entitled the plaintiff to have obtained from the Court a judgment against the defendant in respect of the indemnity relied on?

Mr. Donaldson, on behalf of the owners, submitted that the facts the existence of which constituted this cause of action were as follows: (1) that the plaintiff and the defendant were owner and charterer respectively under the charter-party sued upon; (2) by reason of the defective condition of the goods on discharge at Naples the plaintiff became liable to the receivers and their insurers under the bill of lading signed by the master on the orders of the defendant; and (3) that the plaintiff had been damnified either (i) by having been

36

found liable in the Italian Court to pay the insurers a sum in excess of the sum claimed in this action or (ii) by having paid the sum claimed in settlement of the liability so found. He further contended that of the facts set out above the fact stated under (3) did not occur until after the date Mar. 12, 1959, when the limitation period began.

Mr. Evans, on behalf of the defendant, on the other hand, submitted that for the accrual of the cause of action in the present case it was not necessary for either of the facts stated in (3) to have occurred, namely the determination of liability by the Court or payment.

In considering the rival contentions in the present case it is essential to distinguish between the existence of a certain fact and the plaintiff's ability to prove that fact. This distinction is well illustrated by the decision of the House of Lords in the case of *Central Electricity Board v. Halifax Corporation*, [1963] A.C. 785.

The essential facts of that case were as follows: By the Electricity Act, 1947, assets of electricity undertakings were transferred to Electricity Boards the predecessors in title of the Central Electricity Board. The issue in that case was whether a claim by the Central Electricity Board against the Halifax Corporation for the sum of £34,500 with interest which sum the Corporation had accumulated before the vesting date under the Electricity Act, 1947, namely Apr. 1, 1948, out of the revenues of the electricity undertaking was statute barred by reason of the fact that no action to recover that sum had been instituted by the Central Electricity Board until Mar. 6, 1959, i.e., more than six years after the vesting date. By virtue of Sect. 15 (3) of the Act any question arising as to whether any property is or was held by a local authority wholly or mainly in their capacity as authorized undertakers fell to be determined by the Minister. By Mar. 6, 1953, the Minister had not given his determination. It was held nevertheless that seeing that on the true construction of the relevant statutes the vesting date was Apr. 1, 1948, the plaintiffs' cause of action accrued on that date notwithstanding that by reason of the section of the Act above referred to the plaintiffs could not prove that the sum claimed had become vested in them until the Minister gave his decision.

Lord Reid at p. 801 held as a matter of construction that the giving of a decision by the Minister was not a condition precedent to the vesting and continued:

> . . . No new right or liability came into existence at its date. It is quite clear . . . that the effect of the Minister's decision was merely to *prove* that this sum had belonged to the appellants ever since the vesting date. It created no new right . . . [or indemnity] or chose in action: it merely enabled a pre-existing right to be enforced.[1]

The vesting date being earlier than the date when the period of limitation began to run, the claim was statute barred.

In support of the proposition that time in this case did not begin to run until the amount of the plaintiff's liability had been quantified by the judgment of the Italian Court or until payment, I was referred to passages in Halsbury's Laws of England, Simonds (3rd) ed., as follows: Vol. 24, Sect. 393:

> . . . Upon a contract to indemnify, the statute runs from the time when the plaintiff is actually damnified, not from the time when the event happens which causes the loss. . . .

and Vol. 18, Sect. 982:

> . . . At law an action on the contract of indemnity normally does not lie until the promisee has been actually damnified by paying the third party's claim. . . .

In support of each of these propositions *Collinge v. Heywood*, (1839) 9 A. & E. 633, is cited. The relevant facts in that case were as follows: One Potter distrained on the plaintiffs' goods for rent; for reasons set out in the declaration the defendant and another were desirous that the plaintiff should replevy and prosecute an action of replevin against Potter for taking such distress. In consideration of the plaintiff doing so the defendants undertook and promised the plaintiff

> . . . "to save, defend, and keep harmless and indemnified the said plaintiff from the said distress, and all costs, damages, and expenses which he, the said Plaintiff, had incurred or sustained, or should thereafter incur or sustain, by reason thereof, or by reason of the replevying of the same, or of the said action of replevin . . . or the prosecution thereof." . . .

---

[1] Emphasis supplied by Mr. Justice McNair.

In the course of 1826 certain costs were incurred in the action by the plaintiff for which his attorney delivered to him a bill of costs which were paid partly in September, 1830, and partly in 1831. The instant action was commenced on June 20, 1836. Defendants' Counsel contended that the claim was statute barred on the ground that the Statute of Limitations began to run from the time when the costs were incurred, not from the time of paying the bill. The plea based on the statute was rejected. Lord Denman, C.J., says (*ibid.*, at p. 639):

> . . . it is too clear that, in a case like this, no damage has arisen till the party to be indemnified is called upon to pay. . . .

Mr. Justice Littledale (*ibid.*, at p. 640):

> . . . This was a contract to indemnify merely; and the cause of action did not accrue till the plaintiff was damnified by paying.

Mr. Justice Williams (*ibid.*):

> . . . The defendant here was liable in a certain event, but not while the plaintiff was untouched. . . .

Mr. Justice Coleridge (*ibid.*, at p. 641):

> The short answer to the plaintiff's demand is, that no cause of action arose till he was damnified, and that he was not damnified till he had paid the bill.

It does not clearly appear whether the Court was holding that the date of payment was the critical date or the date of demand for payment; but none of the judgments seem to regard as material the date when the liability is established by judicial process.

For my part I find difficulty in deducing any principle of general application from this decision which seems to me to turn on an interpretation of the exact meaning of the words "incur or sustain". See the argument of plaintiff's Counsel (which was apparently accepted) at p. 637.

> . . . The plaintiff was damnified, *within the meaning of the contract*, when he was compelled to pay, and not before . . . [2]

I emphasize the words "within the meaning of the contract".

A decision on the other side of the case can be found in the case of *Spark v. Heslop*, (1859) 1 E. & E. 563. In that case, in consideration of the plaintiff at the instance of the defendant consenting to pay the amount of a dishonoured bill of exchange on which the defendant was liable as indorser and to bring an action on the bill in the plaintiff's name against H., the acceptor, the defendant gave to the plaintiff the following guarantee:

> ". . . I hereby agree to be answerable to you . . . for all costs, damages and [expenses] which you may sustain by reason of . . . trying the . . . action . . . and . . . relating or incidental thereto . . ."

Judgment was entered in the action against the plaintiff with costs which he paid. He also incurred in the action the costs of his attorney who delivered his bill of costs. These costs were not paid by the plaintiff who sued under the guarantee and was held entitled to recover without having paid. Lord Campbell, C.J., says (*ibid.*, at p. 570):

> . . . Looking both at the words used in the [guarantee] and at the surrounding circumstances, I am of opinion that the fair meaning to be put upon the document is, that the defendant was to be paymaster: at all events, that he was to furnish the means of paying any costs incurred by the plaintiff in the action against [H.]; and that he was not in the position of a mere surety . . .

Mr. Justice Wightman says (*ibid.*, at p. 571):

> . . . The real meaning of this agreement is, not "I will pay you whatever you may have paid," but "I will be answerable to you that the costs shall be paid by me." . . .

It is not a contract of indemnity in the ordinary sense. Both these decisions seem to me to turn on the exact language of the undertaken given.

Accordingly, in my judgment, the first task of the Court is to construe the document and it is not proper or consistent with the authorities to apply a label to an obligation in a document and then to deduce from that label the legal consequences which may flow from other contracts to which the same label can be attached. For instance, contracts of marine insurance are (subject to their special terms) contracts of indemnity.

Yet in *Chandris v. Argo Insurance Company, Ltd., and Others*, and other actions tried at the same time reported in [1963] 2 Lloyd's Rep. 65, Mr. Justice Megaw held that a shipowner's right to recover against

---

[2] Emphasis supplied by Mr. Justice McNair.

his hull underwriters in respect of general average loss arose when the loss was incurred and that accordingly his cause of action accrued at that date and not at the date when the amount of his loss had been quantified by an average adjustment, still less had it accrued at the date of payment or determination for liability by judicial process.

Accordingly the issue in this case which I have to decide depends upon my view of the proper construction of Clause 9. The material words are

> . . . The Master to be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master, Officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders . . .

Though the range of the protection afforded by clauses of this nature to the shipowners has not yet been fully worked out by the decisions of the Courts there have been a number of decisions on the question which are noted in Scrutton on Charterparties, 17th ed. (1964), Art. 154, which have established certain instances of incidents which are within or without the protection of the Clause; but so far as I know it has never been held that payment by the shipowner of a claim or determination of his liability by a judicial decision was a condition precedent to the shipowner's rights of recovery. It seems to me that the plain meaning of the expression to indemnify against "all liabilities" is that it imposes the obligation to indemnify against the incurring of a liability, not the discharge of that liability by payment or the determination of that liability by judicial process. Indemnity against liability seems to me to be different from reimbursement against sums paid in pursuance of a legal liability. The shipowner is damnified as soon as he comes under a liability. The damnification contemplated by the Clause is the incurring of the liability not the payment.

There seems to me to be good business reasons behind such a construction. For instance, if the shipowner's contention in this case is correct, that the right to indemnity arises only on payment, they might be faced with a liability under the bills of lading which was quite outside their financial resources to meet and yet be unable to recover from the charterers until they had paid a sum in discharge of their liabilities which *ex hypothesi* they could not pay. Furthermore as regards the alternative contention that the right to indemnity arises when there has been judicial determination of liability as between a shipowner and the cargo-owners or their insurers, in my judgment such a judicial determination would be in no way binding upon the charterers unless they had expressly agreed to be bound.

Mr. Donaldson however relied upon a decision of the United States District Court for the Southern District of New York delivered on Nov. 15, 1957, a print of which has been supplied to me. The title of this action was *Massoud Abdallah Hidick, Plaintiff v. Orion Shipping and Trading Co., Inc., and Pacific Cargo Carriers Corporation, Defendants; Pacific Cargo Carriers Corporation, Third-Party Plaintiff v. United States of America, Third-Party Defendant*; and is reported in [1958] A.M.C. 1281.

This is a complicated case for one not familiar with the American procedure to follow: but for present purposes it is sufficient to cite the headnote which is as follows:

> A cargo vessel was chartered to the Government . . . the Government supplied a cargo of scrap in which was a container of chlorine gas, which seeped out, injuring the longshoremen. 17 suits were brought against the private shipowner (time to sue shipowner being 3 years). After trials and settlements, the shipowner impleaded the Government (time to sue under Suits in Admiralty Act being two years). *Held*: The shipowner was timely in seeking his remedy-over from the Government. The shipowner's time to sue the U.S.A. did not date from the accident, but it dated from the dates of settlements and payments of judgments and decrees.

By the Suits in Admiralty Act (46 U.S. Code Sect. 745), suits in Admiralty against the U.S.A. must be instituted "within two years after the alleged cause of action arose". In the charter-party under which the shipowners chartered the vessel to the Government there was no express indemnity but the Court held on the basis of a series of decisions of the U.S.A. Courts that on the facts and the true construction of other clauses of the charter-party that "the law requires the Government to indemnify Pacific."

39

So far as I can find the nature of this indemnity is not more precisely defined. The Court however proceeded to analyse a series of cases arising under the Suits in Admiralty Act on the question of the date when a cause of action arises under an indemnity such as that implied by the Court. The Court's decision that the claim was not barred by the Suits in Admiralty Act seems to me to have been based in part at least on procedural matters. See the extract from Moore's Federal Practice cited at p. 1296.

Though I would naturally pay great respect to a decision of an American District Court on the question of a proper construction of a commercial document commonly used in international trade I do not feel that from this decision I gain any real assistance as to the proper construction of Clause 9 of this charter-party.

I accordingly conclude that on the agreed facts of this case the plaintiff's cause of action under Clause 9 of the charter-party arose at the date when the facts came into existence which created their liability to the cargo-owners or their insurers which facts came into existence before the date when the six-year period of limitation began and was not dependent upon either the determination of liability by the Italian Court on Mar. 10, 1962 or the plaintiff's payment under the compromise settlement on Dec. 17, 1963.

The conclusion which I have arrived at makes it unnecessary for me to express any concluded opinion upon the question whether assuming it to be true that the clause in question contained a true contract of indemnity it could be truly said to-day that no cause of action arose until payment. Before the fusion of law and equity by the Judicature Act, 1873, it is I think plain that at common law no action could be maintained until actual loss had been incurred. See the judgment of Sir Henry Cozens-Hardy, M.R., in *In re Richardson, Ex parte The Governors of St. Thomas's Hospital*, [1911] 2 K.B. 705. But even before payment the person claiming to be indemnified could obtain relief in equity in appropriate cases by obtaining from the Court of Chancery an order for the setting up of a fund by the party subject to the indemnity to meet the liability as and when it arose so that the person entitled to the indemnity need not be ruined by having to pay the full amount in the first instance.

Mr. Evans, on behalf of the charterers, argued that since the fusion of law and equity a Judge in the Queen's Bench Division could give such equitable relief in advance of payment or judicial determination of liability even in cases of indemnity in which on their true construction the obligation to indemnify did not arise until payment. This may well be so and if so it may result that the cause of action was complete as soon as the right to such equitable remedy arose. I prefer to express no decision on this point.

There will of course accordingly be judgment for the defendant with costs.

# CALCULATION OF BOSSE'S CLAIM

1 Cargo Claim (see Caethoven letter of 15 June 2005)

| | |
|---|---:|
| Loss of revenue 2nd Tartous | 60,616.35 |
| Loss of sale in core | 689,679.36 |
| | 750,295.71 |
| Interest (one year at 8%) | 60,023.66 |
| | 810,319.36 |

2 Customs Fine

| | |
|---|---:|
| Paid to Syrian Customs (May 2005) | 420,000.00 |
| Interest to May 2006 when 300,000 recovered (one year at 8%) | 33,600.00 |
| | 453,600.00 |
| Less 300,000 recovered | 300,000.00 |
| | 153,600.00 |
| Interest (2 years at 8%) | 24,576.00 |
| | 178,176.00 |

3 Final Hire Statement

| | |
|---|---:|
| (see attached) | 94,709.27 |
| Interest (3 years at 8%) | 22,730.22 |
| | 117,439.49 |

4 Costs

| | |
|---|---:|
| Legal costs and arbitrators | 380,000.00 |
| TOTAL | 1,485,934.85 |

MJS/AW2753

SKYMAR MARITIME SERVICES
TEL: 00963 43 310817 – 311817 - 326817
FAX: 00963 43 315201
EMAIL:skymar@mail.sy
MOB: 00963 94 210817
SYRIA

TARTOUS 30/04/2005

TO:
CLERICI

ATT SASHA

m/v BOSSE GRT 9032 NRT 4268 disch 149948 BOXES of BANANAS

THIS EVENING, WE HAVE JUST RCVD LETTER REF: 1986 FROM HABOUR MASTER
QOUTE
THE PANAMIAN VSL EX-NAME KUDU PRESENTLY MV. BOSSE IS ARRESTED FAVOUR TARTOUS CUSTOMS HOUSE BASIS CUSTOMS CASES.

1- EXECUTIVE CASE NR 6056/2003 FOR AMOUNT 345430 SYR.P
2- EXECUTIVE CASE NR 5847/2003 FOR AMOUNT 18605888 SYR P

IT IS NOT PERMITTED TO SAIL UNTILL PAYING ABOVE AMOUNTS

RGDS
DIRECTOR OF HARBOUR MASTER/ TARTOUS

UNQOUTE

PLS CONTACT PI TO ATTEND

RGDS

07 CIV 7221
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOSSE SHIPPING LIMITED
Plaintiff

AGAINST

GREAT WHITE FLEET LIMITED
Defendant

---

**DECLARATION OF MICHAEL JOHN SMITH**

---

Mills & Co
Milburn House
Dean Street
Newcastle upon Tyne
NE1 1LE

Tel: 0191 2332222
Fax: 0191 2332220
e-mail: law@mills-co.com
Ref: MJS/KHM3415