UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 7221**

BOSSE SHIPPING LTD

Plaintiff

-against-

GREAT WHITE FLEET LTD

Defendant

---

EXHIBIT "ACH 2"

---

This is the Exhibit marked "ACH 2" referred to in the Affidavit of
Adrian Charles Hardingham sworn before me this 17th day of September 2007

*[signature]*

Solicitor empowered to administer Oaths
EDWARD MILLWEBB

Clyde&C
51 Eastche
London
EC3M 1

1

# Procedure Direction

HOUSE OF LORDS

*House of Lords – Appeal to – Leave – Incompetent petitions for leave to appeal – Procedure where petition appears incompetent – Petitions by vexatious litigants.*

The appeal committee of the House of Lords announces an addition to direction 2 of the Directions as to Procedure[1]:

> '(e) Petitions for leave to appeal to the House of Lords brought by a petitioner in respect of whom the High Court has made an order under s 51 of the Supreme Court of Judicature (Consolidation) Act 1925[2], as amended by the Supreme Court of Judicature (Amendment) Act 1959, unless leave to present such a petition has been granted by the High Court or a judge thereof pursuant to that section.'

29th July 1971

DAVID STEPHENS
Clerk of the Parliaments

# Prenn v Simmonds

HOUSE OF LORDS

LORD REID, LORD DONOVAN, LORD WILBERFORCE, LORD PEARSON AND LORD DIPLOCK
8th, 9th, 10th, 14th, 15th JUNE, 29th JULY 1971

*Contract – Construction – Written agreement – Evidence of surrounding circumstances – Factual background – Pre-contract negotiations – Whether court entitled to look at pre-contract negotiations as an aid to construction.*

P wished to procure the services of S, the managing director and leading technician of A Ltd, a wholly-owned subsidiary of RTT Ltd, which did not itself trade. For this purpose P agreed, in 1959, to purchase from CP Ltd its holding of 94 per cent of the ordinary capital of RTT Ltd and the whole of an issue of redeemable preference stock, the amount required to redeem it being £294,716. For this P paid £160,000 in cash, and further agreed to pay the balance of £294,716 in four equal annual instalments, the final instalment being payable on 19th August 1963. The agreement provided that any money applied by RTT Ltd in redeeming preference stock was to go in reduction of the balance of the purchase price. By cl 1 of a separate agreement made in July 1960 between P and S, which specifically referred to the contract between P and CP Ltd, provision was made, inter alia, for the sale of shares in RTT Ltd to S for a specified sum. By cl 2 however it was provided that cl 1 should not take effect unless either (a) the sum of £294,716 payable by P to CP Ltd had been satisfied out of moneys 'provided by RTT Ltd redeeming its Preference Stock Units out of profits which would otherwise be available for dividend' or (b) in the event of the stock being redeemed otherwise than out of the profits of RTT Ltd or the balance of £294,716 being satisfied from another source, the 'aggregate profits of RTT earned during the four years ending 19th August 1963 and available for dividend on the Ordinary Stock Units for the time being issued whether declared or not shall have amounted to

---

1 Form of Appeal, Directions as to Procedure and Standing Orders (1971). See also [1970] 3 All ER 70, [1971] 2 All ER 736; [1970] 1 WLR 1218, [1971] 1 WLR 933; the paragraphs there numbered (1)-(4) appear as paras (a)-(d) in direction 2 in the 1971 edition of the Directions as to Procedure
2 For s 51, as amended, see 25 Halsbury's Statutes (3rd Edn) 723

£300,000 after payment of provision for income tax and profits tax'. Although in the relevant period the profits of the group, i e RTT Ltd and A Ltd, greatly exceeded £300,000 the separate profits of RTT Ltd fell short of this figure. It was contended by P that the reference to 'profits' in paras (a) and (b) of cl 2 of the agreement was to the separate profits of RTT Ltd and that since these had not reached the target figure under cl 2 (b) S was not entitled to exercise his right under cl 1 to purchase the shares in RTT Ltd.

**Held** - In the light of the aim of the agreement, and even on a purely linguistic construction, the references to 'profits' in paras (a) and (b) were to the consolidated profits of the group and not to the profits of the holding company, RTT Ltd, only; furthermore this construction was in accordance with commercial good sense for under the scheme of the Companies Act 1948 and in accepted business practice it was the consolidated account for the group of companies which was the significant document, showing whether the enterprise represented by the group was making a profit; it was only the profits of the group which could provide an incentive for S to remain with the group and would be a measure of his success; on the other hand no purpose had been shown why the reference should be to the separate profits of RTT Ltd which would in effect mean such part of the group profits as the board of RTT Ltd, in effect P, decided to pass up to the parent company (see p 243 h and p 244 a to c and j, post).

Per Curiam. Although in construing a written agreement the court is entitled to take account of the surrounding circumstances with reference to which the words of the agreement were used and the object, appearing from those circumstances, which the person using them had in view, the court ought not to look at the prior negotiations of the parties as an aid to the construction of the written contract resulting from those negotiations. Evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the 'genesis' and, objectively, the 'aims' of the transaction (see p 240 b to d g and h and p 241 a b and f, post).

*Hvalfangerselskapet Polaris Aktieselskap v Unilever Ltd* (1933) 39 Com Cas 1 considered.

**Notes**

For the admission of extrinsic evidence in the construction of documents, see 11 Halsbury's Laws (3rd Edn) 396-412, paras 646-669, and for cases on the subject, see 17 Digest (Repl) 300-355, 1158-1613.

**Cases referred to in opinions**

Crane v Hegeman-Harris Co Inc [1939] 1 All ER 662; affd CA [1939] 4 All ER 68, 35 Digest (Repl) 154, 421.

Hvalfangerselskapet Polaris Aktieselskap v Unilever Ltd, Hvalfangerselskapet Globus Aktieselskap v Unilever Ltd (1933) 39 Com Cas 1, 77 Sol Jo 388, 39 Digest (Repl) 490, 384.

Macdonald v Longbottom (1860) 1 E & E 977, [1843-60] All ER Rep 1050, 29 LJQB 256, 2 LT 606, 120 ER 1181, 17 Digest (Repl) 332, 1378.

River Wear Comrs v Adamson (1877) 2 App Cas 743, [1874-80] All ER Rep 1, 47 LJQB 193, 37 LT 543, 42 JP 244, 3 Asp MLC, 17 Digest (Repl) 147, 485.

Utica City National Bank v Gunn (1918) 118 NE 607.

**Appeal**

This was an appeal by leave by Daniel Dan Prenn ('Mr Prenn') from an order of the Court of Appeal (Lord Denning MR, Widgery and Cross LJJ) dated 28th January 1970 dismissing an appeal by Mr Prenn from the judgment of Pennycuick J dated 25th February 1969 in an action by the plaintiff, John Charles Simmonds ('Dr Simmonds'), whereby he ordered the rectification of a deed dated 6th July 1960 executed by Mr Prenn and Dr Simmonds for the acquisition by Dr Simmonds of

a  certain shares in a company called Controls & Communications Ltd and ordered specific performance of the deed so rectified. The Court of Appeal granted Dr Simmonds specific performance of the deed without rectification. The facts are set out in the opinion of Lord Wilberforce.

*R J Parker QC, J R B Fox-Andrews QC* and *R A K Wright* for the appellant.
*R I Threlfall QC, L J Bromley QC* and *J F Lever* for the respondent.

b  Their Lordships took time for consideration.

20th July. The following opinions were delivered.

**LORD REID.** My Lords, I have read the speech of my noble and learned friend, Lord Wilberforce. I agree with it and would therefore dismiss this appeal.

c  **LORD DONOVAN.** My Lords, I find myself in entire agreement with the opinion of my noble and learned friend, Lord Wilberforce, and like him would dismiss this appeal.

d  **LORD WILBERFORCE.** My Lords, Dr Simmonds's claim in this action is that, under the terms of an agreement under seal dated 6th July 1960, he is entitled to acquire from Mr Prenn, for a consideration of £6,000, a 4 per cent interest in the ordinary capital of a company controlled by Mr Prenn called now Controls & Communications Ltd, but at the relevant date Radio & Television Trust Ltd ('RTT'). This interest was worth at the date of the trial about £200,000. Mr Prenn disputes the claim on the ground that a necessary condition set by the agreement has not been satisfied because less than £300,000 profits available for dividend on the ordinary stock of RTT over the relevant period has been earned. Dr Simmonds maintains that the condition has been fulfilled. The dispute relates not to the figures, which are agreed, but to the definition of profits of RTT available for dividend on its ordinary stock. If this means the separate profits of RTT alone, the amount over the period fell just short of the target, by less than £10,000. If it means the consolidated profits of the group consisting of RTT and subsidiaries, the amount was largely exceeded. The small margin of deficiency, although capable of arousing sympathy for Dr Simmonds, is not an argument for one or other side. A similar situation might arise on either interpretation and is inherent in the nature of 'target' agreements.

The question is thus simply one of construction of the agreement and it should be capable of resolution shortly and cheaply. But Dr Simmonds has claimed in the alternative that, if the agreement did not bear the meaning he contended for, it should be rectified so as to do so. This let in a mass of evidence, oral and documentary, as to the parties' intentions, which would not be admissible on construction, although (as I shall explain) counsel for Dr Simmonds tried to bring some of it in on that issue. It also involved some issues of law. This part of the case overshadowed the rest, so that by far the greater part of the time spent both at first instance and in the Court of Appeal was concerned with it. In this House argument was heard first exclusively on the question of construction and, as your Lordships reached on it a conclusion in favour of Dr Simmonds, no argument on rectification was heard. I now deal with this construction issue.

In order for the agreement of 6th July 1960 to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. There is no need to appeal here to any modern, anti-literal tendencies, for Lord Blackburn's well-known judgment in *River Wear Comrs v Adamson*[1] provides ample warrant for a liberal approach. We must, as he said,

---
[1] (1877) 2 App Cas 743 at 763, [1874-80] All ER Rep 1 at 11.

enquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 (*Macdonald v Longbottom*[2]) it has been clear enough that evidence of mutually known facts may be admitted to identify the meaning of a descriptive term.

Counsel for Dr Simmonds, however, contended for even greater extension of the court's interpretative power. They argued that later authorities have gone further and allow prior negotiations to be looked at in aid of the construction of a written document. In my opinion, they did not make good their contention. A modern authority in this House, which counsel for Dr Simmonds invoked, is *Hvalfangerselskapet Polaris Aktieselskap v Unilever Ltd*[3] where it was necessary to interpret the words 'entire production'. There, as here, there was a claim for rectification in the alternative so that a great deal of evidence of matters prior to the contract was called. But the speeches give no support for a contention that negotiations leading up to the contract can be taken into account; at most they support the admission of evidence to establish a trade or technical meaning (not in question here) and, of course, they recognise the admissibility of evidence of surrounding circumstances. But they contain little to encourage, and much to discourage, evidence of negotiation or of the parties' subjective intentions.

I may refer to one other case to dispel the idea that English law is left behind in some island of literal interpretation. In *Utica City National Bank v Gunn*[4] the New York Court of Appeals followed precisely the English line. Cardozo J in his judgment refers to 'the genesis and aim of the transaction' citing Stephen's Digest of the Law of Evidence, and Wigmore on Evidence. Surrounding circumstances may, he says, 'stamp upon a contract a popular or looser meaning' than the strict legal meaning, certainly when to follow the latter would make the transaction futile. 'It is easier to give a new shade of meaning to a word than to give no meaning to a whole transaction.' The whole judgment, as one may expect, combines classicism with intelligent realism.

So I think that Dr Simmonds gains little support from authority. On principle, the matter is worth pursuing a little, because the present case illustrates very well the disadvantages and danger of departing from established doctrine and the virtue of the latter. There were prolonged negotiations between solicitors, with exchanges of draft clauses, ultimately emerging in cl 2 of the agreement. The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience (although the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, although converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact. Cardozo J thought so in the *Utica Bank* case[4]. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives

---

2  (1860) 1 E & E 977, [1843-60] All ER Rep 1050
3  (1933) 39 Com Cas 1
4  (1918) 118 NE 607

effect to a common intention; the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get 'agreement' and in the hope that disputes will not arise. The only course then can be to try to ascertain the 'natural' meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective—even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised. In the present case, Lord Denning MR seems to have taken into account Dr Simmonds's anxiety (as testified by a witness) to protect himself against unilateral decisions by Mr Prenn; and an argument pressed on us was that, if Mr Prenn's interpretation (i e that only the holding company's profits were relevant) was correct, Dr Simmonds would, in this matter on which he felt so anxious, in some respect at least, be completely in Mr Prenn's hands, for Mr Prenn could decide just how much, or how little, of the subsidiaries' profits were to be passed to the holding company. I cannot see how any of this can be admissible because, I repeat, I cannot see how it is helpful. Given the fact of Dr Simmonds's anxiety, the whole question is how far does the agreement meet it; how can we know, except by interpreting the agreement, how far Mr Prenn was willing to meet him or how far Dr Simmonds decided to take what he could get? Even the argument that Mr Prenn's interpretation would put Dr Simmonds in his hands, although apparently attractive, I find to be dangerous; a man in Dr Simmonds's position—a professional man—entering into relations with the source of finance and benefits to come, might decide, in his own interest, that if he could not get all the protection he wanted, the risk of partial protection was one to accept; that Mr Prenn had to be trusted to act fairly. To say that the clause had this result is not to say that it was futile or frustratory: it is to say that a better clause could, with hindsight, in Dr Simmonds's interest have been drawn. But the court cannot construct such a clause out of the material given.

In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori of Dr Simmonds's intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the 'genesis' and objectively the 'aim' of the transaction.

As to the circumstances, and the object of the parties, there is no controversy in the present case. The agreement itself, on its face, almost supplies enough, without the necessity to supplement it by outside evidence. But some expansion, from undisputed facts, makes for clearer understanding and I include a reference to these in what follows.

In the year (1959) before the making of the contract, RTT was controlled by Crompton Parkinson Ltd, a large public electrical engineering company. RTT itself did not trade, but had a wholly-owned trading subsidiary, Airmec Ltd, which employed Dr Simmonds as managing director and as its leading technician. The structure of RTT was such that Crompton Parkinson held 94 per cent of its ordinary capital, and the whole of an issue of redeemable preference stock; the amount required to redeem it being £294,716 (there were also some capital certificates but I need not refer to this complication). Mr Prenn desired to secure the services of Dr Simmonds in his group of companies and decided to do so by purchasing, from Crompton Parkinson, RTT together, of course, with its subsidiary, Airmec, which in turn would bring with it Dr Simmonds's services. So in July-August 1959 an agreement was reached by which Mr Prenn agreed to buy the 94 per cent of the ordinary capital and the preference stock. For this he paid £160,000 in cash. The balance, £294,716, was to be paid by four equal instalments on 19th August 1960,

1961, 1962 and 1963. The agreement provided that any money applied by RTT in redeeming preference stock was to go in reduction of the balance of the purchase price; and it was no doubt in Mr Prenn's prima facie interest that the preference stock should be redeemed out of profits of RTT so as to avoid his having to find cash from his own resources.

The critical sale agreement between Mr Prenn and Dr Simmonds was dated 6th July 1960, after a period of negotiation. Its connection with the Crompton Parkinson agreement is manifest, both from the recital of the latter in it, and from the coincidence of the critical date in cl 2 with the date—19th August 1963—stated in the Crompton Parkinson agreement as the terminal date for payment. A reading of the agreement shows that it was intended to secure for Dr Simmonds the provision of an interest in the equity of RTT and that this was to be conditional on Dr Simmonds remaining with RTT long enough to ensure that the Crompton Parkinson debt was paid off out of profits of RTT and on RTT in fact earning enough to enable the debts to be paid. Thus cl 3 of the agreement provided for the sale to go off if Dr Simmonds left RTT before the terminal date either voluntarily or through dismissal for gross misconduct. In order to make good this description of the agreement, I must set out a number of its provisions. After stating the parties there are recitals and definitions:

'WHEREAS:

'A. In this agreement the following words and expressions shall have the meanings set opposite them:

| | |
|---|---|
| '"R.T.T."  | Radio and Television Trust Limited . . . |
| '"Ordinary Stock Units" | The Ordinary Stock units of 6d. each in the capital of R.T.T. . . . |
| '"The Contract" | The contract created by exchange of letters dated 21st July 1959 from Mr. Prenn to K. R. Cork as agent for C.P. and 29th July 1959 from C.P. to Mr. Prenn as varied by a Memorandum in writing dated 19th August 1959 being a contract for the purchase by Mr. Prenn of the interest of C.P. in R.T.T. and which includes 356,944 Preference Stock Units remaining in the hands of C.P. Under the terms of this contract as varied there is an obligation on the part of Mr. Prenn to pay the sum of £294,716, being the balance of the purchase money by four equal instalments on 19th August in 1960, 1961, 1962 and 1963 respectively. |

'B. Under the Contract any money received by C.P. from R.T.T. for any of the said 356,944 Preference Stock Units redeemed after 19th August 1959 is to be applied by C.P. in or towards payment of the balance of the said purchase money . . .'

Then the operative part:

'1. (a) [Provided for a payment by Mr Prenn to Dr Simmonds of £6,600.] (b) [Provided for the sale to Dr Simmonds of shares in RTT.] (c) [Provided for sale of further shares to Dr Simmonds.]

'2. THE provisions of Clause 1 hereof shall not take effect unless and until any one of the following conditions has been satisfied:

'(a) The said sum of £294,716 has been paid or satisfied in full on or before the due dates for payment thereof under the Contract out of monies provided by R.T.T. redeeming its Preference Stock Units out of its profits which would otherwise be available for dividend or

'(b) The aggregate profits of R.T.T. earned during the four years ending 19th August 1963 and available for dividend on the Ordinary Stock Units for the time being issued whether declared or not shall have amounted to £300,000

after payment or provision for income tax and profits tax PROVIDED ALWAYS that the conditions of this sub-paragraph (b) shall only apply if the Preference Stock Units or any of them are redeemed otherwise than out of the profits of R.T.T. which would otherwise be available for dividend or the terms of payment of the said balance of the purchase price under the Contract or any part thereof shall be re-arranged or all or any part of the said sum of £294,716 shall be satisfied from any other source

'3. THE provisions of clause 1 shall not take effect if at any time before 20th August 1963 Dr. Simmonds ceases to be employed by R.T.T. either directly or through any of its subsidiaries by reason of his own act or is dismissed for gross misconduct and at the time of such termination neither of the conditions in clause 2 shall have been fulfilled.'

Clauses 4 and 5 contained other consequential provisions.

What, then, with this background, is the meaning of cl 2? Its purpose is plain. Paragraph (a) provides that Dr Simmonds is not to get his shares unless the outstanding debt to Crompton Parkinson has been repaid by means of redemption of preference stock out of profits of RTT. But this might not be fair to Dr Simmonds, for Mr Prenn, under his agreement with Crompton Parkinson, was not obliged to redeem the preference stock, or, if he did, might not use RTT's profits to do so. So para (b) is evidently designed to protect Dr Simmonds against these possibilities. There are three alternative events which might bring it into operation, stated under the proviso. If any of these happened, Dr Simmonds was to get his shares if the aggregate profits of RTT earned over the four years ending 19th August 1963 and available for dividend on the ordinary stock units whether declared or not should have amounted to £300,000 after payment or provision for income tax and profits tax. All of this was in the nature of an inducement to Dr Simmonds, to procure whose expert services was a main object of the Crompton Parkinson purchase, and who was the mainspring of the profit earning activities of RTT through Airmec, to ensure that enough profits were earned to match the £294,716 which, on this hypothesis, was to be paid by Mr Prenn, otherwise than out of RTT's profits, to Crompton Parkinson.

What profits, then, are contemplated by this clause? The profits of the RTT group, including Airmec, or only such separate profits as reach RTT as holding company? This is the whole question in the case.

As a final preliminary matter, before answering this question, it is necessary to state a few more matters of fact which must have been present to the minds of both parties. First, it must have been known to those businessmen, at least in general terms, that under the Companies Act 1948 there had to be placed before the shareholders of RTT in general meeting a consolidated profit and loss account giving a true and fair view of the profits of RTT and its subsidiaries combined just as if it was an account of a single company. No doubt there would also be separate profit and loss accounts of each individual company, including RTT itself, but I have no hesitation in asserting that both under the scheme of the Act and in accepted business practice, the significant document is the consolidated account which alone would show whether the enterprise represented by the group was making profit or not.

Secondly, as one would expect, accounts in this form had been prepared by RTT. There are among the documents consolidated profit and loss accounts of RTT and subsidiaries for the year ended 31st March 1958, the fifteen months ended 30th June 1959, the nine months ended 31st March 1960, the three relevant periods immediately before the agreement. Each of these shows the consolidated profit on trading (i e of the group), the dividend paid (i e on the preference and ordinary capital of RTT) and the balance on profit and loss account (of RTT and the subsidiaries). Thirdly, there are minutes showing how the decisions as to dividends (on RTT capital) out of the profits (of the group) were made. Minutes of 11th August 1959 and 10th June

1960 show, as one would expect, that these were made by the board of the holding company, which then instructed the subsidiaries to declare the appropriate amount by way of dividend, in favour of the holding company.

In the light of this, the meaning of cl 2 of the agreement seems to me clear. The references to 'profits' in para (a) and in para (b) can only, in my opinion, be to the consolidated profits of the group consisting of RTT and its subsidiaries. It is only these profits which could provide an incentive to Dr Simmonds to remain and work with the group and which could be a measure of his success. On the other hand, no purpose can be discerned why the reference should be to the separate profits of RTT, which in fact means such part of the group profits as the board of that company, effectively Mr Prenn, decided to pass up to the parent company.

Linguistically, the arguments point decidedly the same way. The reference to profits 'earned', and that to income and profits tax, point strongly to consolidated profits. The use of the words 'R.T.T.' even coupled with the definition appears to me perfectly neutral, since other usages of 'R.T.T.' in the agreement (definition of 'the Contract' and cl 3) dispel any idea that the draftsman had in mind any segregation of RTT (qua parent) from the rest of its group. The reference (in para (b)) to profits 'available for dividend on the Ordinary Stock Units', so far from pointing towards the limited construction, points, for me, the other way. For both commercially and on the established accounting practice, all profits of the group are available for these dividends. It is true that a large part of the profits was ploughed back into the business of the subsidiaries, and that both parties must have contemplated that this would be done, but this is not to the point. To say so is to confuse the earning of profits with their appropriation; all profits earned are available for dividend; what is done with them is a matter of choice which rests with those who control the company. Even if they decided to 'plough them back' they still remain 'available for dividend', so long as they remain in the balance sheet as 'balance on profit and loss account'.

One other argument I must mention. It is based on para (a). The reference there to profits otherwise available for dividend must, it is said, be to profits of the holding company, because it is only out of them that preference stock can be redeemed. This is said to be borne out by s 58 of the Companies Act 1948, which requires that redeemable preference shares can only be redeemed out of 'profits available for dividend' (or by a new issue). The use of these same words in para (a) is argued to show that only separate profits of RTT can be meant. In my opinion, this argument is fallacious. Paragraph (a) can just as well be referring to group profits; in a real sense (since RTT does not trade) its preference stock can only be redeemed by profits earned by the group. Admittedly, before redemption can occur, they have to be passed up to RTT (holding) by way of dividend on the subsidiaries; but they are still group profits. The only difference between para (a) and para (b) is that in the one case a 'passing up' operation is presupposed, in the other not. But the 'profits' are the same—group profits. The use of the words 'available for dividend' in s 58 proves nothing, since that section is not concerned with any particular type of company or with any distinction between parent and subsidiary. It is simply, in effect, saying that redeemable preference shares must be redeemed out of profits, not out of capital. What those profits are, in the case of a group, must be decided on arguments outside the section.

To sum up, Mr Prenn's construction does not fit in any way the aim of the agreement, or correspond with commercial good sense, nor is it, even linguistically, acceptable. The converse of each of these propositions applies to Dr Simmonds's interpretation. I would accept it. It follows, in consequence, that the alternative claim for rectification does not arise. But I take this opportunity of stating, as was drawn to the attention of the House by counsel at the bar, that the report of the judgment of Simmonds J in *Crane v Hegeman-Harris Co Inc* which is contained in the All England Law Reports[6]—a judgment which has been much quoted and relied on—appears to

---

6  [1939] 1 All ER 662; affirmed by the Court of Appeal [1939] 4 All ER 68

be incomplete, omitting several pages[7]. A full transcript was made available to your Lordships and, subject to verification, should be consulted on future citations.

I would dismiss the appeal.

**LORD PEARSON.** My Lords, I have had the advantage of reading the opinion of my noble and learned friend, Lord Wilberforce, and I agree with it. I would dismiss the appeal.

**LORD DIPLOCK.** My Lords, I agree with what my noble and learned friend, Lord Wilberforce, has said as to the principles to be applied in the interpretation of a written agreement, and as to the reasons which underlie the rule that evidence is not admissible of the negotiations between the parties or any purpose which either of them hoped to achieve by it does not appear from the words used in the agreement and the surrounding circumstances.

I am perhaps less confident that the application of those principles to the written agreement which falls to be construed in the instant appeal indicates that the meaning contended for on behalf of Dr Simmonds is to be preferred to the alternative meaning which commended itself to the Vice-Chancellor. But such doubts as I have are not strong enough to justify my differing from the remainder of your Lordships.

*Appeal dismissed.*

Solicitors: *Kenneth Brown, Baker, Baker* (for the appellant); *Allen & Overy* (for the respondent).

S A Hatteea Esq   Barrister.

---

[7] The passage omitted from the judgment of Simonds J follows immediately after the last line on p 668 of the report and reads as follows:

So far as the documentary evidence goes, the negotiations between the parties began with a letter by the plaintiff to the director of the defendant corporation, Mr Harris, who is addressed as 'Dear Jack', a man with whom the plaintiff was clearly on sufficiently familiar terms. By that letter of 14th July 1935 Mr Crane urges the necessity of coming to some final arrangement in regard to his remuneration, pointing out that the matter had been allowed to drift too long. It is fair to him to say that in that first letter of his there is no reference to the matter which is so important in this suit, the question of his fee being contingent in any sense on what I have called the over-run. Nor, again, in the memorandum of an agreement which he put forward on or about the same date is there any reference to that aspect of the case. But from that moment onwards there is, in my view, no document in this case which is not consistent, and I think they are consistent only with the view that from the outset, at any rate very soon after 14th July 1935, both parties were negotiating their contracts on the footing that the over-run was to influence equally the plaintiff's and the defendants' profit or remuneration. In the agreed bundle of correspondence there is a document representing a draft put forward on behalf of the defendant corporation, and prepared, I think, by their solicitor, Mr Pinsent. In that document there appears quite clearly the provision which I have briefly called the provision in regard to the over-run, and nobody having this document before them could read it without seeing that it was in the plaintiff's mind and in the defendants' minds, and that they intended to bring to the plaintiff's mind the necessity that his remuneration in respect of his contingent fee or share in the second £70,000 was to be dependent on the over-run. That document, which bears I think no date, by common agreement was delivered to the plaintiff on or about 14th August, and with it was delivered a private letter written by Mr Harris to the plaintiff, in which the same thing is reiterated in terms which do not leave any doubt at all what was in the minds of the parties. No other document I think need be referred to until I come to the all-important document, a letter signed by Mr Harris, dated 2nd September 1935, not immediately sent off, but admittedly received by the plaintiff at least by 7th September of that year. That document was the basis of discussions which took place on 16th September between the solicitors to the parties, Mr Jenkins on the one hand, and Mr Roy Pinsent on the other, and also on 19th September when, not only the solicitors, but their clients were present. It is clear on its face that the contingent fee, which may be stated in a variety of ways, but was eventually agreed at two-sevenths of the second £70,000, was to be

contingent in this sense, that it was liable to be eaten into by what I call the over-run. That that was not dissented from by the solicitor for the plaintiff is clear from the entry made in the diary of the solicitor for the defendants immediately after the interview of 16th September. Mr Pinsent, stating his contemporary recollection in an entry of 16th September, says this:

> 'Subsequently attending Mr Jenkins without prejudice in a frank discussion from which we gathered that the chief difficulty was the supervision of Mr Crane's expenses. The latter wanted £13,000 as a fixed fee and to pay his own expenses. He also wanted two-sevenths of £70,000 less the amount of any excess cost [and "excess cost" and "over-run" are equivalent terms] as a fixed fee. He also wanted an arbitration clause.'

That was the contemporary recollection—I might say 'contemporary statement'—by Mr Pinsent of what took place between him and Mr Jenkins on 16th September, and for my part I am satisfied that from 16th September onwards that was no longer a matter of negotiation between the parties, but on the contrary each one of them was well satisfied that the bargain between them in this respect was that the contingent fee, however it might be ascertained, was to be determined by the amount by which the second £70,000 was eaten into by the over-run.

I have said that in order to rectify I must be satisfied that both parties did not intend that agreement, and that both parties did intend something else clear and ascertainable. First of all, in regard to the defendants, I have heard the evidence of Mr Roy Pinsent, the solicitor advising them, I have heard the evidence of Mr McClean, not a director, but an important officer in the defendant corporation, and I have heard the evidence of Mr Baxendale. First of all, with regard to Mr Pinsent, he gave his evidence with the candour and care that one would expect, and he left on my mind the absolute conviction that on 19th September at the all-important interview the defendants, whom he was advising, and he himself were well satisfied that the term had been agreed in regard to the contingent fee, and that it had been agreed in this sense, that it was to be two-sevenths of the second £70,000, subject to over-run. Of course, he could only speak for what was in his own mind; he could not say what was the intention of his clients, except so far as it appeared from their words and their deeds, but I think that it is a reasonable conclusion that it is impossible for him to have left that meeting satisfied that that was their intention if it was not. I say that he was satisfied, in spite of certain criticisms which have been made of his subsequent letters. It is quite true, and I do not forget, that immediately after that interview of 19th September, Mr Jenkins wrote to him a letter, and he replied to it in terms which are not wholly consistent with the view which I am now entertaining, but I am satisfied that the reference to over-run in those letters was not made only because the terms were stated somewhat shortly, and because he assumed, as I think he was entitled to assume, that it was in the mind of Mr Jenkins as of himself that the two-sevenths was subject to over-run. Nor do I forget that nearly a year later when first consulted on the difference that had arisen he did express an opinion on construction which is not wholly consistent, although I think little inconsistent, with the view which he now puts forward as to the intention of the parties. Bearing those points in mind, I am well satisfied, having seen and heard him, that his recollection of what took place on 19th September is accurate.

Now for Mr Baxendale. Mr Baxendale was a witness whose evidence must have impressed anybody who heard him. He went to that meeting with a definite view as to what was to be agreed about the plaintiff's remuneration, and he left it satisfied that that had been agreed, and that the term of the remuneration was that the contingent fee was to be subject to over-run. That is really conclusive of the matter, for Mr Baxendale was the man who, on behalf of the corporation, of which he was vice-president, signed the agreement in question. But the matter does not rest there, for Mr McClean also was present at the interview, and he had taken a large part in the negotiations throughout. He had been really, I think, the right-hand man of Mr Harris in the matter, and had had many interviews with the plaintiff himself. Mr McClean's evidence has been criticised. It has been said that he was too much of an advocate to be regarded as wholly impartial, and in particular his use of the words, 'and retain', has been criticised as showing that he was colouring his evidence. I do not accept that view of Mr McClean's evidence at all. It is true that he used the words, 'and retain', and it may be to that extent he was an advocate, but in my view he was a careful, candid witness, on whose testimony I can rely. His testimony is again the same, that both at this interview and, indeed, at other interviews between himself and the plaintiff, the matter proceeded on the footing that the fee of the plaintiff, insofar as it was contingent, was contingent on the over-run.

a    So much, therefore, for the defendants' side of the case. I am satisfied from hearing their evidence and the consideration of the documents that the written agreement does not, as construed by the arbitrator and the Court of Appeal, conform to their intention or their belief as to what had been agreed between the parties.

Now, what about Mr Crane? With regard to Mr Crane I feel a great difficulty. It is always difficult to say of a man that he agreed a certain term when that term does not find its place in the written agreement and when in the box he denies that he ever agreed to such

b    a term. It is necessary, therefore, to scrutinise with great care his evidence, and to consider the way that he gave it, and to consider his evidence in relation to the contemporary documents. Mr Crane was not a satisfactory witness. How far he was evasive, I often felt difficulty in determining, but of this I am sure, that there were occasions, more than one occasion, when he was deliberately evasive in order to get himself out of an awkward position. There were passages in his evidence which to my mind showed conclusively that he was not being candid with the court in regard to what his attitude was during

c    the negotiations of 1935 which led up to this agreement. This at least is clear from his own evidence, that at all material times he knew what was in the minds of the defendants in regard to the term of his remuneration. He knew that the question of over-run was in their minds. He had before him the undated letter which he received in August. He had the letter of 2nd September which he received on 7th September, and from first to last, as he himself says, he made no objection to the term that his remuneration was to be contingent on over-run. This further: in many conversations that were deposed to by

d    other witnesses, and in letters which he himself wrote, it was quite clear that his attitude was this: 'If you, the defendants, do not make any money out of this, I do not want to make any money either.' What did he mean by that? He was challenged by it, and he was evasive. No satisfactory explanation of that view put forward by him in conversation and in letter has been put forward in the court on his behalf, except that he meant just what the defendants meant, namely, that he meant that his remuneration was to be contingent on

e    over-run. There is one letter written at a late stage in this case—at any rate, a late stage in the litigation or dispute between the parties—as late as 1st February 1937, in which he says, writing to Mr Harris:

'You and I both agree that it has always been our mutual understanding that "if you did not make any money on this job, I did not make any money", and I have always considered by the same token that you would not want me to lose money on this job.'

f    What did he mean by that? He was challenged, and he gave no satisfactory answer. In my view, he meant only one thing: that if that £70,000 was so eaten into by over-run that the defendants did not make any money, why, then, he did not want to make any money either. Of course, he was partly responsible in this sense, that as an architect the actual cost and the excess cost, if there was any, would to some extent—I do not put it too high—depend on the contribution which he made to the saving of expenses. From the interview on 19th September from which, as I said, the defendants' representatives retired

g    believing that the plaintiff knew what they intended with regard to his remuneration, until 23rd October, it is common ground that there was no change of mind. If then I find a common intention on the 19th September, I am entitled to conclude that there was a continuing intention up to 23rd October when the formal instrument was executed. But before I come to that, there is one other aspect of the evidence to which I ought to refer. It bears indeed on that which I have just been saying. It is a memorandum which

h    was submitted by Mr Crane to his own solicitor, and in respect of which privilege was waived, as indeed privilege was waived in respect of many documents in this case in order that I might be able to examine fully into the minds and intentions of the parties at the time when this agreement was being negotiated and executed. The plaintiff prepared a memorandum which may be dated on or about 11th September 1935, i.e., a few days before the meetings of 16th and 19th September at which the matter was finally discussed

i    and negotiated. In that memorandum the plaintiff, after referring to certain matters for the enlightenment of his solicitor, says:

'This leaves a maximum fee, that I will agree to, for my work, which is of course to be contingent upon Mr. Harris receiving the full £140,000—of £33,000. Inasmuch as Mr. Harris is doing this job on a cost plus fixed fee basis and is subject to penalties should the job overrun any cost or time to complete, I am willing to gamble with him to the following extent. I will expect a minimum fee of £13,000 for the architectural

service I am to render. I think that everyone agrees that this is a close estimate as to what this work will cost, and inasmuch as I have to rely on the ability of the Hegeman-Harris Company to perform their services in such a way that they will eventually receive their total fee in order that I shall receive my maximum fee, I think that this amount [i e the £13,000] should be agreed upon without all the conditions stipulated in Mr. Harris's letter of September 2nd. You will recall that he wanted to have complete access to my books and have his Auditors keep accurate accounts of my expenditures so that should he fail to make any money on this job he should have returned to me any moneys that I might have left from the £13,000 fee. He also suggests that should this cost overrun the £13,000 fee that the overrun be deducted from any future Bonus I might receive. This is rather a stupid suggestion because if he does not make any money I will not get any Bonus anyway and in the meantime I have to be subjected to the indignities of having my accounts and expenditures questioned. The more I think of this subject the more I am inclined to believe that £13,000 as a minimum fee, without any strings attached to it, and £33,000 as a maximum fee, is the simplest and best way to begin this contract.'

That was written at a time when the question of the minimum fee was in dispute. The question then was in regard to the minimum fee whether the plaintiff was to have that free from all conditions or whether his expenditure in regard to those items for which he claimed £13,000 was to be subject to scrutiny. What he was objecting to was this. He said: 'Let me have my £13,000 fixed fee free from any conditions, free from any scrutiny. In that respect it will be unlike my other fee to which the conditions have been attached and from which I do not dissent.' Nobody could read that letter, and I am sure Mr Jenkins did not read that letter, as meaning that he was dissenting from the view that in respect of his contingent fee—what he calls his maximum fee, the balance over the £13,000—he was to be subject to the very conditions on which in both those letters which were before him and which I think were before Mr Jenkins the defendant corporation were insisting. From his own documents I can come to no other conclusion than that, whatever Mr Crane now may say was in his mind, he was in agreement with the defendant corporation on this vital point. Without referring to it in more detail than is necessary, there are certain passages in his evidence which appear to me to point most strongly to the same conclusion. It being common ground, as I have said, between the parties that it was the second £70,000 to which they were to look for the profit, Mr Crane is asked in cross-examination:

'Q We have the second £70,000 as the source of profit to Hegeman-Harris, have we not? A Yes.
'Q You appreciated at a very early stage that Messrs. Hegeman-Harris contemplated that £70,000 being eaten into possibly by an over-run? A In the early stages, yes.
'Q What do you mean by "the early stages"? A Before the plans were done, before they could have arrived at a figure when they should have known whether the building could be built for it or not.
'Q You appreciated right up to 19th September and on 19th September Messrs. Hegeman-Harris contemplated their second £70,000 possibly being eaten into by over-run? A That is correct.'

Then again he is asked: 'But it was in your mind that it was in their mind to reduce your remuneration by over-run.' The plaintiff at first declined to answer that, because he said:

'And when I . . .
'Q Will you answer my question? You knew that it was in their mind that your remuneration should be reduced by over-run? A Yes.
'Q You did? A Yes.
'Q And you said nothing about it? A I will not say I said nothing about it.
'Q What did you say? A I do not remember saying anything about it.'

It is quite clear to me from that, and indeed from many other parts of Mr Crane's evidence, that he knew that it was in their mind and that he said nothing because he acquiesced. At one stage it seemed to be put forward in this case that he deliberately refrained from saying anything thinking or hoping that if he said nothing he might get some advantage. I do not think that the plaintiff was dishonest, a conclusion to which that would lead me, in the course of his negotiations. Whatever may be his present views I think he then was honest and assented to this proposal on 19th September in silence because he in fact agreed to it and told his solicitor that he had already agreed to it.