[1994] Vol. 2    LLOYD'S LAW REPORTS    227

C.A.]    The "Island Archon"    PART 3

## COURT OF APPEAL

Apr. 26 and 27, 1994

---

TRIAD SHIPPING CO.

v.

STELLAR CHARTERING &
BROKERAGE INC.

(THE "ISLAND ARCHON")

Before Sir DONALD NICHOLLS V.-C.,
Lord Justice MANN and Lord Justice EVANS

Charter-party(Time) — Indemnity — Implied term — Owners incurred loss in complying with charterers' orders — Whether owners entitled to be indemnified by charterers for such loss — Whether term should be implied.

Arbitration — Jurisdiction — Cargo claims — Whether reference to arbitration in respect of "cargo claims" wide enough to cover claims owners wished to advance — Whether claims included claims in respect of which arbitrator refused leave to amend — Whether claims abandoned — Whether owners entitled to an indemnity from charterers.

By a charter-party dated Mar. 30, 1979 Triad Shipping Co. (the owners) let their vessel *Island Archon* to Stellar Chartering & Brokerage Inc. (the charterers) for 36 months on the New York Produce Exchange form. The vessel was sub-chartered to Maritime Transport Overseas G.m.b.H. (the sub-charterers).

In the course of her employment the vessel carried cargo to Iraq. SEMA were the sole agents that could be employed by or on behalf of a ship in Iraq. Whenever shortage claims were intimated against a ship that was in the course of discharging SEMA, as agents, would require provision of security before the ship sailed to cover possible cargo claims. And because SEMA could be and usually were sued by the cargo receivers the local Courts had jurisdiction. The port authorities issued certificates allegedly showing short-landing and/or damage and the Courts inevitably issued judgments based on these certificates.

Cargo claims were made and were referred to arbitration. The arbitrator was originally appointed on behalf of the sub-charterers and subsequently was appointed on behalf of the charterers as arbitrator. The arbitrator was appointed sole arbitrator in both references. Between Feb. 11, 1981 and Nov. 29, 1984 there was an exchange of correspondence between the owners, charterers, sub-charterers and the arbitrator concerning the cargo claims.

In his award dated Jan. 21, 1992 the arbitrator dismissed the owners' claims for an indemnity in respect of the cargo claims, on the ground that it was not part of the owners' pleaded claim, that the owners needed to amend their pleadings to include it and that leave to amend would not be given because the claim if introduced by the amendment would be time barred and bound to fail.

The charterers submitted that the arbitrators had no jurisdiction in respect of the claim for an indemnity.

The owners appealed, the issues for decision being inter alia (1) Did the charterers agree that a claim by the owners for an indemnity in respect of cargo claims should become one of the issues referred to the arbitrator in the existing reference prior to exchange of pleadings in late 1986? (2) If the answer was yes did such claims include the claim in respect of which the arbitrator refused leave to amend i.e. the claim in respect of payments made in discharge of liabilities to cargo claimants which the arbitrator determined were liabilities of SEMA (the SEMA claims)? (3) If the answer to questions (1) and (2) were yes did the reference prevent the SEMA claims being barred by lapse of time? (4) Did the 1986 points of claim plead a cause of action in respect of the SEMA claims? (5) If the answer to question 4 was no did the 1986 points of claim or the omission therefrom of the SEMA claims amount to an abandonment of the SEMA claims or in any other way remove them from the matters before the arbitrator? (7) If the arbitrator was wrong to conclude that the owners' said claims were bound to be time barred were the owners entitled to an indemnity from the charterers?

———*Held*, by Q.B. (Com. Ct.) (CRESSWELL, J.), that (1) on a true construction of the correspondence the charterers agreed that a claim by the owners for an indemnity in respect of cargo claims should become one of the issues referred to the arbitrator as sole arbitrator in the existing reference prior to the exchange of pleadings in late 1986; and such claims included the claims in respect of which the arbitrator refused leave to amend i.e. the claims in respect of payments made in discharge of liabilities to cargo claimants, the SEMA claims;

(2) the reference to arbitration prevented the SEMA claims from being barred by lapse of time;

(3) there was no basis for the allegation of abandonment; if the points of claim did not on their true construction encompass the SEMA claims this was the result of oversight or error;

(4) on the evidence the arbitrator applied the correct principles; he found that there was a direct causal link between the relevant orders and the loss claimed; the owners were entitled to be indemnified by the charterers in respect of the cargo claims.

The charterers appealed, the only issue raised by this appeal being whether the shipowners were entitled to succeed in their claim for an indemnity, which in the absence of any express undertaking in the charter must be based on an implied term.

— ——*Held*, by C.A. (Sir DONALD NICHOLLS, V.-C., MANN and EVANS, L.JJ.), that (1) the shipowners were entitled to rely on an implied right to be indemnified against the consequences of complying with the time charterers' order to proceed to Basrah and deliver the cargo there notwithstanding that it was an order which the time charterers were entitled to give and the shipowners were bound to

obey; there was an express finding that the losses claimed were the direct consequence of complying with the order (*see* p. 234, cols. 1 and 2; p. 238, col. 2);

(2) even when there was an express indemnity time charterers were not liable for all consequences which might result from compliance with their order in that the shipowners might be at fault; a shipowner remained responsible for the safe navigation of the ship; and the loss might be regarded as caused in law by some subsequent or intervening event (*see* p. 234, col. 2; p. 236, col. 1; p. 237, col. 2; p. 238, col. 1);

(3) what risks the shipowner had agreed to bear must depend on the true construction of the charter and therefore on the situation when the charter was entered into; the findings were that the Iraqi system was well known only when the vessel was ordered there in June/July 1980, and the Iran/Iraq war which might have been responsible for the problem did not begin until September 1980; in these circumstances the shipowners' failure to guard against the difficulties over a year before could not provide grounds for barring their claim (*see* p. 236, col. 2; p. 237, cols. 1 and 2);

(4) it was insufficient to justify an implied term that it would be "reasonable" for the shipowner to stipulate for an express indemnity; nevertheless the implication was justified first by business efficacy in the sense that if the charterer required to have the vessel at his disposal and to be free to choose voyages and cargoes and bill of lading terms also, then the owner must be expected to grant such freedom only if he was entitled to be indemnified against loss and liability resulting from it; and secondly by implication of law; the appeal would be dismissed (*see* p. 237, col. 1; p. 238, col. 1).

---

The following cases were referred to in the judgments of Sir Donald Nicholls, V.-C. and Lord Justice Evans:

A B Helsingfors Steamship Co. Ltd. v. Rederiaktiebolaget Rex (The *White Rose*), [1969] 2 Lloyd's Rep. 52;
*Aquacharm*, The [1980] 2 Lloyd's Rep. 237;
*Athanasia Comninos*, The [1990] 1 Lloyd's Rep. 277;
Ben Line Steamers Ltd. v. Pacific Steam Navigation Co. (The *Benlawers*), [1989] 2 Lloyd's Rep. 51;
C. *Joyce*, The [1986] 2 Lloyd's Rep. 285;
Dawson Line Ltd. v. Aktiengesellschaft "Adler" Fuer Chemische Industrie A.G., (C.A.) (1931) 41 Ll.L.Rep. 75; [1932] 1 K.B. 433;
Elder Dempster & Co. v. C. G. Dunn & Co. Ltd., (1909) 15 Com.Cas. 49;
*Erechthion*, The [1987] 2 Lloyd's Rep. 180;

*Georges Christos Lemos*, The [1991] 2 Lloyd's Rep. 107;
Kruger & Co. v. Moel Tryvan Steamship Co. Ltd., (H.L.) [1907] A.C. 272;
Larrinaga Steamship Co. v. The Crown (The *Ramon de Larrinaga*) (H.L.) (1944) 78 Ll.L.Rep. 167;
Mareva Navigation Co. Ltd. v. Canaris Armadora S.A., [1977] 1 Lloyd's Rep. 368;
*Nanfri*, The (H.L.) [1979] 1 Lloyd's Rep. 201; [1979] A.C. 757;
*Nogar Marin*, The (C.A.) [1988] 1 Lloyd's Rep. 412; [1987] 1 Lloyd's Rep. 456;
*Paros*, The [1987] 2 Lloyd's Rep. 269;
Portsmouth Steamship Co. Ltd. v. Liverpool & Glasgow Exchange Association, (1929) 34 Ll.L.Rep. 459;
Royal Greek Government v. Minister of Transport (The *Ann Stathos*), (1950) 83 Ll.L.Rep. 228;
*Sagona*, The [1984] 1 Lloyd's Rep. 194;
Sheffield Corporation v. Barclay, (H.L.) [1905] A.C. 392;
Stag Line Ltd. v. Ellerman & Papayanni Lines Ltd., (1949) 82 Ll.L.Rep. 826;
Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co., (C.A.) (1934) 50 Ll.L.Rep. 185; (1934) 49 Ll.L.Rep. 306; (1934) 39 Com.Cas. 318;
Yeung (Stanley) Kai Yung v. Hong Kong Shanghai Banking Corporation, (H.L.) [1981] A.C. 787.

---

This was an appeal by the charterers Stellar Chartering & Brokerage Inc. from the decision of Mr. Justice Cresswell ([1993] 2 Lloyd's Rep. 387) allowing the appeal of the owners Triad Shipping Co. against the arbitration award made by the sole arbitrator dismissing the owners' claim for an indemnity in respect of cargo claims.

Mr. Timothy Young (instructed by Messrs. Richards Butler) for the owners Triad Shipping; Mr. Angus Glennie, Q.C. (instructed by Messrs. Lovell White Durrant) for the charterers Stellar Chartering.

The further facts are stated in the judgment of Lord Justice Evans.

Judgment was reserved.

Wednesday June 15, 1994

## JUDGMENT

**Lord Justice EVANS:** As long ago as Mar. 30, 1979, the owners of the *Island Archon* chartered her to the appellants for a term of 36 months on the New York Produce Exchange form of time charter-party.

In the course of her employment under the charter-party, the vessel was ordered on a voyage from European ports to Iraq. Cargo claims were asserted by the Iraqi receivers. The orders were given by German sub-charterers, but they have become insolvent. The shipowners, who are the present respondents, had to provide security before the ship was allowed to leave Basrah, the Iraqi port in question, and this gave rise to some delay. The shipowners claim an indemnity against their losses from the time charterers, who are the appellants.

The only issue raised by this appeal is whether the shipowners are entitled to succeed in their claim for an indemnity, which in the absence of any express undertaking in the charter-party must be based on an implied term. There is, however, a complicated procedural history. The dispute was referred to arbitration. The claim for an indemnity was objected to on the grounds inter alia that it had not been pleaded, and that in any event it was time barred. In the result, the arbitrator rejected it on the latter basis. It has been held that that was wrong as a matter of law. The procedural history is set out in the judgment of Mr. Justice Cresswell, from which this appeal is brought. It is now reported at [1993] 2 Lloyd's Rep. 388. He stated issue No. 7 before him in the following terms:

> 7. If the arbitrator was wrong to conclude that the owners' said claims were bound to be time-barred, are the owners entitled to an indemnity from the Charterers?

After a thorough review of the authorities, Mr. Justice Cresswell concluded that the shipowners were entitled to succeed. In this respect he agreed with the conclusion of the arbitrator, Mr. Bruce Harris. The charterers now appeal.

The facts giving rise to the claim for an indemnity are unusual. In Basrah, the State Enterprise for Maritime Agency ("SEMA") was the only agent that could be employed on behalf of the ship. SEMA were also the owners' P. & I. Club correspondents. When cargoes were discharged, the port authorities issued certificates allegedly showing short-landing and/or damage. The arbitrator found:

> These were frequently, viewed objectively, of highly dubious reliability. Nonetheless, they would be produced in Iraqi Courts in support of claims for shortage or damage and the Courts accepted them effectively as conclusive evidence against the carrier.

Moreover, whenever shortage or damage claims were intimated against a ship that was in the course of discharging — and this happened frequently, if not invariably — the agents (SEMA) would require the provision of security to cover possible cargo claims before the ship sailed (award par. 33). The local Courts assumed jurisdiction over such claims, because SEMA were regarded as an Iraqi party, and the Courts —

> ... then inevitably issued judgments based on the short-landing/damage certificates [par. 33].

The arbitrator described this as "the Iraqi System" and his findings include the following:

> At the relevant time — and this was well-known in shipping circles — chaos was prevalent in Iraqi Ports, and in all aspects of their operation including the handling and supervision of cargoes and the pursuit of cargo claims ... put shortly, any ship ordered to discharge general cargo in Iraq was almost bound to have cargo claims made against it and to have those claims taken to court locally, leading to adverse judgments, regardless of whether there was any actual shortage or damage, or otherwise any other liability on the ship under the Bills of Lading [pars. 32–33].

This background explains why the arbitrator described the basis of the owners' claims as follows:

> Claims had been settled by payments either by SEMA or direct to receivers in respect of shortage claims and cargo damage claims. So far as the shortage claims went, the owners did not say that there was any breach on the part of the charterers and the claims arose from inaccurate bills of lading having been issued so as to give rise to an indemnity on classic grounds, nor that bills of lading were issued on terms less favourable to the owners than those of the charter. The claim was put forward only on the basis that the ship had been ordered to go to Iraq and had thereby been subjected to "the Iraqi system" and its alleged inevitable consequences ... [par. 39].

The relevant express terms of the charter-party were these. The vessel was —

> ... to be employed, in carrying lawful cargo (see Clause 62) ... in such lawful trades, between safe port and/or ports ...

always within Institute Warranty Limits excluding Cuba, Israel, Vietnam, Cambodia, North Korea, and Angola including Cabioda, Namibia, Nigeria, Cyprus, Churchill . . . as the Charterers or their Agents shall direct, on the following conditions . . . [Lines 25–35].

The charter period, as stated above, was 36 months, two months more or less at charterers' option. Clause 8 was slightly amended to read:

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall tender all customary assistance with the ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim, *secure and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo, as presented, in conformity with Mate's or Tally Clerk's receipts.

By cl. 38 —

. . . the U.S. Clause Paramount, Canadian Clause Paramount, . . . C.S.U.K. Paramount . . . deemed to form part of this Charterparty and U.S.A. & Canadian Clauses Paramount to be incorporated in all Bills of Lading.

This was a typed clause, in other words, a specially agreed term, as was cl. 45:

45. Notwithstanding the provisions of Clause 8, Master and Owners authorised Charterers, Sub-Charterers or their agents to sign Bills of Lading for and on behalf of the Masters, in accordance with Mate's receipts, if so required by Charterers who shall indemnify vessel and Owners from all consequences arising therefrom.

If the claim had been presented on the basis that the bills of lading, which required the shipowners to deliver the cargo in Basrah, had exposed them to a liability towards the cargo receivers which the charter-party did not require them to bear, then the claim would largely have been governed by cll. 8 and 45 of the charter-party, and by a substantial number of authorities in similar bill of lading cases. These were recognized as a separate category in *The Nogar Marin*, [1988] 1 Lloyd's Rep. 412 (see p. 417) although, in my judgment, no different principles are involved from other cases where an indemnity is claimed.

Under cll. 8 and 45, if bills of lading were signed by time charterers or their agents, then there was an express indemnity against the consequences of so doing (cl. 45). The only remaining issue would be whether the shipowner's liability to the cargo receivers, as established by the judgment of the Iraqi Courts, was a consequence of that act. If bills of lading were signed by the master pursuant to cl. 8, then there was no express indemnity and the question would arise whether a promise to indemnify the shipowners would be implied. In such circumstances I would have little difficulty in holding that there was an implied term. This would be justified by the weight of legal authority to which I have referred and by the further practical consideration that if there was no implied indemnity when bills of lading were presented to the master for his signature, but an express indemnity when they were signed by charterers or their agents, then the liability to indemnify might depend upon the accidental circumstance whether the master's signature could be obtained before the vessel sailed, or not.

It should be noted, however, that the implied indemnity under cl. 8 would not be as wide as the express indemnity under cl. 45. The former would not include the consequences of the master's failure to perform his duty of checking the accuracy of the bill as presented, extending at least to the apparent good order and condition of the cargo shipped: see *The Nogar Marin*, at p. 422.

However, the claim in the present case is not put forward on this basis. I mention it only because it is relevant to the issues which do arise, as will appear below.

What is said is that the loss suffered by the shipowners, in the form of the payments which they were required to make, first as security for cargo claims and then in order to satisfy the order of the Iraqi Courts even though no shortage or damage to cargo in fact had occurred, was a direct consequence of the charterers' order to the vessel to proceed to Basrah and deliver the cargo there. The arbitrator so found:

. . . there was an unbroken chain of causation between the orders to discharge in Iraq and the owners' liability to indemnify SEMA or pay the receivers . . . [par. 35].

This was against the background of his earlier findings in pars. 32 and 33 that no significant loss or damage to the cargo could be said to have occurred in fact.

The plaintiffs therefore rely on an implied undertaking to indemnify them against the consequences of the charterers' order to the vessel to proceed to Iraq. It matters not for this pur-

pose whether the order was given expressly, as probably it was, or impliedly by means of presenting bills of lading which named Basrah as the destination of the voyage.

The learned Judge upheld this claim, applying principles which he deduced from the authorities (see [1993] 2 Lloyd's Rep. at p. 407). These included:

> 2. Under a time charter party the shipowner puts the vessel at the disposal of the charterer, who can choose for himself what cargoes he shall load and where he shall send the ship, provided that the limits prescribed by the contract are not exceeded. When deciding who has to bear the consequences of a choice being made in one way rather than the other, it is reasonable to assume that the consequences shall fall upon the person who made the choice, for it is the charterer who has the opportunity to decide upon the wisdom of the selection which he makes [*The Georges Christos Lemos* third party proceedings (sup) at p. 107, Mr Justice Mustill].

With regard to cl. 8 of the N.Y.P.E. form, he cited the following passage from the judgment of Mr. Justice Mustill, in *The Athanasia Comninos*, (reported in [1990] 1 Lloyd's Rep. 277 though decided in December 1979):

> It has long been established that a provision in this form impliedly requires the charterer to indemnify the shipowner against the consequences of complying with an order as to the employment of the ship. [p. 290].

Mr. Glennie, Q.C. for the time charterers submits that this was wrong, or at least too broadly stated. He contends that no promise to indemnify can be implied if the order was one which the charterer was entitled to give. Conversely, that in order to recover an indemnity the shipowners have to establish that the charterers gave the order in breach of the charter. He relies in particular on the passage from the judgment of Mr. Justice Bingham in *The C. Joyce*, [1986] 2 Lloyd's Rep. 285 which was quoted in part with approval in the Court of Appeal's judgment in *The Nogar Marin* per Lord Justice Mustill, (p. 420). After considering the three leading cases (*Kruger & Co. v. Moel Tryvan Steamship Co.*, [1907] A.C. 272, *Elder Dempster & Co. v. C. G. Dunn & Co. Ltd.*, (1909) 15 Com. Cas. 49 and *Dawson Line Ltd. v. Aktiengesellschaft "Adler" Fuer Chemische Industrie A.G.*, (1931) 41 Ll.L.Rep. 75; [1932] 1 K.B. 433), Mr. Justice Bingham said this at p. 290:

> . . . the first ground of liability depends on a finding that the charterers were in breach of contract in tendering bills for signature which conflicted with their obligations under the charter-party. Crucial to both grounds of decision was the finding of disparity between the bills which the charterers were under the charter-party entitled to present and the bills which they did present. From this finding the conclusion naturally follows, and it matters little whether the owners claim damages for breach of contract of which an indemnity will be the measure, or an indemnity arising from the loss which they have suffered from complying with the charterers' request to do something which they were not obliged to do under the charter-party.

Those authorities were concerned, therefore, with a situation where the charter did not permit the charterers to present bills of lading to the master for signature in the form in which they did; that was itself a breach of the charter-party. Therefore, Mr. Glennie submits, no implied indemnity can arise unless the charterers were in breach, and here they were not in breach if they were entitled to give the order which they did. Basrah was within the (effectively) world-wide trading limits in this charter-party and was not an unsafe port, and the contrary is not suggested by the shipowners.

The question of principle thus raised by this appeal is whether a promise to indemnify the shipowners against the consequences of complying with an order as to the employment of the ship can be implied when the order was lawfully given; when it was an order which the charterer was entitled to give. It is common ground that any such implication —

> . . . is not automatic. It must always depend on the facts of the individual case, and on the terms of any underlying contractual relationship . . . [*The Nogar Marin* at p. 422]

but it is not suggested that any special facts, whether supporting or rebutting the alleged implication, arise here. The "underlying contractual relationship" was that of shipowner and time charterer under a long-term time charter on N.Y.P.E. terms which save as regards bills of lading signed by the charterers or their agents (cl. 45) is silent as regards any right of the shipowner to be indemnified against the consequences of obeying orders which the time charterers were entitled to give. In such circumstances, it is submitted, no such implication can properly be made. Mr. Glennie relied upon the established rule that no term can be implied unless it is necessary for the business efficacy of the contract, in other words, to make the contract work, or unless the parties would have agreed with an officious bys-

tander that "of course" the term was part of their bargain, though not expressed. If they had agreed it, or thought that it was agreed between them, in the course of negotiating a charter-party (a "complex and compound bargain" per Mr. Justice Kerr in *Mareva Navigation Co. Ltd. v. Canaris Armadora S.A.*, [1977] 1 Lloyd's Rep. 368 p. 380), then they would have expressed it, as they did on a more limited basis in cl. 45.

Far from being "long established" (*The Athanasia Comninos* at p. 290), Mr. Glennie submitted that there is no authority which supports an implied indemnity on a time charter where the charterer is not shown to have committed a breach; where he has done no more than he was entitled to do.

This is a formidable submission and requires consideration of authorities dating back to the beginning of the present century when time charter-parties became more common or at least more frequently the subject of dispute in the Courts. The reason for this may have been the fact that shipping movements could be predicted more reliably with steamships than with sail, and this led to charterers being more willing to pay hire for the use of the ship's services throughout an agreed period. Whatever the reason was, the question of an implied indemnity soon arose for decision in *Kruger v. Moel Tryvan* under a time charter made in 1903, and it was held that the charterers were in breach of contract when they presented bills of lading for signature which gave rise to liabilities under the bill of lading contracts which were excepted under the charter-party.

As an alternative ground of decision, the shipowners were held to be entitled to be indemnified against the liabilities which they incurred to third parties, the bill of lading holders, as the result of complying with the charterers' request to sign bills of lading in that form. This was an application of the general principle founded on *Sheffield Corporation v. Barclay*, [1905] A.C. 392 and recently affirmed in *Stanley Yeung Kai Yung v. Hong Kong Shanghai Banking Corporation*, [1981] A.C. 787. It has been held to be applicable in bill of lading cases, not only in *Kruger v. Moel Tryvan* but since then in *Strathlorne Steamship Co. Ltd. v. Andrew Weir & Co.*, (1934) 50 Ll.L.Rep. 185 and in *The Sagona*, [1984] 1 Lloyd's Rep. 194 (see p. 204). In both later cases the charterer directed the master to deliver cargo to a person who was unable to present the bill of lading and therefore was not contractually entitled to receive it. This order could be said to have been given in breach of the charter-party, as it clearly was in breach of the bill of lading contract, but it may also be regarded as extra-contractual so far as the charter-party was concerned, and Mr. Glennie recognizes this as a second kind of situation where an implied right to an indemnity may arise. He submits, however, that such a right does not support the implication of a general right of indemnity in the charter-party itself.

Essential to the reasoning in all the authorities is the tri-partite relationship between shipowners, charterers and cargo interests. Legal relations between shipowner and charterer are governed by their contract contained in the charter-party. When a bill of lading is issued or is transferred to the owner or person entitled to possession of the cargo, who is not the charterer, then it contains or evidences a separate contract between the shipowner and that other person. If the shipowner's liability under the bill of lading is more onerous than under the charter-party, then the extent to which, if at all, he can recover an indemnity against the excess from the charterer is governed by the charter-party, or it may arise under the general principles of law recognized in *Kruger v. Moel Tryvan* as a consequence of the master's compliance with the charterers' request.

The terms of the bill of lading as presented for signature may be different from those "required" by the charter-party (per Lord Justice Scrutton in *Dawson Line Ltd. v. Adler*, (1931) 41 Ll.L.Rep. 75 at p. 78, col. 2; [1932] 1 K.B. 433 at p. 439) and in such cases a breach of contract is established from the fact of presentment alone, as in *Kruger v. Moel Tryvan* itself. Conversely, if the bill of lading is in a form which *is* required by the charter-party, even though its terms are different from those of the charter-party itself, then it is difficult to imply a promise that the charterer will indemnify the shipowner against the consequences of doing what the charter required him to do. If no promise is implied, the effect is that the shipowner has agreed to the charter terms as between himself and the charterer, and other terms with the holders of the bill of lading; and this was held to be the true construction of the charter-party contract in *The C. Joyce* (above).

The intermediate case, which arises for consideration in the light of Mr. Glennie's submissions, is where the charter-party permits the charterer to present and to require the master to sign a bill of lading whose terms and conditions of carriage differ from those found in the charter-party itself. In these circumstances, there is no breach of charter-party by the char-

Case 1:07-cv-07221-PKL    Document 18    Filed 09/17/2007    Page 7 of 13

[1994] Vol. 2                  LLOYD'S LAW REPORTS                           233
C.A.]                          The "Island Archon"                    [EVANS, L.J.

terer, nor can the charterer's direction or request to the master be said to lie outside the charter-party; it is permitted by the charter-party and he is entitled by contract to act as he has done.

The particular issue, thus defined, has not been specifically addressed in any of the authorities to which we have been referred. With the possible exception of *Strathlorne Steamship Co. v. Andrew Weir & Co.*, (1934) 49 Ll.L.Rep. 306 at p. 312; (1934) 39 Com. Cas. 318 at p. 323 (Mr. Justice Roche) and (1935) 50 Ll.L.Rep. 185 (C.A.), none of them before *The Athanasia Comninos* in 1979 has held that the right to an implied indemnity exists under a time charter-party which entitles the charterer to act as he has done and which therefore required the shipowner to comply with his direction or request. The matter therefore must be considered as an issue of principle.

Again, the historical background is relevant. At the time of *Kruger v. Moel Tryvan* in 1907, although time charters included such phrases as "Master to sign bills of lading as presented", or "without prejudice to this charter-party", it was possible to hold that presenting a bill of lading containing different terms from those of the charter-party itself was a breach of contract: see the *Kruger* decision itself. But in modern conditions the situation is entirely changed. This may be as a result of the widespread standardisation of bill of lading terms by international conventions and of national legislation which makes such terms compulsory as between shipowner and bill of lading holder, though not (usually) between shipowner and charterer: e.g. the Carriage of Goods by Sea Acts, 1924 and 1971, in the United Kingdom. The current situation was described by Lord Wilberforce in *The Nanfri*, [1979] 1 Lloyd's Rep. 201, at p. 206, col. 1; [1979] A.C. 757 at p. 777, where the charter-parties were in Baltime form and therefore contained an express indemnity:

> It is important in this connection to have in mind that the present charters are time charters, the nature and purpose of which is to enable the charterers to use the vessels during the period of the charters for trading in whatever manner they think fit. The issue of bills of lading in a particular form may be vital for the charterers' trade, and indeed in relation to this trade, which involved c.i.f. or c. & f. contracts the issue of freight pre-paid bills of lading is essential if the trade is to be maintained. Furthermore, cl. 9, as is usual in time charters, contains an indemnity clause against all consequences or liabilities arising from the master signing bills of lading. This

underlines the power of the charterers, in the course of exploiting the vessel, to decide what bills of lading are appropriate for their trade and to instruct the masters to issue such bills, the owners being protected by the indemnity clause.

Then what limitations are there upon this power? It must be clear that the owners cannot require bills of lading to be claused so as to incorporate the terms of the time charter: such a requirement would be contrary to the whole commercial purpose of the charterers.

The situation therefore may often arise, where, far from the charterers being in breach by reason of presenting for signature a bill of lading containing different terms and conditions of carriage from the charter-party, the master would place the shipowners in breach of contract if he refused to sign, assuming only that the bill is accurate as to the apparent condition of the cargo loaded and is not in terms which can be said to be outside the scope of any which were contemplated by the charter-party. Does the implied right to be indemnified arise in such a case?

In my judgment, there is no reason in principle why it should not do so in accordance with the general rule founded on *Sheffield Corporation v. Barclay*, [1905] A.C. 392. If the rule applies when the charterer makes a request outside the terms of the charter-party, as Mr. Glennie concedes that it does, then why should it not also apply when the same request has been contemplated by the charter itself? The fact that the request is a direction which the master is under a contractual duty to obey does not mean that the rule cannot operate: see *The Nogar Marin* at p. 417. In such circumstances, the correct legal analysis in my judgment is that the right to an indemnity exists under an implied term of the charter-party. Nor is there any reason why the implied term should be limited to the consequences of complying with one kind of direction only, that is, to sign bills of lading in a particular form.

Support for the existence of an implied right of indemnity in general terms in a time charter can be found in *The Erechthion*, [1987] 2 Lloyd's Rep. 180 where the parties agreed through Counsel, and Mr. Justice Staughton accepted, though perhaps in terms which registered some doubt, that there was an implied obligation to indemnify against consequences caused by compliance with the charterers' lawful orders as to employment of the vessel (p. 183). On the other hand, in *The Paros*, [1987] 2 Lloyd's Rep. 269 Mr. Justice Hobhouse, held at p. 273 that:

... if it is a contractual and proper bill of lading then there is no cause for complaint and therefore no ground for claiming damages for breach of contract or an indemnity ...

and in *Larrinaga Steamship Co. v. The Crown (The Ramon de Larrinaga)*, (1944) 78 Ll.L.Rep. 167 Lord Porter at pp. 176–177 referred to orders —

... such as under this charter-party [the charterers] are entitled to give.

In *The Georges C. Lemos*, (reported at [1991] 2 Lloyd's Rep. 107 but decided at the same time as *The Athanasia Comninos* in 1979) Mr. Justice Mustill justified the existence of an implied right to an indemnity in time charters because it was "reasonable" to make this assumption in a time charter case and, as Mr. Glennie rightly submits, that alone is not a sufficient basis for a term to be implied. In *Ben Line Steamers Ltd. v. Pacific Steam Navigation Co., (The Benlaws)*, [1989] 2 Lloyd's Rep. 51 the claim under an implied indemnity failed on the facts.

Finally, the leading text books (Scrutton 19th ed.) Art. 178; Carver (13th ed.) par. 668 and Time Charters (3rd ed.) by Wilford, Coghlin and Kimball) all support the existence of an implied term though without referring expressly to the issue raised by Mr. Glennie in the present case.

He has demonstrated, in my judgment, that there is no authority which explicitly supports the implied right to an indemnity in a case where the charter-party entitled the charterer to act as he did and the shipowner was bound to obey. This was partly because the particular issue was never raised for decision. Nevertheless, when Mr. Justice Mustill said in *The Athanasia Comninos* in 1979 that this "has long been established", without suggesting that the right was limited to cases where the charterer's order was given in breach of contract, or was extra-contractual in the sense that the shipowner or master was not under a duty to obey it, he was referring to a long-held general belief among maritime lawyers including, and perhaps especially, maritime arbitrators that no such qualification was necessary. Although not expressly decided in any reported case, the view was supported by leading text-book writers, as it has continued to be. In my judgment, he correctly stated the law.

For these reasons, I would reject Mr. Glennie's submission and hold that the shipowners are entitled to rely upon an implied right to be indemnified against the consequences of complying with the time charterers' order to proceed to Basrah and deliver cargo there, notwithstanding that it was an order which the time charterers were entitled to give and the shipowners were bound to obey. There is an express finding that the losses claimed were the direct consequence of complying with the order and on this basis the shipowners are entitled to succeed and the appeal should be dismissed.

The implications of this conclusion are, however, potentially far-reaching and these should be considered before this case is finally disposed of.

Orders as to the employment of the ship which the master is bound by cl. 8 to obey include orders to load a particular cargo from the range of lawful cargoes permitted by the charter-party (lines 24–25 and cl. 62) and to proceed to a named safe port within the limits provided for in lines 31–35.

These liberties do not, of course, entitle the charterers to load non-contractual or dangerous cargoes, or to order the ship to an unsafe port. If they were to give such an order, then the master could refuse to obey, but if he complied with the order then, unless he had exposed the ship to obvious dangers, the shipowners would be entitled to recover damages for breach of contract and it is clear that they could recover an indemnity also.

But if the order is lawful, whether as to the cargo to be carried or the port to which the vessel is to proceed, and damage results, and if there is an implied indemnity in general terms then the charterers will always be liable for such damage, notwithstanding that the cargo was permitted by the charter-party and the port was safe. This would make it unnecessary to consider whether the charterer's order was given in breach of the charter-party, so as to found a claim in damages, because the charterers would be liable in any event.

It is clear, however, that even when there is an express indemnity, time charterers are not liable for all consequences which may result from compliance with their order. First, the shipowners may themselves have been at fault: see *The Nogar Marin* at p. 417. This exception, however, may be more apparent than real, because the intervening fault can readily be seen to have broken the chain of consequences flowing from the charterers' order, in accordance with established general principles. Secondly, it has been held that the shipowner remains responsible for the safe navigation of the ship: see *Larrinaga v. R.* (above) and *The*

*Erechthion* (above) where this factual issue was remitted to the arbitrators (and, we were told by Counsel, the arbitrators rejected the shipowners' claim; this must have been on the basis that, applying the law as stated by Mr. Justice Staughton, they found that the port authority's orders to the vessel, which led to her being at the place where she was damaged, broke the chain of causation flowing from the charterers' order to proceed to the port — see pp. 186–188). Similarly, in *A/B Helsingfors Steamship Co. v. Rederiaktiebolaget Rex (The White Rose)*, [1969] 2 Lloyd's Rep. 52 Mr. Justice Donaldson at p. 59 held that:

> . . . it is necessary in every case to establish an unbroken chain of causation . . .

In that case the vessel was ordered to load at a United States port, Duluth. A stevedore employed by contractors engaged by the time charterers was injured by falling into an unfenced hold, and the shipowners were exposed to substantial liabilities under Minnesota law, even though they themselves were not at fault. Mr. Justice Donaldson, and the arbitrator concluded that the charterers' order to proceed to Duluth was not the cause of the shipowner's loss (p. 59). However, he added this at pp. 59–60:

> Unless it can be said that this law is so unusual as to constitute Duluth a legally unsafe port to which the vessel should not have been ordered — and no such contention was advanced — or that the time charterers engaged stevedores who were incompetent by local standards . . . I do not consider that it can be said that there is the necessary causal connection between the order to load and the loss.

The concept of "legal unsafety" has not been pursued in other authorities, and insofar as Mr. Justice Donaldson was saying that charterers could not be liable under the indemnity unless the order was given in breach of the charter-party, as an order to proceed to an unsafe port would be, the dictum supports Mr. Glennie's submission in the present case. But another reading of the judgment is that an indemnity protects the shipowners in cases where there is some *unusual* feature of the port to which the ship is ordered to proceed. If that is so, then the causation argument produces the unexpected result that the chain of causation remains intact if unusual consequences intervene.

If the vessel is damaged at a port to which she has been properly ordered by time charterers, then it is difficult to rebut a claim that the damages was a consequence of her being there at the material time, and therefore of the time charterer's orders to proceed there. This analysis was adopted by Mr. Justice Mustill, in *The George C. Lemos* where time charterers were held liable:

> It seems to one perfectly possible to have a loss which is caused by the shipment of a cargo having certain properties, even if the properties of the cargo in question are no different from those of other cargoes of the same description. In the present case, if one asks the question (eliminating the possibility of fault on the part of the shipowner) "Why was there an explosion?" the answer is — "Because there was methane in the hold". And if one goes on to ask "Why was there methane in the hold?" the answer is — "Because the Time Charterers called on the vessel to load coal". This answer is in my opinion sufficient to found an indemnity without proof that the coal was in any way unusual [[1990] 1 Lloyd's Rep. at p. 296].

If this straightforward test of causation was applied in cases where the vessel is damaged at a port to which the charterers ordered her, then it would become unnecessary to determine whether the port was unsafe at the time of the order; if it was, then the orders were given in breach of contract; if it was not, then the shipowners are entitled to an indemnity.

This clearly is not the law, and in my judgment the reason is to be found in the following passage from the judgment of Mr. Justice Lloyd, in *The Aquacharm*, [1980] 2 Lloyd's Rep. 237, which is cited under the heading "Ordinary expenses and navigational risks in Wilford's Time Charters (3rd ed. 1989) at p. 241:

*Ordinary expenses and navigational risks*

Moreover, the owners are not entitled to recover from the charterers under their indemnity the ordinary expenses and losses of trading, despite the fact that in a broad sense these are incurred as a result of their obedience to the orders of the charterers. This was expressed by Lloyd, J. in *The Aquacharm* in the following words:

> It is of course well settled that owners can recover under an implied indemnity for the direct consequences of complying with the charterers' orders. But it is not every loss arising in the course of the voyage that can be recovered. For example, the owners cannot recover heavy weather damage merely because had the charterers ordered the vessel on a different voyage, the heavy weather would not have been encountered.

The connection is too remote. Similarly, the owners cannot recover the expenses incurred in the course of ordinary navigation, for example, the cost of ballasting, even though in one sense the cost of ballasting is incurred as a consequence of complying with the charterers' orders: see *Weir v. Union Steamship Co. Ltd.* [1900] A.C. 525. The same considerations apply in the present case. The costs of transhipment were an ordinary expense incurred in the course of navigation.

Claims under an express indemnity failed in two cases where the vessel suffered a loss which resulted, not from the charterer's orders, but from navigational risks to which she was exposed in the course of carrying them out: *Larrinaga Steamship Co. v. The Crown*, (1944) 78 Ll.L.Rep. 167 (H.L.) and *Stag Line Ltd. v. Ellerman & Papayanou Lines Ltd.*, (1949) 82 Ll.L.Rep. 826 (Mr. Justice Morris, see pp. 835-837).

Causation was analysed as a mixed question of law and fact by Mr. Justice Devlin in *Royal Greek Government v. Minister of Transport (The Ann Stathatos)*, (1950) 83 Ll.L.Rep. 228) where an arbitrator had found that time charterers were liable under an express indemnity where the causes of an explosion on board an oil tanker included the nature of the cargo loaded pursuant to the charterers' orders. The arbitrator's decision was upheld. Mr. Justice Devlin at p. 234 expressly referred to the possibility of a case where the charterer was entitled to give the orders which he did:

> Dangerous cargoes, trades, ports and places can all be prohibited by express provision, but many cases may arise which are outside the rigid framework of a prohibition clause, but where an owner, if he were free to choose, might prefer not to go to a particular place or take a particular cargo, not necessarily because he foresees any definite danger but because he feels that it might lead to trouble. If he is to surrender his freedom of choice and put his master under the orders of the charterer, there is nothing unreasonable in his stipulating for a complete indemnity in return.

The authorities show, therefore, that time charterers may be held liable under an express indemnity for the consequences of ordering the chartered vessel to load a particular cargo or to proceed to a named port, even though the order is one which the charterer is entitled to give and the master is bound to obey. But the consequences for which the charterer is liable do not include two categories of loss. First, the loss may be regarded as caused in law by some subsequent or intervening event. An act of negligence may often, but not invariably, break the chain of causation in this sense: *Portsmouth Steamship Co. Ltd. v. Liverpool & Glasgow Exchange Association*, (1929) 34 Ll.L.Rep. 459 (Mr. Justice Roche), and *The White Rose* at p. 59. Secondly, the loss although a consequence "in a broad sense" (Wilford p. 241) may have arisen from a risk which the shipowner has agreed to run, hence the exclusion of navigation risks and also the distinction which has been held to exist between time and voyage charter-parties (per Mr. Justice Devlin, in *The Ann Stathatos* and Mr. Justice Mustill, in *The Georges C. Lemos* (3rd party proceedings) [1991] 2 Lloyd's Rep. 107).

This does not mean that a rigid distinction between time and voyage charters must always be made. If the question is whether the shipowner has accepted the risk to which in the event the vessel has been exposed, there could be voyage charters giving the charterer a wide range of options to choose a cargo or port where it would be "reasonable" for the shipowner to expect the indemnity to apply, and conversely, time charters with a narrow range e.g. charters for the period of a specified voyage or "trip", where it would not.

Applying the same analysis to the facts of the *White Rose*, the shipowners could be said to have accepted the normal incidents of loading cargo at a United States port, including the risk of liability under the local State law to an injured stevedore when the shipowners themselves were not at fault, but this would not bar them from recovering an indemnity from the time charterers if the local law was "unusual", as contemplated by Mr. Justice Donaldson, in the passage quoted above.

What risks the shipowner has agreed to bear must depend upon the true construction of the charter-party and therefore upon the situation when the charter-party was entered into. If there had been a finding in the present case that the "Iraqi system" was notorious at the date of the charter-party in March, 1979 then there might be substance in the charterers' contention that the shipowners' had consented to bear the consequences of ordering the vessel to discharge at an Iraqi port, which they could have excluded from the agreed limits if they had sought to do so. But the findings are that the Iraqi system was well known only when the vessel was ordered there in June/July 1980, and the Iran/Iraq war which may have been responsible for the problem did not begin until September 1980. In these circumstances, the shipowners'

failure to guard against the difficulties over a year before cannot provide grounds for barring their claim.

This leads back to the basic issue whether an indemnity should be implied where the shipowner places the master under the orders of the charterer, but no corresponding express indemnity is given. As Mr. Glennie rightly submits, it is insufficient to justify an implied term that it would be "reasonable" for the shipowner to stipulate for an express indemnity. Nevertheless, the implication is justified, in my view, first by "business efficacy" in the sense that if the charterer requires to have the vessel at his disposal, and to be free to choose voyages and cargoes and bill of lading terms also, then the owner must be expected to grant such freedom only if he is entitled to be indemnified against loss and liability resulting from it, subject always to the express terms of the charter-party contract; and secondly by the legal principle underlying the "lawful request" cases such as *Sheffield Corporation v. Barclay*; in other words, an implication of law.

In my judgment, therefore, the award and the judgment in the present case in favour of the shipowners are consistent with the authorities and justified by the relevant principles of law. The right to be indemnified may be implied, but it is subject to the same restrictions as regards consequences as have been held to apply to an express right, and in both cases the right is subject to the shipowners' acceptance of risk, including the risk of liabilities to third parties, as between himself and the charterers on the true construction of the charter-party itself. I would dismiss this appeal.

Lord Justice MANN: I agree that this appeal should be dismissed for the reasons given by Lord Justice Evans. I have had the advantage of reading in draft the additional observations of the Vice-Chancellor and I agree with them.

Sir DONALD NICHOLLS V.-C.: I too would dismiss this appeal. I add only some observations in deference to the wide-ranging submissions placed before us. In the nature of things, parties to a contract and their advisers do not foresee every eventuality which may occur in the course of carrying out the contract. They cannot be expected to provide for every possibility. Hence it comes about that a perennial source of dispute concerns which party to a contract is to bear an unforeseen loss. The loss will lie where it falls, unless some contrary provision is to be read into the contract as a matter of implication. Such an implication arises if it is clear the contracting parties must have so intended. In other words, that the provision in question although unexpressed in the contract, is necessarily implicit having regard to the terms of the contract and its commercial or other setting. Commercial setting includes any established legal framework for the particular type of contract.

Under a typical charter-party, elaborate provision is expressly made for which party is to bear many of the risks inherent in performing the charter-party. The particular area with which this appeal is concerned is the carrying out of instructions properly given by a time charterer to a shipowner. In this area, even in the absence of express provision, the incidence of the normal risks attendant upon carrying out charterer's instructions is now well mapped out in decided cases. For instance, it is trite law that a shipowner is not normally entitled to be indemnified against the usual perils of navigation arising in the course of a voyage upon which a vessel has been lawfully sent on the charterer's instructions. Thus a shipowner is not entitled to be indemnified against all losses arising whilst engaged in carrying out charterer's orders.

However, despite the wealth of experience now embodied in charter-parties and numerous decided cases, unforeseen types of occurrence still arise. The present case is an example of this.

In the present case the losses attendant upon discharge in Iraqi ports by reason of what has been described as "the Iraqi system" were not foreseen when the charter-party was entered into. There is no finding that the so-called Iraqi system was well known or even existed when the charter-party was entered into in March 1979, as distinct from when the charterer gave his directions for the particular voyage. The charterers' submissions placed much emphasis on the fact that, although the type of loss was not foreseen, the loss arose without fault on the part of the charterer from the shipowner carrying out a direction the charterer was authorized by the contract to give. In my view, the fact that the loss arose, without fault of either party, in carrying out an instruction the charterer was entitled to give is a factor to be taken into account in considering whether an indemnity of the shipowner against this loss is necessarily implicit in this charter-party. It is a factor, but it

is far from being conclusive against the existence of such an indemnity. Indeed, the boot is on the other foot. The implication of an indemnity against losses arising from a charterer's instructions is not always to be made. Ultimately the existence or not of an implied indemnity depends on the facts of the particular case. However, the established understanding in shipping circles is that the *general* rule is that the shipowner is entitled to look to the charterer for an indemnity against the consequences of complying with an order as to the employment of the ship: see Mr. Justice Mustill in *The Athanasia Comninos*, [1990] 1 Lloyd's Rep. 277 at p. 290. This established general principle is part of the setting against which this charter-party is to be read and understood.

However, this general rule does not provide a neat and simple answer in this case. As already mentioned, not every loss arising while the ship is engaged in carrying out the charterer's orders is for the account of the charterer. This formulation of the general rule does not expressly identify which types of loss are normally within the indemnity and which are not. What it does is focus attention on what are properly to be regarded as "the consequences" of complying with a direction. Thus, with this formulation the Court is concerned to distinguish between types of hazard which are regarded as "the consequence of" the charterer's direction and those which are not. Under the general rule, the implied indemnity extends to the former but not the latter.

This formulation, which invokes principles of causation, does not resolve all the difficulties. It re-states the problem in different language. This is helpful so far as it goes, but it raises problems of its own. Let me explain. As already noted, the shipowner remains responsible for the safe navigation of the ship even though the voyage is being undertaken at the direction of the charterer. Further examples of items which are not regarded as "the direct consequence" of complying with the charterer's orders, and therefore outside the indemnity, are given in the judgment of Mr. Justice Lloyd in *The Aquacharm*, [1980] 2 Lloyd's Rep. 237 at p. 244, in the passage cited in Wilford's Time Charters and set out in Lord Justice Evans' judgment.

Where does this leave the matter? In this context causation will be a useful tool in some instances, as where the loss arose from an intervening act of negligence. Then causation will assist in demarcating the proper ambit of the indemnity in the particular case. However, it cannot be treated as adequate for all purposes. In the ordinary way, a foreseeable consequence of an act may well be regarded as caused by that act. But in this area of the law, the fact that a consequence is foreseeable, far from leaving the chain of causation unbroken, may have precisely the opposite result. The very fact that the loss flowing from charterer's orders was an ordinary and foreseeable risk may lead to the conclusion that it is not within the indemnity. So the application of conventional principles of causation will not always yield the answer.

The truth is that causation all too easily can become a place of comfortable refuge which avoids the need to articulate the basic underlying principle. Here the underlying principle is that the implied indemnity extends only to certain of the consequences flowing from a shipowner complying with charterer's orders. The problem is to identify those consequences. To be within the implied indemnity the loss must arise directly from the charterer's instruction. But more is required before a loss is covered by the indemnity. The loss must also be one which, on a fair reading of the charter-party, the shipowner cannot be taken to have accepted. One example is a loss arising directly from an instruction improperly given by the charterer. In that case the charterer would be acting in breach of his contract with the shipowner. Another example, where there is no question of the charterer's direction being given in breach of contract, is loss arising directly from a bill of lading which the charterer was entitled to require the master to sign but which imposed on the shipowner a different liability from that marked out, as between shipowner and charterer, by the charter-party itself. (This latter example of an implied indemnity is to be contrasted with the case where the parties agreed that bills of lading would be in a particular form, necessarily exposing the shipowner to a particular liability.)

In the present case the charterer's direction gave rise to an unforeseen type of loss, suffered by the shipowner without his fault, arising directly from the delivery of cargo in accordance with the charterer's instructions. In my view this loss is within the scope of the implied indemnity. It arose directly from the charterer's orders. And on a fair reading of the charter-party the shipowner cannot be understood to have accepted this risk when he agreed to act on the charterer's instructions.

Indeed the loss suffered by the shipowner here is an example par excellence of the type of loss to which the well established indemnity implied from complying with charterer's orders applies. I can see no reason for disagreeing with the conclusion of the experienced arbitrator and of the experienced trial Judge.

For the reasons given in the judgments that have been handed down, this appeal will be dismissed.

[Order: *Appeal dismissed with costs; leave to appeal to the House of Lords refused.*]

---

COURT OF APPEAL

Apr. 19, 20 and 21, 1994

---

E.E. CALEDONIA LTD.
(formerly OCCIDENTAL PETROLEUM (CALEDONIA) LTD.)
v.
ORBIT VALVE CO. PLC

Before Lord Justice NEILL,
Lord Justice BELDAM
and Lord Justice STEYN

Contract — Construction — Indemnity clause — Contract to overhaul gas valves on Piper Alpha platform — Disastrous fire on platform — Service engineer died — Whether plaintiffs' right to indemnity included consequences of plaintiffs' negligence — Whether indemnity covered breach of statutory duty — Whether engineer's death caused by performance of contract.

By a contract contained in or evidenced by a written service order dated June 7, 1988 the defendants agreed to supply a service engineer to overhaul certain valves in the gas condensation module on the Piper Alpha platform. The other party to the contract were the plaintiffs who were at all material times one of the joint owners of the platform and were the operators and occupiers of the platform.

The contract provided inter alia

10 . . . (b) Company's and Contractor's Employees and Property. Each party hereto shall indemnify . . . the other, provided that the other party has acted in good faith, from and against any claim, demand, cause of action, loss expense or liability . . . arising by reason of any injury to or death of any employee . . . of the indemnifying party, resulting from or in any way connected with the performance of this Order.

It was contemplated by the parties that the services specified in the contract would be performed over a period of about 10 days commencing July 8 during which time Mr. Quinn, the service engineer, would be accommodated on the platform.

Mr. Quinn had worked during the day of July 6 and had gone off duty at about 18 00 hours. He went to the accommodation module and was there when a fire started on the platform. Mr. Quinn was in no way responsible for the fire or in breach of any statutory or common law duty.

Mr. Quinn lost his life in the fire and claims were made on the plaintiffs by his estate and his dependents. These claims were settled by the plaintiffs for £642,627.68 and the plaintiffs claimed that sum from the defendants under the indemnity clause in the contract.

The plaintiffs admitted that a cause of the fire was the negligence of their own servants and that