PART 8                                    **The "Kitsa"**                                    [Q.B. (Com. Ct.)

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Jan. 25; Feb. 16, 2005

---

ACTION NAVIGATION INC.
*v.*
BOTTIGLIERE DI NAVIGAZIONE S.p.A.
(THE "KITSA")

[2005] EWHC 177 (Comm)

Before Mr. Justice AIKENS

**Charter-party (Time) — Vessel chartered by owners and then sub-chartered for time chartered trip — Discharge of cargo delayed and bottom of vessel became fouled — Whether owners had agreed to run risk of fouling — Whether vessel off-hire during time spent de-fouling hull — Whether arbitrators' decision correct in law — Arbitration Act, 1996, s. 69.**

The vessel, later renamed *Kitsa*, was chartered on an amended NYPE form for a period of four to six months, later extended to about seven to nine months. The trading limits were "always within Institute Warranty Limits", subject to certain exclusions. The charter-party also provided:

15. That in the event of loss of time from deficiency and/or default of men or deficiency of stores, fire, breakdown or damages to hull, machinery or equipment, included but not limited to strikes of Master, officers and crew, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all directly related extra expenses shall be deducted from the hire. . . .

54. Deviation/Put Back

Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, . . . or by reason of the refusal of the Master, officers or crew to do their duties, or any owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regain[s] a point of progress equivalent to that when the hire ceased hereunder. Bunkers consumed while the vessel is off-hire and all extra directly related expenses incurred during such period shall be for owners' account . . .

The charterers sub-chartered the vessel, also on an amended NYPE form. The sub-charterers then sub-sub

chartered the vessel for a time charter trip for the carriage of coal from South Korea to Visakhapatnam (Visak), India. The sub-sub charter-party was also on an amended NYPE form.

Discharge of the cargo at Visak was delayed, and the vessel remained at the port for over three weeks, during which time her hull became seriously fouled by barnacles. The owners subsequently undertook de-fouling work at Portland, Dorset (U.K.).

The owners claimed that the cost of de-fouling the vessel at Portland, which was approximately U.S.$180,000, should be paid for by the charterers. The owners relied on a right to an implied indemnity under the head charter-party. The owners also claimed that the charterers had wrongfully put the vessel off-hire for the period whilst the de-fouling work was being done at Portland.

The charterers denied that the costs of de-fouling were within the scope of any implied indemnity, and they maintained that the vessel was off-hire at Portland during the de-fouling work.

The disputes were referred to arbitration. The arbitrators made three separate awards; one in respect of each charter-party. In relation to the disputes under the head charter, the arbitrators rejected the owners' claim that the charterers should indemnify them for the cost of de-fouling the vessel at Portland, holding that, given the circumstances in which the fouling of the hull had occurred at Visak, the cost of de-fouling was not within the scope of the implied indemnity in the head charter. The arbitrators also rejected the owners' submission that hire was payable during the period that the de-fouling work was carried out at Portland. They concluded that, under the terms of the head charter, the vessel was off-hire during that time.

The owners appealed to the High Court under s. 69 of the Arbitration Act, 1996 on two questions of law, the issues for decision being (1) whether the owners could recover the cost of de-fouling under an implied indemnity, and (2) whether the vessel was off-hire at Portland within the meaning of cl. 15.

In relation to the first issue, the owners submitted that the fact that the parties had agreed that the vessel could trade anywhere within a very wide range of ports (within IWL) and could carry a variety of cargoes gave rise to the implication of a right to indemnity for losses and expenses that resulted from the utilization of that choice by the charterers. The charterers argued that the arbitrators did not err in law, given their findings of fact.

In relation to the second issue, the owners submitted that the arbitrators had erred in law in holding that the vessel was off-hire under cl. 15 of the charter-party. The charterers contended that the arbitrators had founded their decision on cl. 54 of the charter-party, and not cl. 15.

—— , *Held*, by Q.B. (Com. Ct.) (AIKENS, J.), that the appeal would be dismissed.

(1) The charterers were entitled to give an order as to employment of the vessel that involved her in going to Visak, a warm water port, to discharge her cargo of coal. The charterers did not commit any breach of contract ( see par. 22).

[2005] Vol. 1    LLOYD'S LAW REPORTS    433

Q.B. (Com. Ct.)] | The "Kitsa" | [AIKENS, J.

(2) The arbitrators had concluded that the risk of the vessel suffering hull-fouling by being inactive at a warm water port for 22 days as a result of a legitimate order of the charterers was foreseeable and foreseen by both sides at the time the charter-party was made, as were the risks that the vessel's performance would suffer as a result of hull fouling, and that if hull fouling occurred the owners would have to clean her hull as soon as they could (see par. 23).

(3) When a tribunal of fact had to decide whether particular expenses were within the scope of an implied indemnity under an NYPE charter-party, it was entitled to ask the question whether the relevant type of risk was one that the shipowners agreed to bear at the time the charter was concluded (see par. 25):

————The Island Archon, [1994] 2 Lloyd's Rep. 227 considered.

(4) In the present case the relevant type of risk was the risk that the vessel would suffer hull-fouling because the vessel was inactive at a warm water port for 22 days as a result of a legitimate order as to employment by the charterers, and the risk that the owners would suffer expense in hull-cleaning as a consequence. Since the arbitrators had concluded that that type of risk was one that was foreseeable and foreseen by both parties at the time the charter-party was concluded, they were entitled to conclude that the relevant type of risk was one that the owners agreed to accept at the time the charter-party was made (see par. 25).

(5) Moreover, the arbitrators found that the expenses of cleaning the hull-fouling were ordinary expenses of trading under the charter-party. Such expenses were not recoverable from the charterers under an implied indemnity notwithstanding that in a broad sense they were incurred in consequence of the lawful orders of the charterers (see pars. 26 to 28):

The Aquacharm, [1980] 2 Lloyd's Rep. 237 and The Island Archon, [1994] 2 Lloyd's Rep. 227 considered.

(6) Given the arbitrators' conclusions, the arbitrators were entitled, on the law, to hold that the owners' expenses of de-fouling were outside the scope of the implied indemnity provided by the charter-party (see par. 29).

(7) As to whether the vessel was off-hire at Portland, the arbitrators' finding was that the vessel was off-hire within the terms of cl. 54 of the charter-party, rather than cl. 15. Since leave to appeal had only been given on a point of law concerning cl. 15, the appeal on that issue had to fail (see pars. 42 and 45):

————The Rijn, [1981] 2 Lloyd's Rep. 267 considered.

The following cases were referred to in the judgment:

A/B Helsingfors Steamship Co. v. Rederiaktiebolaget Rex (The White Rose), [1969] 2 Lloyd's Rep. 52; [1969] 1 W.L.R. 1098;

Actis Co. Ltd. v. The Sanko Steamship Co. Ltd. (The Aquacharm), [1980] 2 Lloyd's Rep. 237

Newcastle P&I Association Ltd. v. Assurance Foreningen Gard Gjensidig, [1998] 2 Lloyd's Rep. 387;

Royal Greek Government v. Minister of Transport (The Ann Stathatos), (1950) 83 Ll. L. Rep. 228;

Santa Martha Baay Scheepvaart and Handelsmaatschappij N.V. v. Scanbulk A/S (The Rijn), [1981] 2 Lloyd's Rep. 267;

Triad Shipping Co. v. Stellar Chartering and Brokerage Inc. (The Island Archon), (C.A.) [1994] 2 Lloyd's Rep. 227.

This was an appeal on questions of law by Action Navigation Inc. owners of the vessel later renamed Kitsa from an arbitration award holding in favour of the charterers Bottigliere Di Navigazione S.p.A. (1) that the owners were not entitled to recover the costs of de-fouling the vessel's hull from the charterers, and (2) that the vessel was off-hire during the time spent de-fouling the vessel's hull.

Mr. James Turner (instructed by Messrs. Holman Fenwick & Willan) for the owners; Mr. Michael Nolan (instructed by Messrs. Davies Johnson and Co.) for the charterers.

The further facts are stated in the judgment of Mr. Justice Aikens.

Judgment was reserved.

Wednesday, Feb. 16, 2005

————————

JUDGMENT

Mr. Justice AIKENS:

Background

1. This is an appeal by shipowners from an arbitration award dated June 30, 2004. The appeal is brought with the permission of Mr. Justice Langley. The disputes arose out of a time charter-party dated Nov. 17, 1999 on an amended NYPE form ("the charter-party"). By that charter-party Action Navigation ("the owners") agreed to charter the gearless bulk carrier later renamed Kitsa, ("the

AIKENS, J.]                          The "Kitsa"                        [Q.B. (Com. Ct.)

vessel"), to Bottiglieri di Navigazione S.p.A. as charterers, ("the charterers"), for a period of four to six months. The charter period was later extended to about seven to nine months. The trading limits under the charter-party were "always within Institute Warranty Limits" (line 15), subject to the exclusion of the countries and other areas set out in cl. 88 of the charter-party.

2. On Mar. 2, 2000 the charterers sub-chartered the vessel to Kleimar N.V. ("the sub-charterers"). That sub-charter-party was on an amended NYPE form. The terms were identical to those of the charter-party apart from the provisions relating to the period of the charter and the hire. The sub-charterers then sub-sub chartered the vessel to Pan Ocean Shipping Co. Ltd., for a time charter trip for the carriage of coal from South Korea to Visakhapatnam ("Visak"), India. That charter-party, dated Mar. 20, 2000 ("the sub-sub charter-party") was also on an amended NYPE form.

3. Disputes also arose under the sub-charter-party and the sub-sub charter-party. Each of the three charter-parties provided for disputes to be referred to arbitration in London. All three parties had the good sense to appoint the same arbitrators to consider the disputes that arose out of the three charter-parties. The three arbitrators were Mr. George Lugg, Mr. Robert Gaisford and Mr. Ian Kinnell, Q.C., who was appointed by the first two arbitrators.

4. The claim of the owners against the charterers under the head-charter fell under two heads. The first was for a balance due on the final account at the end of the charter-party. This claim turned mostly on what hire was due. The second dispute concerned the owners' claim for the expenses incurred in consequence of bottom fouling which the vessel suffered when she was ordered to discharge her cargo at Visak, India. The vessel arrived there, laden, on May 4, 2000. Discharge of the cargo was delayed and so she remained at the port for over three weeks. The owners claimed that, whilst at Visak, the vessel's hull became seriously fouled by barnacles. The owners undertook de-fouling work at Portland, Dorset (U.K.), in November, 2000. They claimed that the cost of de-fouling the vessel at Portland, which was approximately U.S.$180,000, should be paid for by the charterers. The owners relied on a right to an "implied indemnity" under the charter-party. They said that they were entitled to be indemnified for the consequences of obeying the lawful order of the charterers that the vessel go to Visak. The owners also claimed that the charterers had wrongfully put the vessel off-hire for the period whilst the de-fouling work was being done at Portland. The owners therefore claimed unpaid hire in the sum of U.S.$47,811.00 for that period.

5. The charterers resisted these claims in the arbitration. They said that, given the circumstances in which the fouling had occurred, the costs of de-fouling were not within the scope of the "implied indemnity" under the charter-party. They also maintained that the vessel was off-hire during the de-fouling work. The charterers alleged that they had claims against the owners based on the under-performance of the vessel and other matters.

6. The arbitrators made three separate awards; one in respect of each charter-party. In relation to the charter-party disputes, the arbitrators rejected the owners' claim that the charterers should indemnify them for the cost of de-fouling the vessel at Portland. They held that, given the circumstances in which the fouling of the hull had occurred at Visak, the cost of de-fouling was not within the scope of the "implied indemnity" in the charter-party.

7. The arbitrators also rejected the owners' submission that hire was payable during the period that the de-fouling work was carried out. They concluded that, under the terms of the charter-party, the vessel was off-hire during this time.

8. The arbitrators gave one set of reasons for the three awards. Most unfortunately there was a gap of almost a year between the conclusion of the hearings before the arbitrators in July, 2003 and the publication of the awards and reasons to the parties on June 30, 2004. (I was told that during this time two of the arbitrators were seriously ill, although the main reason for the delay was pressure of work). I fear that this gap has led to the reasons being less well structured than would normally be the case from three such experienced arbitrators. This has meant that the arbitrators' reasons are, with respect, sometimes less clear than they would normally be, although never sufficiently opaque as to require that the award and reasons be remitted for clarification.

*The two points of law on which leave to appeal was given*

9. Mr. Justice Langley gave the owners leave to appeal on the following two points of law, which are set out in par. 1 of the owners' application for leave to appeal dated July 26, 2004:

(a) whether a time charter-party permitting the vessel to be traded within Institute Warranty Limits necessarily carries with it an assumption by the shipowner of all risks ordinarily incident at each port within those limits, such that the implied indemnity against the consequences of obeying charterers' lawful orders does not extend to the materialisation of risks peculiar to the particular port or class of ports, [and]

(b) whether time spent removing marine growth which had attached itself to the hull of the vessel in the course of service under the relevant charter-party amounted to time lost within the meaning of cl. 15 of the charter-party.

10. One of the submissions of Mr. Michael Nolan (for the charterers) before me was that these questions of law do not arise given the terms of the award and reasons of the arbitrators. He submitted that the appeal must therefore fail at the outset. I will have to consider this argument in due course.

*The terms of the charter-party*

11. The arbitrators stated in par. 12 of their reasons that a copy of each of the three charter-parties should be deemed annexed to the reasons. Not all the relevant terms of the charter-party are set out in the reasons, (in particular lines 14–15 of the preamble and cll. 8 and 88). But, in the light of par. 12 of the reasons, counsel at the hearing before me agreed that I was entitled to look at the charter-party and consider all its terms for the purposes of the appeal.

12. The following clauses of the charter-party are relevant to this appeal:

(1) Preamble lines 1–12, 13–15 and 21–22:

This charter-party, made between . . . owners of the good . . . Motorship "LA ENSENADA" *to be renamed "KITSA"* . . . with hull, machinery and equipment in a thoroughly efficient state, . . . and capable of steaming, ~~fully laden~~ under good weather conditions ~~about~~ (see specification) . . . and . . . charterers . . .

. . . the said owners agree to let, and the said charterers agree to hire the said vessel, from the time of delivery, for a time-charter period of minimum four months to about six months . . . always via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits . . . within below mentioned trading limits . . .

. . . Vessel on her delivery *or on her arrival at the first load port* to be ready to receive *in all respects any permissible charterers' intended cargo* . . . and tight staunch, strong and in every way fitted for the *intended cargoes.* ~~service.~~ . . .

(2) Clause 1:

1. That the owners shall . . . keep the vessel in a thoroughly efficient state in hull, machinery and equipment . . . for and during the service.

(3) Clause 4:

4. . . . hire to continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the owners . . . .

(4) Clause 8:

That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and *equipment* boats. The Captain (although appointed by the owners) shall be under the orders and directions of the charterers as regards employment and agency; and charterers are to load, stow, *secure and discharge* ~~and trim~~ the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

(5) Clause 15:

15. That in the event of loss of time from deficiency *and/or default* of men or *deficiency of stores,* fire, breakdown or damages to hull, machinery or equipment, *included but not limited to strikes of Master, officers and crew,* grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all *directly related* extra expenses shall be deducted from the hire . . . .

[Note: In the preceding quotations, words or passages in italics represent amendments or additions to the printed form. The following provisions were additional to those based upon the printed form.]

(6) Clause 54.

Deviation/Put Back

Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, . . . or by reason of the refusal of the Master, officers or crew to do their duties, or any owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regain[s] a point of progress equivalent to that when the hire ceased hereunder. Bunkers consumed while the vessel is off-hire and all extra directly related expenses incurred during such period shall be for owners' account . . . .

(7) Clause 69

Vessel's Description

. . .

About 13 knots on about 49 metric tons Intermediate Fuel Oil plus about 2 metric tons Marine Diesel Oil basis average laden/ballast.

In port consumption 2 metric tons Intermediate Fuel Oil plus 2 metric tons Marine Diesel Oil.

Vessel uses Marine Diesel Oil whilst maneuvering in confined/narrow water.

. . .

All details "about".

(8) Clause 88: "Country Exclusions". *A long list of excluded countries and certain areas is there set out.*

(9) Addendum No. 1 to the charter-party:

Delivery to be in direct continuation from the maximum period under Charter Party dated Nov. 17, 1999 which is 10 00 hours G.M.T. June 16, 2000.

. . .

All the terms, conditions and exceptions of the above mentioned Charter Party dated Nov. 17, 1999 to remain unchanged and in full force and effect.

*The first issue: can the owners recover the cost of de-fouling under the "implied indemnity"?*

*The arbitrators' findings of fact and conclusions*

13. In relation to the claim to recover the cost of de-fouling under an "implied indemnity" pursuant to the charter-party, the arbitrators made the following findings of fact:

(1) Hull, or bottom, fouling is well-known as a possible, likely or even virtually certain consequence of a vessel's more or less prolonged inactivity in the warmer waters of the world. Severe fouling may considerably affect the performance of the vessel in terms of both speed and consumption (par. 27 of the award).

(2) The vessel arrived at Visak, laden with cargo, on May 4, 2000 (par. 50). The order to proceed to Visak and discharge there was a legitimate order under the charter-party (par. 50). No instruction was given to the vessel by the charterers (or any others in the charter-party chain) otherwise than to perform that legitimate service (par. 31).

(3) The vessel remained at Visak for 22 days or so. That was longer than might, in ideal circumstances, have been expected (par. 30). Significant fouling affected the vessel whilst she was at Visak (par. 62). The extent of the fouling disclosed by the underwater inspection of the vessel at Portland, on November, 2000, would materially have affected the performance of the vessel and would require attention (par. 63).

(4) If the vessel had remained at Visak for a shorter time than 22 days or so, then little or no significant fouling would have taken place (par. 30).

(5) Neither the charterers nor those "below" them in the charter-party chain sought to delay the vessel from the performance of her most obvious commercial purpose in calling at Visak, i.e. to discharge the cargo and then depart. The vessel was kept waiting to discharge at Visak, but that was only because of operational considerations at the port and not for any other reason. Because the vessel was gearless, she was in the hands of the shore as to the rate and manner of her discharge (par. 31).

(6) The cause of such fouling as did take place at Visak was "merely the natural consequence of the vessel's remaining at the port in question for the period that she did in fact remain there". It was not as a result of any breach of the charter by the charterers (or the sub or sub-sub charterers) (par. 33).

14. The arbitrators' conclusions on this issue are set out in pars. 29, 30, 31 and 32 of the award. Mr. Turner, for the owners, criticized those reasons in argument before me. I therefore set out the material parts:

(1) 29. It seems to us that the owners are not at all well placed in the circumstances of the present case when seeking to recover any loss or expense to which they were put as a result of any fouling at Visak (or elsewhere) by relying upon such indemnity as they may have been entitled to under the charter-party. Unlike some other forms, the NYPE form contains no express indemnity in the owner's favour in respect of the consequences of compliance with the charterer's orders, and none was in the present case added to the printed form. It is, however, accepted that, in appropriate circumstances, the owner may be entitled to rely upon an implied indemnity to a similar effect. The extent of the availability of such an indemnity has often been the subject of debate, but not the subject of any very clear definition which has gained universal acceptance . . . . Even when the charterer's order was beyond any shadow of a doubt, a legitimate order with which the owner was bound to comply, the indemnity may be granted, not merely in respect of liabilities incurred, but also in respect of loss or damage caused, in such cases, however, much may turn upon the facts of the particular case, upon the terms of the particular charter-party, and, in the light of these, upon what risks it appears each party has agreed to bear.

(2) 30. In the present case, the charterer's order to proceed to Visak for discharge was

without doubt, a legitimate order, and the question that we have, therefore, asked ourselves is whether, nonetheless, the charterers had accepted responsibility for the consequences of any fouling that may have taken place at that port. There was some evidence that the vessel *might* have been discharged far more rapidly than she was, and allowing for little, or limited, waiting time, *might* have been in and out of the port within much less time than the 22 or so days that she in fact spent there. Had that been the case, the expert evidence (to which, of course, we will have to refer in some greater detail a little later on) informed us that little or no significant fouling would have been likely to have taken place. But we were wholly unpersuaded that the mere fact that the vessel actually spent rather longer at Visak that might in ideal circumstances, have been expected demonstrated that the charterers had accepted the risk of liability towards the owners in respect of the consequences of fouling while the vessel remained there. Still less would we accept that this had been the case in respect of any later port of call.

(3) 31. Neither the charterers nor those below them in the contractual chain sought to delay the vessel from the performance of her most obvious commercial purpose in calling at Visak, namely to discharge her cargo, and then to depart. We can imagine circumstances in which — entirely legitimately as a matter of contract — a vessel may be held up at a port of discharge while for example, disputes are settled between charterers and receivers which have nothing whatsoever to do with the owner, and in such circumstances it might well be the appropriate conclusion that any resultant loss to the owner had flowed not from any risk that he had accepted, but from his compliance with the charterer's instruction. And we could, we are sure, multiply examples falling on one side of the line or upon the other, including those in which the conclusion may depend upon matters such as the notoriety of the risk: compare *The Island Archon*, [1994] 2 Lloyd's Rep. 227. The present is, in our judgment, a rather more simple case, and it is one upon which our collective experience, and assessment of the available evidence, has led us to a conclusion as to the correctness of which we have no doubt. Putting the matter quite shortly, "(i) for the vessel to discharge at Visak was, if we may so put it, an entirely ordinary consequence of her chartered service, (ii) no instruction was given to the vessel otherwise than to perform that service, (iii) no suggestion has been made (and we have seen nothing to suggest) that the vessel was kept waiting to discharge at Visak otherwise

than because of operational considerations at the port, and (iv) the vessel was gearless, and accordingly in the hands of the shore as to the rate and manner of her discharge.

(4) 32. Putting the matter not merely shortly, but also bluntly, we regard as wholly unrealistic any suggestion that the time actually spent by the vessel at Visak went beyond any reasonable expectation on the part of an owner of a vessel similar to *Kitsa* as to how long his vessel *might* be required to spend there in the course of entirely ordinary employment to the sub-continent. In our view, the risk of fouling as a result of that employment was *not* a risk that the owners in the present case "cannot be taken to have accepted" (*The Island Archon*, above, at p. 238). In our judgment, no claim could possibly succeed on the facts of the present case.

### The first issue: the arguments of the parties on the appeal

15. Before me it was common ground that, in general terms, there should be implied into the terms of this charter-party a provision that requires the charterers to indemnify the shipowner against the consequences of complying with a charterer's order as to the employment of the vessel. It was agreed that this implied right to an indemnity, or "implied indemnity" as it is often called, arises in this case by virtue of the express terms of cl. 8 of the NYPE form and the wide trading limits within which the vessel can be employed under this charter-party. It is to be implied either as being both reasonable and necessary for the business efficacy of the charter-party or as a matter of law.[1] The argument before me concerned the scope of this implied right to an indemnity. Both parties agreed that the scope must be determined as a matter of construction of the charter-party, to be considered at the time it was concluded and taking account of the factual background against which the charter-party was agreed by the shipowners and charterers. The parties also agreed that the issue of whether there was a right to an indemnity in this case must depend on the particular facts as found by the arbitrators in their reasons. In this regard counsel agreed that there must be a direct causal link between the order given and the loss or expense suffered for which the owner claims an indemnity.[*]

[1] There was no dispute about the precise juridical basis for the implied indemnity. In the Court of Appeal decision in *Triad Shipping Co. v Stellar Chartering and Brokerage Inc. The "Island Archon"*, [1994] 2 Lloyd's Rep. 227, Evans, L.J. held that the right to an indemnity was to be implied on both bases: see p. 237. Neale, L.J. concurred with Evans, L.J. but gave a separate judgment as did Morritt, L.J. agreed with both judgments. See *Whistler International Ltd. v Kawasaki Kisen Kaisha Ltd. The "Hill Harmony"*, [2001] 1 L.L.R. Rep. 147 at 155, per Lord Hobhouse, citing the A.B. Marintrans *Shipowners Co. v Bank of America National Trust*, "The *Mata K*", [1998] 2 W.L.R. 1135.

16. Mr. Turner, who appeared for the appellant shipowners on the appeal (but who had not appeared in the arbitration), submitted that when the arbitrators considered the question of whether the owners were entitled to recover the cost of de-fouling under the "implied indemnity", they did not ask the correct questions. The correct questions should have been: first, on the true construction of the charter-party, was it agreed between the parties that the charterers would indemnify the owners for an expense of this type if it resulted directly from an order of the charterers as to the employment of the vessel? Secondly, was the cost of de-fouling directly caused by the orders of the charterers (through the sub-sub charterers) to send the vessel to Visak and discharge her cargo there? Mr. Turner submitted that the order to send the vessel to Visak must be one as to the employment of the vessel. He also maintained that the arbitrators had found, as a fact,[3] that the fouling had been caused by the vessel remaining at Visak for 22 days.

17. Mr. Turner submitted that the tribunal had erred in its reasoning in two principal respects. First, he said that they appeared to attempt to construe the charter-party by reference to the actual use of the vessel during its term, i.e. being ordered to Visak and also by what happened there. He said that this was clear from the phraseology used in pars. 29 to 32 of the reasons. Secondly, Mr. Turner said that the arbitrators appeared to consider the right to an indemnity by reference to the vessel's particular employment which led to the fouling at Visak, which the arbitrators characterized (in par. 32 of the reasons) as "entirely ordinary employment to the sub-continent". Mr. Turner submitted that the arbitrators had wrongly concluded that because such employment (which was within Institute Warranty Limits — "IWL") was permitted under the charter-party, therefore the owners had agreed to accept the risks (falling short of danger) ordinarily incident at the ports of the sub-continent, including fouling of the hull and the costs of removing it.

18. Mr. Turner submitted that the fact that the parties to the charter had agreed that the vessel could trade anywhere within a very wide range of ports (within IWL) and could carry a variety of cargoes[4] meant that the charterers had a very wide freedom of choice in how to employ the vessel. This very freedom of choice gave rise to the implication of a right to indemnity for losses and expenses that resulted from the utilization of that choice by the charterers.[5] He submitted that it is well-established that the right to an indemnity was not dependent upon proof of a breach of contract by the charterers;[6] nor is the right necessarily excluded in cases where the loss or expense resulted from a particular risk that was notorious.

19. Mr. Nolan, for the charterers, submitted that the first question of law on which leave to appeal was given is not one that arises out of this award. The point, as phrased in par. 1(a) of the application notice that sought leave to appeal from the award, (set out at par. 9 above), was not the basis of the argument in the arbitration and the arbitrators did not expressly or impliedly rule on it. The arbitrators correctly applied the law to the facts as they found them and so the appeal on the first point of law must be dismissed.

20. Further, he submitted, if the Court considers the issue more broadly, as opposed to the point of law on which leave has been granted, the arbitrators did not err in law, given their findings of fact. Mr. Nolan submitted that there are three key findings of fact by the tribunal. First, that it is well known that hull fouling "is a possible, likely, or even virtually inevitable consequence" of a vessel's "more or less prolonged inactivity in the warmer waters of the world".[7] Secondly, that the hull fouling occurred at Visak because the vessel was kept alongside there for 22 days or more.[8] Thirdly, that the vessel remained there not because of anything that the charterers did (or failed to do), but because of operational considerations at the port. And, because the vessel was gearless, she was in the hands of the shore as to the rate and manner of her discharge.[9]

21. Mr. Nolan submitted that the question of law that the arbitrators had to answer was: on the true construction of the charter-party and those facts as found, did the charterers agree, impliedly, to indemnify the owners for the loss or expense of hull cleaning which was a consequence of ordering the vessel (legitimately) to discharge her coal cargo at Visak? Or, to put it conversely, had the owners impliedly agreed to bear the risk of loss or expense of cleaning the hull fouling that resulted from such an order. Mr. Nolan accepted that the order to go to and discharge at Visak was an order as to the "employment" of the vessel. But he submitted that the arbitrators' conclusion, in par. 32 of the award, that "the risk of fouling as a result of that employment was *not* a risk that the owners in the present case cannot be taken to have accepted", was one

---

[3] Mr. Turner relied in particular on the statement of Devlin, J. in *Royal Greek Government v. Minister of Transport (The "Ann Stathatos")*, (1948) 81 Ll.L.Rep. 355 at 359, and that of Colman, J. in *Newcastle P&I Association v. Assurance Foreningen Gard Gjensidig*, [1998] 2 Lloyd's Rep. 387 at 393-394.

[4] IWL, *Ann Stathatos case*, at 243, per Evans, L.J.

[5] Par. 14.

[6] Par. 32 of award.

[7] Par. 32.

that they were entitled to reach on the facts and cannot be characterized as an error of law. Therefore the arbitrators did not err in law in concluding that the owners were not entitled to be indemnified for the cost of de-fouling at Portland.

### Discussion and conclusion on the Implied Indemnity point

22. Both parties agreed that, on the facts of this case, the charterers were entitled to give an order as to employment of the vessel that involved her in going to Visak, a warm water port, to discharge her cargo of coal. The arbitrators held[10] and it has been agreed on this appeal that the charterers did not commit any breach of contract at any material stage. It is plain that, in the broadest sense, the hull fouling was a consequence of the order to go to Visak and that the owners had to clean the vessel's hull because her performance had declined as a result of the hull fouling. But it is also clear from the arbitrators' findings of fact that although the vessel might have been discharged in less than the 22 days or so she was at Visak,[11] the amount of time actually spent did not exceed "any reasonable expectation on the part of an owner of a vessel similar to *Kitsa* as to how long his vessel *might* be required to spend there in the course of entirely ordinary employment to the sub-continent".[12] Although Mr. Turner criticized the wording of that finding of fact, it is, in my view, unexceptional. The arbitrators were pointing out that the vessel was, in fact, ordered to the sub-continent and they were finding that the time the vessel spent at Visak was within the reasonable expectations of owners of vessels like *Kitsa*. I do not accept that the wording of the reasons shows that the arbitrators had forgotten that the charter-party permitted the charterers to trade the vessel very widely — within IWL for the carriage of a variety of cargoes.

23. On my reading of the arbitrators' reasons, the arbitrators concluded that the *risk* of the vessel suffering hull fouling by being inactive at a warm water port for 22 days as a result of a legitimate order of the charterers as to the employment of the vessel was something that was foreseeable and foreseen by both sides at the time the charter party was made. Further, as I read the arbitrators' reasons, the *risk* that the vessel's performance would suffer as a result of hull fouling and that if that happened this could mean that the owners would have to clean her hull as soon as they could, were also foreseeable and foreseen by both parties at the time the charter-party was concluded. Those further conclusions of fact and law can be derived from the

arbitrators' reasons at pars. 27–33, 36, 37, 62, 64 and 65. All these conclusions were not and could not be challenged before me.

24. I accept Mr. Turner's submission that just because a particular risk of loss or expense is foreseen or foreseeable at the time a charter-party is made, that is not conclusive to determine whether that loss or expense is within the scope of an implied indemnity. But it is clear from the judgments of both Lord Justice Evans and Nicholls, V.-C, in *The Island Archon*[13] that if, at the time that the charter-party is concluded, the occurrence and type of loss or expense to the shipowner flowing from the order as to employment of the vessel were *unforeseen*, then that will be a potent factor in deciding that the loss or expense will fall within the scope of the implied indemnity: particularly when the order was lawful.[14]

25. It is also apparent from the decision of the Court of Appeal in *The Island Archon* that when a tribunal of fact has to decide whether particular expenses are within the scope of an implied indemnity under an NYPE charter-party, it is entitled, as a matter of law, to ask the question: was this type of risk one that the shipowners agreed to bear, at the time the charter was concluded: see p. 236. In the present case "this type of risk" means the risk that the vessel will suffer hull-fouling because the vessel was inactive at a warm water port for 22 days as a result of a legitimate order as to employment by the charterers and the risk that the owners will suffer expense in hull-cleaning as a consequence. If, as I find, the arbitrators have concluded that "this type of risk" was one that was foreseeable and foreseen by both parties at the time the charter-party was concluded, then, given the approach of the Court of Appeal in *The Island Archon*, the arbitrators were entitled to conclude that "this type of risk" was one that the owners agreed to accept at the time the charter party was made. That is, essentially, a finding of mixed fact and law. It is precisely the conclusion that the arbitrators did reach in par. 82 of their award.

26. Moreover, taking the arbitrators' findings in their reasons as a whole, with particular reference to pars. 27 to 33, I conclude that the arbitrators found that the expenses of cleaning the hull-fouling were ordinary expenses of trading under this charter party and that the parties (at the time the charter-party was made) would have so regarded this type of expense. Moreover, as I read their reasons, the arbitrators concluded that de-fouling had to be carried out by the owners because of their obligation to keep the vessel in a thoroughly efficient state throughout her service.[15]

10 Par. 37.
11 Par. 33.
12 As found in par. 33 of the arbitrators' reasons.

13 See now sub-nom *Hyundai v I Laemsi*.
14 See in particular the statements of Evans, LJ and Nicholls V-C, as set out above.
15 This is the effect of cl. 1 of the charter-party.

27. In *Actis Co. Ltd. v. The Sanko Steamship Co. Ltd.* (The *"Aquacharm"*), [1980] 2 Lloyd's Rep. 237 at 244–245, Mr. Justice Lloyd had held that the costs of transhipment, so as to reduce the draft of the vessel during her transit of the Panama canal, could not be recovered by shipowners from charterers under an implied indemnity pursuant to an NYPE form of charter. Mr. Justice Lloyd said that those costs were "an ordinary expense incurred in the course of navigation". Subsequently, in the well-known text book, Wilford on Time Charters (3rd ed., 1989), the authors stated the proposition, based on Mr. Justice Lloyd's statement, that:

> . . . the owners are not entitled to recover from the charterers under their indemnity the ordinary expenses and losses of trading, despite the fact that in a broad sense these are incurred as a result of their obedience to the orders of the charterers.[16]

28. In *The Island Archon* Lord Justice Evans concluded that the statement of Mr. Justice Lloyd in *The Aquacharm* and that in "Wilford" demonstrated that even if, "in a broad sense", a loss by shipowners was a consequence of a lawful order of the charterers, if the loss (or expense) had arisen from a risk that the shipowner has agreed to run, then there is no right to an indemnity.[1] That conclusion can be analysed in terms of causation, by regarding the loss or expense as being not *directly* caused by the order as to employment of the vessel. Alternatively it can be analysed as a conclusion on what risks the parties agreed that the shipowner would bear.

29. Whichever approach is adopted, given the arbitrators' conclusions as I read them, the arbitrators were entitled, on the law, to hold that the owners' expenses of de-fouling were outside the scope of the implied indemnity or wider by the charter-party.

30. Therefore I do not need to decide whether, strictly speaking, the point of law for which the owners were given leave to appeal arises on the reasons given by the arbitrators. I can understand why the point of law was framed by the terms set out in the arbitration application, because that formulation makes it look like a short point of law that is of general public importance in the shipping world. However, in my view those who apply for leave to appeal from an arbitration award must try to assess to analyse and identify with precision the particular point of law that arises on the facts of the case. Here the point of law could have been expressed simply as: "whether on the facts found and on the true construction of the charter-party . . .

[ illegible footnote text ]

dated Nov. 17, 1999, the owners were entitled to be indemnified by the charterers for the cost and expenses incurred in relation to de-fouling the hull of the vessel at Portland, in November, 2000". If the point of law had been put in those terms, I doubt whether leave to appeal on the issue would have been given.

*The second issue: was the vessel off-hire at Portland?*

31. The second point of law on which leave to appeal was given (set out at par. 9 above) relates to the application of cl. 15 of the charter-party, commonly called the "off-hire" clause. In the arbitration the owners had contended that the charterers were not entitled to put the vessel off-hire whilst the de-fouling work was carried out at Portland. The arbitrators rejected that submission at pars. 65 and 73 of the reasons.

32. The arbitrators stated as follows:

> (1) A substantial part of the hull was in fact cleaned while the vessel was at Portland, resulting in improved performance. As we have previously made clear, the owners were not entitled to require the charterers to pay the costs of cleaning, and whilst it was being undertaken the vessel was off-hire (par. 65).

> (2) 73. So far as the call at Portland is concerned, we have stated, in par. 65, above, that the vessel was off hire during the period spent cleaning there, and in so far as the call at Portland was for the owners' purposes (in order that they might comply with their obligation to maintain any time lost in going there, as well as additional fuel consumed, is for the owners' account. The revised figures . . . [give] a total to be allowed in the charterers' favour of US\$47,511.

33. There is no mention of cl. 15 of the charter-party in either passage, nor indeed in any earlier passage in the reasons, except in par. 20. There the arbitrators say that [the] "will have to take account of its [sic: cl. 15's] provisions in due course". But, in fact they do not expressly do so later in the award. Nor is there any reference to cl. 54.0 which is headed "Deviation/Dry Dock" and which provides that the vessel will be off-hire "if on the time of inefficiency . . ." if the vessel "deviates from the course of the voyage caused by . . . any owners' matters" until the vessel is "again efficient" and, broadly, is in the same position as she had been or in an equivalent position.

34. So the somewhat laconic remarks in pars. 65 and 73 are the sole total of the arbitrators' reasons for holding that the vessel was off-hire at Portland.

At no point in the reasons do the arbitrators expressly state whether they had decided that the vessel was off-hire under cl. 15 or cl. 54 of the charter-party.

35. Mr. Nolan submitted that the reference to "owners' purposes" in par. 73 of the reasons makes it tolerably clear that the arbitrators were founding their decision on cl. 54 of the charter-party. He said that the minor verbal difference between "owners' purposes" and "owners' matters" is insignificant.

36. Mr. Turner submitted that there are five pointers which together lead to the conclusion that the arbitrators were holding that the vessel was off-hire under cl. 15, not cl. 54. First, he submitted that the use of the words "in so far as" in par. 73 suggested that the tribunal were referring to a "net loss of time" off-hire clause (i.e. cl. 15), rather than a "period" off-hire clause (i.e. cl. 54). But just before those words in par. 73, the arbitrators had written "the vessel was off hire during the period spent cleaning there". Those words suggest a reference to a "period" clause.

37. Secondly, Mr. Turner notes that the arbitrators use the phrase "owners' purposes" and not "owners' matters". He submits that this is significant. I regard the use of the different word as insignificant. Of more importance is the fact that there is no expression like "owners' matters" or "owners' purposes" in cl. 15 at all. Therefore the use of this wording points, if anything, to an intention to refer to cl. 54, not cl. 15.

38. Next, Mr. Turner points to the fact that there is no reference in par. 73 to the vessel "deviat[ing] from the course of the voyage", which might have been expected if the arbitrators were concluding that the vessel was off hire by virtue of cl. 54. Mr. Turner is correct as to the lack of those words in that paragraph. But it is clear from other passages in the reasons that the principal reason that the vessel went to Portland was so that de-fouling work could be done, rather than for the charterers' trading purposes. The arbitrators had previously concluded that the owners were obliged to do the cleaning in order to fulfil their obligation to maintain the vessel in a thoroughly efficient state under cl. 1 of the charter-party. If the vessel had gone to Portland for "owners' matters" then that would bring the case within cl. 54, provided that the charterers could show that the vessel suffered a period of "inefficiency".

39. Fourthly, Mr. Turner notes that at par. 20 of the reasons, the arbitrators refer to cl. 15 of the charter-party and comment that they will have to return to that clause "in due course". Although there is no further reference to cl. 15, he submits that the "due course" must refer to the two paragraphs later on in the reasons that deal with off-hire, i.e. pars. 65 and 73. However, I note that in par. 72 of the reasons, the arbitrators had said that the vessel was off-hire during a stoppage that was attributable to breakdowns of the main engine, which would come within the words "breakdown to machinery" within cl. 15 of the charter-party. So the proleptic remark in par. 20 may refer equally to par. 72.

40. Lastly, Mr. Turner points out that although there is no reference to cl. 15 in the reasons apart from par. 20, neither is there a reference to cl. 54, other than at par. 14, where it is set out. That fact, although true, does not seem to me to advance the argument much.

41. It is unfortunate that the arbitrators did not state expressly which clause they intended to refer to when they held that the vessel was off-hire during the de-fouling at Portland. Neither side asked for the reasons to be remitted for further clarification, doubtless because that would be tantamount to playing Russian roulette on this point.

42. I have concluded that the arbitrators made a finding that the vessel was off-hire within the terms of cl. 54 of the charter-party. My reasons for this conclusion are, first: the arbitrators concluded that the call at Portland was for "owners' purposes". This is a reflection of the wording in cl. 54. There is no equivalent in cl. 15. Secondly, if the arbitrators had intended to refer to cl. 15 then I would have expected them to make a finding of fact as to the loss of time actually suffered as a result of the call at Portland, but there is nothing in the reasons to that effect.

43. Thirdly, if the arbitrators had intended to refer to cl. 15 then their ruling would have been contrary to the decision of Mr. Justice Mustill (as he then was) in *Santa Martha Baay Scheepvaart and Handelsmaatschappij N.V. v. Scanbulk A/S* (The "*Rijn*"), [1981] 2 Lloyd's Rep. 267 at 271–272. In that case Mr. Justice Mustill had to deal with an argument raised on an appeal from arbitrators by way of Special Case. In that the charterers could rely on cl. 15 of the NYPE form[a] to reduce the hire payable because the vessel lost time as a result of hull fouling caused by marine growth. Mr. Justice Mustill concluded that the arbitrators had found that the charterers had ordered the vessel to Lorenco Marques where she had been delayed for three months; that the marine growth was the natural consequence of the vessel remaining in service; and that the claim to put the vessel off-hire related to the

time spent in hull-cleaning at Cape Town and time lost on the subsequent voyage from Cape Town to Baltimore. Mr. Justice Mustill held that, (i) in the absence of a finding to the contrary, the hull-fouling by marine growth was not fortuitous; (ii) on the true construction of cl. 15, non-fortuitous marine growth did not fall within the phrase in the first half of cl. 15, that is " . . . any other cause preventing the full working of the vessel"; (iii) non-fortuitous marine growth was not a "defect in hull", and so did not fall within the wording of the second half of cl. 15; therefore (iv) neither the time spent hull-cleaning at Cape Town, nor any subsequent loss in time during the voyage to Baltimore (because of a reduction in speed) fell within the wording of cl. 15.

44. If the arbitrators had intended to hold in this case that the vessel was off-hire under the terms of cl. 15 of the charter-party, they would have had to distinguish Mr. Justice Mustill's decision in *The Rijn*. Two of the arbitrators are very experienced

shipping lawyers. I am sure that they would have been aware of Mr. Justice Mustill's decision and would not simply have ignored it. Therefore I conclude that the arbitrators were not focusing on cl. 15 at all, but decided the off-hire issue on the basis of cl. 54.

45. Mr. Turner accepted that if the arbitrators' decision was not based on cl. 15, then he could not challenge the award and reasons on this issue, because leave to appeal was only given on a point of law concerning cl. 15. Accordingly this part of the appeal must fail.

*Conclusions*

46. The appeal of the owners on both points of law must therefore be dismissed. I am grateful to both counsel for their interesting and concise submissions.